1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3              WESTERN DIVISION

4                  - - -

5    HONORABLE FERNANDO M. OLGUIN, DISTRICT JUDGE PRESIDING

6

7    UNITED STATES OF AMERICA,        )
                                      )
8              Plaintiffs,            )
                                      )
9                                     )
                                      )
10        vs.                         ) No. CR 23-0031-FMO-1
                                      )
11                                    )
                                      )
12   FRANZ GREY,                      )
                                      )
13             Defendant.             )
     ─────────────────────────────── )

14

15

        REPORTER'S TRANSCRIPT OF COURT PROCEEDINGS
16
     *EVIDENTIARY HEARING ON DEFENDANT'S MOTION TO SUPPRESS*
17              *EVIDENCE and STATEMENTS [54]*

18              LOS ANGELES, CALIFORNIA

19          WEDNESDAY, DECEMBER 6, 2023

20   ────────────────────────────────────────────────────

                   MARIA R. BUSTILLOS
21              OFFICIAL COURT REPORTER
                    C.S.R. 12254
22              UNITED STATES COURTHOUSE
                   350 WEST 1ST STREET
23                    SUITE 4455
              LOS ANGELES, CALIFORNIA 90012
24                  (213) 894-2739
                  MADAMREPORTER.COM
25

1                    **A P P E A R A N C E S**

2

3

4       **ON BEHALF OF THE PLAINTIFFS,**
        **UNITED STATES OF AMERICA:**        OFFICE OF THE UNITED STATES
5                                            ATTORNEY
                                             BY:  ALIX McKENNA, ESQ.
6                                            312 NORTH SPRING STREET
                                             SUITE 1200
7                                            LOS ANGELES, CA 90012
                                             (213)894-500-9350
8

9                                            OFFICE OF THE UNITED STATES
                                             ATTORNEY
10                                           BY:  THOMAS J. MAGANA, ESQ.
                                             312 NORTH SPRING STREET
11                                           12TH FLOOR
                                             LOS ANGELES, CA 90012
12                                           (213)894-1344

13

14      **ON BEHALF OF THE DEFENDANTS,**
        **FRANZ GREY:**                      OFFICE OF THE FEDERAL PUBLIC
15                                           DEFENDER
                                             BY:  CHARLES J. SNYDER, ESQ.
16                                           321 EAST 2ND STREET
                                             LOS ANGELES, CA 90012
17                                           (213)894-4407

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1                            **I N D E X**

2
                                                        <u>PAGE</u>
3    DEFENSE'S CASE........................          6

4
     <u>DEFENSE'S WITNESSES:   DIRECT   CROSS   REDIRECT   RECROSS</u>
5
     **FRANCISCO, CLINT**          --    --                    --
6    BY CHARLES SNYDER         13   131        --             --
     BY THOMAS MAGANA          --    --        106            --
7    (FURTHER)                                 141            --
     **GREY, FRANZ**                --    --        --             --
8    BY THOMAS MAGANA          152   --        --             --
     BY CHARLES SNYDER         --   159        --             --

9

10

11

12

13
                              - - -
14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>E X H I B I T S</u>

2

         DEFENSE'S                          RECEIVED        MARKED
3
              12                               --              74
4             10                               --              76
              4                                --              76
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1          LOS ANGELES, CALIFORNIA; TUESDAY, APRIL 10, 2012

 2                            -o0o-

 3               (COURT IN SESSION AT 9:10 A.M.)

 4          THE COURTROOM DEPUTY:  Calling item number

 5     four, CR 23-00031-FMO:  United States of America v.

 6     Franz Grey.

 7          Will counsel please make their appearances.

 8          MR. MAGANA:  Good afternoon, Your Honor.

 9     Thomas Magana for the United States.  I'm joined at

10     counsel table by AUSA Cox McKenna.

11          THE COURT:  Good afternoon.

12          MR. SNYDER:  And good afternoon, Your Honor.

13     Charles Snyder on behalf of Franz Grey, who is present

14     and currently in custody.

15          THE COURT:  Okay.  So we're here for an

16     evidentiary hearing on defendant's motion to suppress.

17          Mr. Snyder, do you want to get started?

18          MR. SNYDER:  Yes, Your Honor.  And although

19     it's our motion, it's the Government's burden.  We would

20     ask that the deputy go first.  But of course, whatever

21     order the court wants to go in.

22          THE COURT:  That's fine.  Why don't we have the

23     deputy go first --

24          MS. MCKENNA:  Your Honor --

25          THE COURT:  -- it'll take the longest anyway.
```

1          MS. MCKENNA:  Prior to the deputy taking the

2    stand, may we quickly address a brief issue?

3          THE COURT:  Sure.

4          MS. MCKENNA:  We've turned over, in an

5    abundance of caution, an item related to the deputy's

6    personnel file from 2019.  It was -- it's not anything

7    that we believe is relevant in any way.  Again, it was

8    an item in which the finding was that the actions of the

9    involved parties appeared to be reasonable.

10         Essentially, the officer saw that there was a

11   warrant for a person attached to a trailer and briefly

12   went in to see that individual was in the trailer.  And

13   the individuals who were in the trailer were briefly

14   handcuffed, in part, because he said -- state one of

15   them had a knife on him.  And ultimately, the only

16   reason that we turned it over is because there was an

17   opinion that the reason for handcuffing that person and

18   the reason for placing him in the backseat should have

19   been documented.

20         However, again, the actual finding was that the

21   actions of the officers was reasonable.  The -- the --

22   it's the Government's position that this incident from

23   four years ago, of which the officer essentially has no

24   recollection, has no relevance whatsoever to any of the

25   issues at hand.  And, of course, it was established case

 1    law that the -- the witness can't be impeached by

 2    extrinsic evidence on the collateral matter.

 3          So it's the Government's position that the

 4    incident from 2019 should not be allowed to be brought

 5    up on relevance grounds in cross-examination.

 6          THE COURT:  Okay.  Thank you.

 7          MR. SNYDER:  Yeah, briefly.  So I have exhibits

 8    with me.  I can just represent to you what they say.

 9    The Government was aware of this handful of material no

10    later than November 6th.  They produced it to me for the

11    first time yesterday afternoon.  I'm not seeking a

12    continuance of the hearing, but my first point is that:

13    If this was the Government's position, the Government

14    has long lost the opportunity to make this argument,

15    number one.

16          Number two, I think that the court will find

17    that this complaint is in fact extremely relevant

18    because what actually happened here was that Deputy

19    Francisco claimed that there was a warrant associated

20    with an RV.  There wasn't.  The warrant was associated

21    with a person who lived at a different residence.

22          And you'll see this is part of the findings

23    that were given to me two hours before the hearing

24    today.  He then put the people in the back of a car

25    without a basis.  He then searched their camper for ten

1    minutes.  And he said that they lied about it and then

2    was found, along with his trainee, to have inaccurately

3    documented it.

4          So the information here is extremely relevant.

5    Also, there's not a jury.  The court is the factfinder.

6    There are no rules of evidence.  If the court finds that

7    it's not relevant, then, of course, it won't consider

8    it.  But I think that you will see then, in the context

9    of the examination, it's quite relevant and also, the

10   issue of timeliness.

11         MS. MCKENNA:  Your Honor, I did want to -- to

12   make some corrections in the facts.  There were no

13   findings that anything was inaccurate.  The -- our

14   finding is that the officers acted appropriately.  The

15   only -- the only comment was that the reason for this --

16   for the home detention should have been documented.

17   It's only an issue as to documentation.

18         With regards to the *Henthorn* disclosure, we

19   reviewed this.  We determined that it was not relevant.

20   We turned it over in an abundance of caution.  When the

21   Defense asked additional questions about the incident,

22   as a professional courtesy, we put in a subpoena for the

23   report, which is not something that is generally

24   available to us.

25         I asked first as a courtesy from the sheriff's

1    to be able to pick it up today so that I could get it to

2    counsel prior to the hearing.  And then we turned it

3    over as soon as it was made available to us, but again,

4    this --

5              THE COURT:  You only knew about it today?  You

6    only got it today?

7              MS. MCKENNA:  We turned -- we -- we -- I was --

8    I reviewed the report.  I prepared a summary of the

9    report, which I believe was more than adequate to -- to

10   reflect any potential relevance.

11             THE COURT:  You know, summary of reports,

12   that's -- that's what you've determined is relevant.  I

13   don't understand why you guys do that all the time.

14   Just give them the report.  What you think is relevant

15   and what he thinks are relevant are two different

16   things.

17             MS. MCKENNA:  Your Honor, these items were not

18   available to us.  They're not provided to us in

19   discovery.  This is something that is only potentially

20   available to us by subpoena.  So we did turn it over

21   what was -- we believe was relevant and to clarify --

22             THE COURT:  So you're telling me that -- that

23   you're working with the sheriffs.  They're the officers

24   that you have to rely on to prove this case.  But if you

25   want a copy from something that relates to the officer

```
 1    or the case in any way, they -- your own investigating
 2    officers in this particular point is the L.A. County
 3    Sheriffs.  Your investigating officers won't give it to
 4    you?  You have to subpoena your own officers to get your
 5    own information for the case?
 6            MS. MCKENNA:  Yes, Your Honor, with regards to
 7    any personnel material, they will not provide those
 8    materials to us.  In particular, for personnel materials
 9    related to an incident that has no bearing on the case
10    at hand and that is many years old.  I did previously
11    make a request and was told that I had to put in a
12    subpoena.
13            THE COURT:  And -- and -- but you waited a
14    month to tell Defense counsel?
15            MS. MCKENNA:  I -- I don't --
16            THE COURT:  Why didn't you tell him earlier so
17    he could put in a subpoena?
18            MS. MCKENNA:  I -- Your Honor, I don't --
19    I'm -- I'm not sure about the accuracy of that date.  We
20    did do a review within the last couple weeks, and what
21    we wanted to actually speak to the officer before
22    turning over any of the information to make sure that
23    everything was accurate and to make sure that there was
24    nothing else that we should conclude -- we should
25    include that --
```

1    THE COURT:  But wait, it's -- the officer

2    doesn't have any say over whether stuff in his -- I

3    mean, they can certainly object to whatever's in their

4    personnel file, but HR -- the HR department that has say

5    over what's in the -- in the personnel file; right?

6    We're talking about personnel documents.

7    MS. MCKENNA:  Understood, Your Honor.

8    THE COURT:  Okay.

9    MS. MCKENNA:  The officer may have had

10   additional information.  For example, the -- the actual

11   report does not indicate which officer wrote the

12   documentation.

13   THE COURT:  See, all of that just goes to the

14   weight.  Everything you're saying, I don't disagree.

15   It -- it's fine.  Those are -- I totally see your point,

16   but it just goes to the weight, not to the

17   admissibility.  But I'm just troubled because I -- you

18   know, it's -- it's this thing where it appears that, you

19   know, you -- you unilaterally decide -- I mean, we're

20   talking about work product; right?

21   What you see in a document and what you see in

22   a file, that's your own work product and your own

23   assessment of what you think is relevant.  You have no

24   idea how opposing counsel can use that and frame an

25   argument and frame a cross-examination and use that kind

1    of evidence.

2           That's the problem I'm having here is that

3    you're making that determination and then you waited

4    until the last minute.  You should have at least given

5    defense counsel the opportunity to serve a subpoena for

6    the information.  And you could have said, "Look, I

7    don't know whether this is relevant or not, but it

8    appears like it might be.  So I'm going to let you know,

9    and you can serve the subpoena."

10          And I would have signed off on the subpoena and

11   we -- he'd have the information much sooner than two

12   hours, but it is what it is.

13          Let's just get started.  Go -- go ahead.

14          MR. SNYDER:  Just very briefly -- and I agree

15   with you -- because there's a lot to cover.  So I want

16   to get started.  I will say that I did bring the

17   November 6th e-mail, which starts:  "In addition to the

18   item you mentioned, there was one item from a deputy's

19   personnel file that we intended to disclose in an

20   abundance of caution and can do so once a protective

21   order is filed."

22          We then agreed through a protective order --

23   and one was entered in.  It wasn't produced to me until

24   24 hours before the hearing.  And the actual underlying

25   report was produced as I was walking over.  I'm not

```
 1   asking for a continuance, but I just want to be real
 2   clear about what the record is.  And I'm happy to file
 3   these e-mails after the hearing.
 4         THE COURT:  No, it's not necessary.  I mean,
 5   look.  It's just -- I just need you guys to be up front,
 6   turn everything over.  And you know, it's just --
 7   it's -- turn over as soon as you have it.  And let's
 8   move forward.
 9         Okay.  Let's get the officer on the stand.
10         MR. SNYDER:  Thank you, Your Honor.  I guess I
11   would call Deputy Clint Francisco, who has already
12   testified by way of declaration.
13         GOVERNMENT'S WITNESS, CLINT FRANCISCO, SWORN.
14         THE COURT:  Can you give that folder to my
15   clerk -- can you give it to the clerk.
16         THE COURTROOM DEPUTY:  Thank you.
17         THE WITNESS:  Absolutely, uh-huh.
18         THE COURTROOM DEPUTY:  Please state your name
19   for the record.
20         THE WITNESS:  My name is Clint Francisco.
21         MR. SNYDER:  May I proceed?
22         THE COURT:  Go ahead.
23                    CROSS-EXAMINATION
24   BY MR. SNYDER:
25   Q      Deputy Francisco, I want to start with a few
```

```
 1    questions about writing police reports; okay?
 2    A       Yes.
 3    Q       You've been -- you've been with the sheriff's
 4    department for a little over 11 years; right?
 5    A       Correct.
 6    Q       And during that time you've received training
 7    on how to write reports?
 8    A       Yes.
 9    Q       You've also trained other deputies on how to
10    write reports?
11    A       Yes.
12    Q       And you understand that police reports serve a
13    number of important purposes; right?
14    A       Yes.
15    Q       And they're an important part of the judicial
16    process; right?
17    A       Yes.
18    Q       And for that reason, reports are supposed to be
19    unbiased; right?
20    A       Yes.
21    Q       They're supposed to be accurate; right?
22    A       Correct.
23    Q       They're supposed to be complete?
24    A       Yes.
25    Q       And they're supposed to contain all pertinent
```

```
 1    information; right?
 2    A         Yes.
 3    Q         Pertinent information can include information
 4    that obviously helps to develop your case; right?
 5    A         Yes.
 6    Q         But pertinent information also includes
 7    information that might be harmful to your case; right?
 8    A         Yes.
 9    Q         Pertinent information can include information
10    that makes you look bad; right?
11    A         No.
12    Q         If it's pertinent to the case and it makes you
13    look bad, should it go in the report?
14    A         If -- when I write a report, I'm not writing
15    the report about myself.  I'm writing the report about
16    the crime and evidence of the crime.
17    Q         Sure.  But if you did something wrong, right,
18    in the course of investigating, that would be something
19    that you should put in the report; right?
20    A         That's not pertinent to the evidence of the
21    crime.
22    Q         So you're saying that if you did something
23    wrong --
24              MR. MAGANA:  Objection, Your Honor.  This is
25    vague and calls for speculation.
```

1          THE COURT:  Overruled.

2     BY MR. SNYDER:

3     Q       So anything that you do that's wrong, you don't

4     put in the report; is that what you're saying?

5          MR. MAGANA:  Objection, Your Honor.  This

6     misstates the witness's testimony.

7          THE COURT:  Overruled.

8          THE WITNESS:  I don't -- when I write my

9     reports, I write the true events of what transpired with

10    the evidence that supports the crime which I arrested

11    the person for.  So I don't write about my personal

12    actions.  It's the elements of the crime.

13    BY MR. SNYDER:

14    Q       So it's your testimony that pertinent

15    information doesn't include information about your

16    investigative activities; is that right?

17    A       I don't understand the question.

18    Q       You said that when you write reports, you don't

19    include anything about what you personally do; is

20    that -- is that what your testimony is?

21          MR. MAGANA:  Objection, Your Honor.  This,

22    again, misstates the testimony.

23          THE COURT:  Overruled.

24          THE WITNESS:  You just changed what you just

25    said, though.  What I said is, I write the pertinent

```
 1  facts in the report that are needed for prosecution

 2  purposes.

 3  BY MR. SNYDER:

 4  Q       Well, let me ask you this:  Does pertinent

 5  information include information about your investigative

 6  activities?  Like, what brought an incident to your

 7  attention, what you were told about an incident, what

 8  you observed, what actions you took; does it include

 9  that?

10  A       Yes.

11  Q       Okay.  And those are your activities; right?

12  A       Yes.

13  Q       And so if you did something wrong during that

14  process, would it go in your report or would it not go

15  in your report?

16  A       If I -- I -- I don't understand that question.

17  That makes no sense to me.

18  Q       No problem.  All right.

19          Let's talk briefly about warrant affidavits.

20  And just so we're on the same page, when I refer to a

21  "warrant affidavit," I mean a sworn statement of

22  probable cause in a warrant packet.

23          You understand that; right?

24  A       Yes.

25  Q       You agree that warrant affidavits, like arrest
```

1    reports, are also important judicial documents; right?

2    A        Yes.

3    Q        When you submit an affidavit, you're asking a

4    judge to do something significant and meaningful; right?

5    A        Yes.

6    Q        And for that reason, it's important that your

7    affidavits are accurate; right?

8    A        Yes.

9    Q        And it's important that they're precise; right?

10   A        Yes.

11   Q        Obviously, that means you can't lie in a

12   warrant affidavit; right?

13   A        Yes.

14   Q        It also means that the affidavit should be

15   drafted with some care; right?

16   A        Yes.

17   Q        So that every part of it is factually accurate;

18   right?

19   A        Yes.

20   Q        And not misleading?

21   A        Correct.

22   Q        Let's talk briefly about declarations:  You

23   submitted a declaration in this case; right?

24   A        Yes.

25   Q        You understand that a declaration, like a

```
 1   warrant affidavit, is a sworn statement?

 2   A        Yes.

 3   Q        It's submitted under penalty of perjury; right?

 4   A        Yes.

 5   Q        And you understood that the declaration you

 6   submitted in this case was prepared for a judge; right?

 7   A        Yes.

 8   Q        And that he was going to read your declaration;

 9   right?

10   A        Yes.

11   Q        And take it into account when deciding a

12   suppression motion; right?

13   A        Yes.

14   Q        I'm going to talk really briefly about how your

15   declaration was prepared.

16            You didn't write your declaration in this case

17   entirely on your own; right?

18   A        Correct.

19   Q        The declaration was mostly written by the

20   prosecutor; right?

21   A        Yes.

22   Q        Now, generally, the way that this works -- and

23   you tell me if this is what happened in this case -- is

24   that you have a meeting with the prosecutor or the

25   agent, and you tell them what happened.  And then at
```

```
 1    some point after you have those meetings, the prosecutor

 2    sends you a first draft; is that what happened here?

 3    A       Yes.

 4    Q       Did you have meetings or did you have phone

 5    calls?

 6    A       We had meetings.

 7    Q       How many meetings?

 8    A       I think we had two.

 9    Q       Was the agent there?

10    A       Yes.

11    Q       Was the agent taking notes?

12    A       Yes.

13    Q       Now, at some point, the prosecutor wrote a

14    first draft of your declaration; right?

15    A       Yes.

16    Q       And he asked you to review it?

17    A       He did.

18    Q       And you did review it; right?

19    A       I did.

20    Q       You had an opportunity to make changes to it?

21    A       I did.

22    Q       Did you make any changes?

23    A       Yes, I did.

24    Q       What were the changes?

25    A       I don't remember which changes.  We were on the
```

```
 1    phone, and he made those changes as we were talking.
 2    Q        And when he sent it to you and he asked you if
 3    you had any changes, did he say, "Don't write down your
 4    changes, call me instead"?
 5    A        I don't -- I don't remember exactly what he
 6    said.
 7    Q        How did you communicate with the prosecutor?
 8    Did you communicate with him by e-mail, by phone, or by
 9    text message?
10    A        By phone.
11    Q        By phone only?
12    A        Um, it would be between the agent and like --
13    kind of, like a three-way.  He contacts the agent, and
14    then he -- and then the agent would contact me.
15             MR. MAGANA:  Objection, Your Honor.  Relevance.
16             THE COURT:  Overruled.
17    BY MR. SNYDER:
18    Q        And how'd you communicate with the agent?
19    A        Via cell phone.
20    Q        Any written documents, e-mails, text messages?
21    A        No.  It was via -- just talking, and she'd tell
22    me where to go and stuff like that.
23    Q        Okay.  So at some point, obviously, you -- you
24    eventually sign the declaration; right?
25    A        Yes.
```

```
 1    Q        And when you signed it, that was only after you
 2    had a chance to talk with the prosecutor, review it,
 3    make changes to the declaration; right?
 4    A        Yes.
 5    Q        Now, there are some exhibits attached to your
 6    declaration.  For example, Exhibit C is a warrant
 7    abstract.
 8             Did you provide any exhibits to the prosecutor?
 9    A        No.
10    Q        Did they ask you for any documentary support
11    for any of the claims?
12    A        No.
13    Q        You didn't bring any additional documents or
14    exhibits to this hearing; right?
15    A        No.
16    Q        All right.  So I want to turn now to the
17    declaration that you filed in this case.  And I actually
18    want to start with some of the things discussed in
19    paragraph 2, where you talk about your history with the
20    department.  I'll include some things that aren't in
21    there.  But really briefly, you started in the training
22    academy in October 2012; right?
23    A        Yes.
24    Q        And after you left the training academy, you
25    were elevated to the custody division; right?
```

UNITED STATES DISTRICT COURT

```
 1    A        In -- it wasn't October.  I think it was in --
 2    September is when we started.
 3    Q        And once you were elevated to the custody
 4    division, you spent 20 months at North County
 5    Correctional Facility, Castaic; right?
 6    A        Yes.
 7    Q        And then after 20 months at Castaic, you were
 8    elevated to the patrol division; right?
 9    A        Patrol training, yes.
10    Q        And as the name suggests, patrol is riding
11    around in a marked car; right?
12    A        Yes.
13    Q        Responding to incidents that are in the patrol
14    area?
15    A        Yes.
16    Q        And you have, what?  One or two-man teams?
17    A        Um, in a training unit, it's a TO and a
18    trainee, at first.
19    Q        So is that -- it's -- you start off with a
20    training officer, and then you're on your own; is that
21    what I'm hearing?
22    A        Yes.  And then you ride solo.  And then we have
23    county units, too, that are two-man units.
24    Q        Got it.  In 2019, you were promoted again from
25    patrol deputy to training officer; right?
```

```
 1   A        Yes.

 2   Q        And you were supervising junior officers when

 3   you were in that role; right?

 4   A        Yes.

 5   Q        And you were training officer for three years;

 6   right?

 7   A        Two years.

 8   Q        And then it says in your declaration that in

 9   2022 you joined something called the "special assignment

10   team"; right?

11   A        What year?

12   Q        In 2022.

13   A        I don't remember the exact year.  I -- I know I

14   did it for like a year and seven months.

15   Q        Well, I'll tell you that you filed your warrant

16   affidavit on December 16th; does that sound right?

17   A        Yes.

18   Q        And in that time, you said that in a little

19   over seven months with the special assignment team, you

20   had done a certain number of drug and gun

21   investigations.  So it must have been in 2022; does that

22   sound right?

23   A        Over the course of my career, not just over --

24   in that time frame.

25   Q        Okay.  Well, we can go and look at it.  Do you
```

1    know when you joined the special assignment team?

2    A        Um, like I said, I didn't know exact -- exactly

3    what year it was.  I -- I'd have to look back in my

4    personal records to find the exact date.

5    Q        Okay.  And then the year, do you know?

6    A        Like I said, I did it for about a year and

7    seven months.  So go back from today for a year and

8    seven months because I'm at a new assignment right now.

9    Q        Got it.  Okay.

10           As the name suggests, the special assignment

11   team handles special assignments; right?

12   A        Yes.

13   Q        And those are assignments that are more

14   complicated or dangerous or higher priority than routine

15   patrol assignments; right?

16   A        No.

17   Q        What makes them special?

18   A        It's just that we don't get any calls for

19   service.

20   Q        You don't get calls for service, but you have a

21   six-man team; right?

22   A        Yes.

23   Q        And you work at night; right?

24   A        We work at night, yeah.

25   Q        In your declaration you described a special

```
1    assignment team as "a crime prevention unit"; right?
2    A       Yes.
3    Q       And I'll tell you for now, at this point, in
4    your warrant affidavit, you said that in a little over
5    seven months with the special assignment team, you've
6    been involved in approximately 50 drug investigations;
7    right?  That's what you said?
8    A       Yes.
9    Q       And during that same time period, you were
10   involved in approximately 35 gun investigations; right?
11   A       Yes.
12   Q       So 85 drug or gun investigations in a little
13   over seven months with the special assignment team;
14   right?
15   A       Year and seven months.
16   Q       Well, I'm going to ask you to turn to what's
17   been marked as Exhibit 2.
18           It's in the -- the binder right next to you.
19   Exhibit 2 is a -- a search warrant packet.  And I guess
20   maybe if we just stop briefly at the front page...
21           And I'm reading here now.  And -- and you can
22   read along.  I'm down near the bottom of the front page:
23   "The search warrant and the incorporated affidavit
24   were" -- sorry.
25           "The search warrant and incorporated affidavit
```

 1    were sworn to as true and subscribed before me on this

 2    17th day of December 2022, at 48 hours"; right?

 3            That's what that says?

 4    A       Yeah, I see that at the bottom.

 5    Q       Okay.  And then if we go to the third page of

 6    Exhibit 2 -- and let's see, one, two, three, four -- 5th

 7    line down.  I'm going to read, and you can just read

 8    along with me:

 9            All right.  "Now, your fine as currently

10    assigned to the special assignment team at Santa Clarita

11    and has been so assigned for over seven months.  During

12    this time, your fine has investigated and has assisted

13    in investigating approximately 50 drug-related arrests

14    and 35 firearm-related arrests."

15            Is that -- that's what you wrote; right?

16    A       Yes.

17    Q       Okay.  You were a member of the special

18    assignment team on December 16th, 2022; right?

19    A       Yes.

20    Q       Let's talk about what happened that day.  So on

21    December 16th, after you went on duty, you got a call

22    from Deputy Haven; right?

23    A       Yeah.

24    Q       Deputy Haven was a patrol deputy in

25    Santa Clarita; right?

```
 1    A         Yes, he's a training officer.

 2    Q         And he told you about a report of criminal

 3    activity; right?

 4    A         Yes.

 5    Q         And -- and in your declaration on that

 6    paragraph 4, you refer to it as a "call about an

 7    embezzled U-Haul truck"; right?

 8    A         Yes.

 9    Q         Now, according to your declaration -- and,

10    again, I'm at paragraph 4 -- you say that Deputy Haven

11    gave you several pieces of information during this call;

12    right?

13    A         Yes.

14    Q         First, he said that the missing U-Haul had been

15    initially reported 11 days earlier; right?

16    A         I -- I don't remember the exact time on that.

17    Q         If you want to refresh your recollection,

18    that's fine.  This isn't a memory test.  This is

19    paragraph 4(A) of your declaration, which is Exhibit 1

20    in the binder in front of you.  And if you want to take

21    a look at it and let me know if that's helped to refresh

22    your recollection when you're done.

23    A         That was in this first paragraph?

24    Q         Yeah, paragraph 4(A).

25    A         I've never used one of these before.  So you're
```

1    talking on the first page?

2             MR. SNYDER:  Your Honor, can I --

3             THE COURT:  From the very second page.  It's --

4    he showing the second page in the -- in the book.  It's

5    the very first exhibit.

6    BY MR. SNYDER:

7    Q       Does that refresh your recollection that one of

8    the things he told you was that the U-Haul was initially

9    reported 11 days earlier on December 5th?

10   A       It doesn't say 11 days.  It says the date of

11   November 14th.

12            So I don't know if I have the wrong paragraph,

13   but...

14            THE COURT:  He's saying that the call came in

15   on December 5th --

16            THE WITNESS:  Okay.

17            THE COURT:  -- but you didn't go to the actual

18   house till December 16th.  That's 11 days later.  That's

19   what he's asking you.

20            THE WITNESS:  Oh, yeah.  That's correct.  And

21   that's when I went out there, but --

22            THE COURT:  Okay.  Well, that document doesn't

23   say that.

24            THE WITNESS:  Well --

25            THE COURT:  But you can -- you can do the --

1    the calculation.

2              THE WITNESS:  So from --

3              MR. SNYDER:  Yeah, that --

4              THE COURT:  That's what -- that's what he's

5    getting at.

6    BY MR. SNYDER:

7    Q        Yeah, sorry.  What I was referring to is the

8    part where you wrote:  "On December 5th, 2022,

9    Freddy Moreno, manager of the U-Haul rental office,

10   called to report this embezzled truck"; right?

11   A        Yes.

12   Q        So one of the things that Haven told you was

13   that this had been reported originally 11 days earlier

14   on December 5th; right?

15   A        Like I said, I -- I wasn't -- he -- I wasn't

16   aware of that original report.

17   Q        Well, it's in your declaration.

18   A        After the fact.  You're asking me if I knew it

19   at that second, but I still had to do my own

20   investigation when I did the follow-up on it.

21   Q        Sorry.  I'm asking what it is that Deputy Haven

22   told you on December 16th when he called you?  And what

23   you wrote in your declaration was that on

24   December 16th, the first thing he said was that the

25   U-haul was originally reported stolen 11 days earlier;

1    right?

2            That's what you wrote?

3    A        That's when the original report was done, yes.

4    Q        And that's what Deputy Haven told you; right?

5    A        Yes.

6    Q        Okay.  And what he also told you was that, at

7    the time, the U-Haul manager, Freddy Moreno, had placed

8    that call; right?

9    A        No.  That was found out later, but compiled

10   into the declaration.

11   Q        Sorry.  So this section of your declaration,

12   which you said under oath is what you were told, that

13   includes information from both before and after that

14   date; is that what you're saying?

15   A        No.  So -- after the investigation there's a

16   detective on the case too that looked up other calls for

17   service and everything like that.  And that's where that

18   information was told.  And that's how this went into the

19   declaration.

20   Q        Sorry.  Just to go back.  I'm reading from

21   paragraph 4 now.  And this is -- we went over how the

22   declaration was prepared and -- and you signing it.  You

23   said:  "On December 16th, 2022, I received a call from

24   Deputy Daniel Haven who works in patrol during daytime

25   hours"; right?  That's what you wrote?

1    A        Yes.

2    Q        And then you wrote that:  "He informed me that

3    he had responded to a call earlier in the day regarding

4    an embezzled U-Haul truck and relayed the following";

5    right?

6             That's what you wrote?

7    A        Yes.

8    Q        Okay.  And then the next sentence was:  "On

9    December 5th, 2022, Freddy Moreno, manager of the U-Haul

10   rental office, called to report an embezzled 26-foot

11   U-Haul truck."

12            That's what you wrote; right?

13   A        Yes.

14   Q        Are you saying that that's not true?

15   A        No.

16   Q        Well, maybe I don't understand your testimony.

17   Because you're saying that some of the information was

18   not relayed to you on that date and some of it you found

19   out later through a further investigation.  I -- I'm not

20   clear.  Maybe you can explain.

21   A        As I explained, we have a detective in the case

22   that looked up previous calls for service.  At the time,

23   Deputy Haven did tell me what is written in the

24   affidavit.  And that's the information that I do have,

25   and that's what's in the declaration.

1    Q        Okay.  So what he told you was that on

2    December 5th, Freddy Moreno, from U-Haul, called to

3    report this embezzled U-Haul truck; right?

4    A        Yes.

5    Q        And during that call, Mr. Moreno provided

6    Mr. Grey's name; right?

7    A        Yes.

8    Q        And he provided Mr. Grey's listed address;

9    right?

10   A        Yes.

11   Q        And he said that the truck had been missing for

12   some time at that point already on December 5th; right?

13   A        Yes.

14   Q        And he said that voicemails and calls to

15   Mr. Grey had gone unreturned; right?

16   A        Yes.

17   Q        In that initial report, Mr. Moreno did not say

18   anything about meth; right?

19   A        Correct.

20   Q        And in response to that report, nobody was

21   dispatched for the U-Haul at all; right?

22   A        That call for service, I'm not sure if they

23   went to that one or not.

24   Q        Well, I'll leave it for now.  We can come back.

25   There's a report attached as Exhibit 5 -- as Exhibit A

1    to your declaration.

2            I'll ask this question:  Was the special

3    assignment team called out on that day?

4    A       No.

5    Q       The second thing that Deputy Haven told you

6    according to your declaration, was that U-Haul called

7    back again on December 16th, that date; right?

8    A       Yes.

9    Q       And once again, the call was placed by the same

10   Mr. Moreno; right?

11   A       Yes.

12   Q       And once again, he said that his truck was

13   missing; right?

14   A       Yes.

15   Q       He provided Mr. Grey's name; right?

16   A       I'm not sure if he provided his name or not.

17   Q       I'll just say that paragraph 4(B) of your

18   declaration says what it says; right?  If it says that

19   he provided the name, he provided the name.  And if not,

20   not.  Can we agree on that?

21   A       Do you want me to check to see if it's in

22   there?

23   Q       Sure.  I can actually read it to you.  So in

24   your declaration, which you signed:  "On December 16,

25   2022, LASD dispatch had received a call for service from

1    U-Haul stating that an individual claiming to be

2    Mr. Grey's neighbor had reported the presence of the

3    U-Haul truck at 33570 Bouquet Canyon Road."  And it goes

4    on and on.

5            So it identified Mr. Grey, again; right?

6    A        Yes.

7    Q        This is a lot of the same information as the

8    original call that had been made 11 days earlier; right?

9    A        Yes.

10   Q        But this time, there was a new piece of

11   information; right?  What Mr. Moreno reported on this

12   day was that a neighbor had provided additional

13   information; right?

14   A        Yeah.

15   Q        And what that neighbor supposedly said to

16   Mr. Moreno was that Mr. Grey was making meth in the back

17   of the U-Haul; right?

18   A        Yes.

19   Q        Now, to be clear, that report was not made

20   directly to law enforcement; right?

21   A        It was reported in that call for service on

22   December 16th.

23   Q        And that call was placed by Mr. Moreno; right?

24   A        Yes.

25   Q        So, it was kind of a second-hand report

1    received through Mr. Moreno?

2    A        Yes.

3    Q        And nobody from the sheriff's department talked

4    to this -- this person who might be a neighbor on that

5    day; right?

6    A        No.

7    Q        That person, as far as you knew, was anonymous;

8    right?

9    A        Yes.

10   Q        Nonetheless, in response to that second report,

11   which now included the meth tip, officers were

12   dispatched out to go get the truck; right?

13   A        Yes.

14   Q        And, in fact, the investigation was sent to the

15   special assignment team; right?

16   A        No.

17   Q        Did the special assignment team not report in

18   response to that call?

19   A        No -- that -- we -- I got the information from

20   Deputy Haven.

21   Q        Right.  And he asked you to take the call;

22   right?

23   A        No.  He just told me about the call.

24   Q        Okay.  And you then determined that that was an

25   appropriate matter for the special assignment team?

1   A        It's something for us to look into, yes.

2   Q        All right.  I want to turn briefly now and look

3   at your report, which I've included as Exhibit 3 in that

4   binder.  For the court's reference, this is Exhibit 29

5   for the motion.  I gave him different hearing exhibit

6   numbers, which may not have been helpful.

7            So once you've turned to Exhibit 3 in that

8   binder, let me know.

9   A        I'm there.

10  Q        Okay.  So we talked earlier about

11  report-writing; right?

12  A        Yes.

13  Q        And how it's important to include pertinent

14  information in your reports; right?

15  A        Yes.

16  Q        Can you tell me where the tip about a possible

17  mess -- meth lab is mentioned in your report?

18  A        It's in my report.

19  Q        Where?

20  A        It was in reference to that call for service.

21  Q        Do you say the word "meth"?

22  A        Meth?

23  Q        Sorry, I'm asking you, in your report that you

24  wrote, you're saying -- is -- am I -- am I missing it?

25  In --  in Exhibit 3, this is the report that you wrote

```
 1    the day after.
 2            Do you say that you got a tip about a possible
 3    meth lab in that report?
 4    A       No.
 5    Q       No.  Now, it's not your position that that meth
 6    lab tip was irrelevant to your investigation; right?
 7    A       Correct.
 8    Q       In fact, it's mentioned repeatedly in the
 9    declaration that you filed in this case; right?
10    A       Yes.
11    Q       You mentioned it in paragraph 4(B), which we
12    were just looking at; right?
13    A       Yes.
14    Q       You mention it in paragraph 8, I'll represent
15    to you.  Any -- any reason to dispute that?
16    A       No.
17    Q       You mentioned it in paragraph 10(D); right?
18    A       I'd have to double-check to make sure it was
19    there.
20    Q       Well, it says what it says.  You mentioned it
21    in paragraph 10(E), too.  Any reason to dispute that?
22    A       If you want me to double-check it, I will.
23    Q       You can look.  Feel free.  10(E).
24            I can read it for you.  It says:  "We received
25    a tip that narcotics were possibly being manufactured at
```

```
 1   this residence"; see that?
 2   A       Yes.
 3   Q       But if someone were to read your report, they
 4   wouldn't see this tip anywhere; right?
 5   A       No.
 6   Q       And if it had some significance, in terms of
 7   the decisions that you made or the actions that you
 8   took, that would be hidden too; right?
 9   A       No.
10   Q       I want to turn now and look at the warrant
11   affidavit that you filed, which is Exhibit 2.  And --
12   and again, tell me when -- when you've had a chance to
13   look at it.
14   A       You want me to look at it?
15   Q       Well, I can just ask you the question.
16   A       Yes, please.
17   Q       In your warrant affidavit, you only said that
18   you got a report about embezzled U-Haul; right?
19   A       Yes.
20   Q       You don't say anything about any tip regarding
21   a supposed meth lab; right?
22   A       Correct.
23   Q       And so if that fact had some significance, in
24   terms of any decisions that you made or actions that you
25   took, that wouldn't be known to someone who was reading
```

```
 1    the affidavit; right?
 2            You're looking at the prosecutor and giving him
 3    a facial expression.  What did you mean by that?
 4    A       Oh, I should look at you.  I'm sorry.  I don't
 5    understand that question.  Can you rephrase it?
 6    Q       Yeah, sure.  If the fact of the tip had some
 7    significance, in terms of the actions that you took or
 8    the decisions that you made, that would not be known to
 9    someone reading the affidavit; right?
10    A       I was responding to the embezzled vehicle.
11    Q       Understood.  But the meth tip is not in your
12    affidavit; can we agree on that?
13    A       Yes.
14    Q       So going back now to the declaration you filed
15    in this case -- this is paragraph 4(C), you say that
16    after receiving this information about the truck and the
17    possible meth lab from Deputy Haven, you determined that
18    this was an appropriate matter for the special
19    assignment team; right?
20    A       It's -- it was a crime, yes.
21    Q       I'm just reading your words.  Your words were:
22    "I believe this was an appropriate matter for the
23    six-person special assignment team"; right?
24    A       Yes.
25    Q       Now, again, the special assignment team is a
```

```
 1   six-man tactical unit; right?
 2   A       It's -- it's a patrol team.  We just don't get
 3   calls for service, and we go investigate crimes that we
 4   have time to do.  So we're not considered -- it's not a
 5   promotion or it's not considered anything advanced.
 6   Q       Okay.  So can we agree that it's a six-man team
 7   at least?
 8   A       Yes.
 9   Q       And you refer to it as a crime prevention unit;
10   right?
11   A       Yes.
12   Q       And the first time that this truck was called
13   in where there was no tip about meth, as far as you
14   know, nobody was dispatched at all; right?
15   A       Yup, I don't know.
16   Q       As far as you know?
17   A       Correct.
18   Q       On December 16th, it was called in, again, with
19   this new information about a possible meth lab; right?
20   A       Yes.
21   Q       And on that date, you determined that this was
22   an appropriate matter for the special assignment team;
23   right?
24   A       Based on the embezzled vehicle.
25   Q       I want to talk to you now about paragraph 5 of
```

```
 1    your declaration.  In paragraph 5, you say that you ran

 2    a record's check before going to Mr. Grey's house;

 3    right?

 4    A       Yes.

 5    Q       And I actually want to read exactly what you

 6    wrote.  You wrote:  "Upon receiving the report from

 7    Deputy Haven, I ran a record check on Mr. Grey."

 8            That's what you wrote; right?

 9    A       Yes.

10    Q       You wrote that you ran a record's check on

11    Mr. Grey, quote, "in the CHEER system" -- C-H-E-E-R-S --

12    "CHEERS system for California criminal record history,

13    RAPS system" -- R-A-P-S system -- "for L.A. County

14    information, and the California Warrant System"; right?

15    A       Yes.

16    Q       And you say that during that check you

17    determined that Mr. Grey had a warrant; right?

18    A       Yes.

19    Q       You say that you also accessed his criminal

20    history; right?

21    A       Yes.

22    Q       And you say that you saw that he had a prior

23    felony; right?

24    A       Yes.

25    Q       And you also say that you learned that he was
```

```
 1    listed on the terrorist watchlist; right?
 2    A       Yes.
 3    Q       You said that you reviewed these three specific
 4    databases in order to learn this information, right,
 5    CHEERS, RAPS, and the California Warrant System?
 6    A       Yes.
 7    Q       And you say in your declaration that you ran
 8    both, local and statewide searches; right?
 9    A       Not statewide.
10    Q       We talked earlier about how your declaration
11    was prepared; right?
12    A       Yes.
13    Q       Okay.  I'm going to read from paragraph 5 of
14    your declaration, and then you tell me if I got it
15    right.  I'm now at -- there are no page numbers, but
16    it's 3 of 7.
17            There you wrote:  "Above record systems are
18    limited to records generated within L.A. County and the
19    State of California."
20            That's what you wrote; right?
21    A       Correct.  But you said "states."  I didn't run
22    the whole United States.  I did do the check in
23    California and local.
24    Q       Oh, I apologize.  Yeah, I said -- I meant state
25    not "states," if that was not clear.
```

```
 1              Okay.  Not -- I'm not familiar with CHEERS and

 2   RAPS, but I think I know the California Warrant System.

 3   The California Warrant System is a system that allows

 4   you to run a statewide search for warrants; right?

 5   A       Yes.

 6   Q       That's also known as the Wanted Persons System;

 7   right?

 8   A       Correct, yes.

 9   Q       And that's one of the databases that's

10   accessible through Flex; right?

11   A       Yes.  And at that time, I didn't have access to

12   that.  A secretary ran it for me.

13   Q       We'll get to that.

14   A       Okay.

15   Q       Now, all the records systems mentioned in your

16   declaration are electronic systems; right?

17   A       Yes.

18   Q       And these systems are kept on

19   government-controlled databases; right?

20   A       Yes.

21   Q       And those databases are maintained for the

22   purposes of law enforcement?

23   A       Yes.

24   Q       And when you run someone on one of these

25   electronic government-controlled databases, you do it on
```

```
1    a government device; right?

2    A        Of course, yes.

3    Q        You do it on a computer at the station or

4    department-issued mobile device or mobile data center in

5    the car.  But however you do it, it's done

6    electronically on a government computer; right?

7    A        Yes.

8    Q        Now, earlier we were talking about the process

9    for preparing your declaration; right?  And how you had

10   this back and forth with the prosecutors; right?

11   A        Yes.

12   Q        The fact that you knew your declaration would

13   be submitted to a judge; right?

14   A        Yes.

15   Q        That it was important that it would be

16   completely accurate and truthful; right?

17   A        Yes.

18   Q        And you had the opportunity to review your

19   declaration before filing it; right?

20   A        Yes.

21   Q        Now -- one second.  The only exhibit attached

22   to your declaration related to these supposed searches

23   that you say you ran is Exhibit C; right?

24   A        And that's where at in here?

25   Q        It's -- there are a number of tabs on your
```

```
 1    declaration -- sorry.  On the first exhibit, there's an

 2    Exhibit C -- just tell you, it's a warrant abstract.

 3    A        Yeah, just the warrant abstract.

 4    Q        Right.  There are no other exhibits; right?

 5    A        No.

 6    Q        And you didn't bring any other exhibits to this

 7    hearing; right?

 8    A        Correct.

 9             MR. SNYDER:  Your Honor, I want to ask to turn

10    now to an e-mail in a document that was produced to me

11    for the first time yesterday afternoon, which is

12    attached as exhibit -- or it's Exhibit 14 in your

13    binder.

14             THE COURT:  Okay.

15    BY MR. SNYDER:

16    Q        Let me know when you get there.

17    A        Okay.

18    Q        All right.  And if -- the first page is an

19    e-mail from the prosecutor to me, if you go to the

20    fourth page, which is a letter date the December 5th,

21    2023 -- do you see that?

22    A        Yes.

23    Q        And I want to ask you to -- to read along with

24    me for the first paragraph, and I'm going to read it

25    aloud.  It says:  "On November 7th, 2023, during a
```

```
 1   meeting to prepare for his testimony at the forthcoming

 2   hearing on defendant's motion to suppress that was

 3   attended by AUSA Thomas Magana and ATF Special Agent

 4   Brandice Olmos (phonetic).  Los Angeles County Sheriff's

 5   Deputy Clint Francisco made statements consistent with

 6   his prior reports and declarations in this matter along

 7   with the following additional statements."

 8            Do you see that?

 9   A        I do now, there was two different ones.

10   Q        Oh, I apologize.

11            So that's the first paragraph.  And you had

12   this meeting over -- or approximately one month ago;

13   right?

14   A        On November 7th?

15   Q        Yeah?

16   A        Yes.

17   Q        In the second paragraph -- and again, you read

18   along while I read aloud -- it says:  "Prior to

19   responding to the call for service during which Mr. Grey

20   was arrested, Deputy Francisco asked an L.A. County

21   Sheriff's Department secretary to run a wants and

22   warrants check on Mr. Grey and learned that Mr. Grey had

23   a following felony conviction, an outstanding warrant,

24   and was on the terrorist watchlist; right?

25   A        Yes.
```

```
 1   Q        Now, in your declaration -- this is paragraph
 2   5 -- you wrote:  "Upon receiving this report from
 3   Deputy Haven, I ran a record check on Mr. Grey"; right?
 4   A        Yes.
 5   Q        There are no records to support you running a
 6   check on Mr. Grey; right?
 7   A        That was me running the records by asking the
 8   secretary to run it for me.  That's how we do it all the
 9   time.
10   Q        Sure.  But if I pulled up your MDC records, for
11   example, I wouldn't see that; right?
12   A        No.
13   Q        Okay.  And there's nothing associated with you
14   specifically running those searches; right?
15   A        It was me because I had the information giving
16   it to the secretary to -- and they put in my information
17   in the -- the urn number to that report to access that
18   data.  The secretary doesn't know how to do that.
19   Q        Okay.  In your declaration, you didn't say
20   anything about calling a sheriff's department secretary;
21   right?
22   A        We -- in all of our reports, we don't reference
23   a secretary.
24   Q        You didn't say anything in your declaration
25   about calling a secretary; right?
```

```
 1   A        No.

 2   Q        Now, you didn't say that -- you didn't just say

 3   that you ran the record's search.  You also say that you

 4   ran searches on three specific databases; right?

 5   A        The secretary did, yes.

 6   Q        Right.  Is it your testimony that as the

 7   secretary is relaying this information to you, he or she

 8   is kind of calling out, "Now, I'm running CHEERS.  Now,

 9   I'm running RAPS.  Now, I'm running the California

10   Warrants System."

11            Is that your testimony?

12   A        She -- when I tell her to run a subject, that's

13   what she does.  And she runs all those systems because

14   we don't have access to those databases.  I don't even

15   have a log-in for those databases.

16   Q        You don't have a log-in to -- to check the

17   California Warrant System?

18   A        At that time, no.

19   Q        Who is it that ran those searches?

20   A        I don't know -- I don't remember the

21   secretary's name.

22   Q        All right.  So in your declaration, you wrote

23   that you recalled running these searches on three

24   specific databases; right?

25   A        Uh-huh.
```

1    Q        And you -- and you wrote that you recalled

2    receiving specific information about Mr. Grey; right?

3    A        Yes.

4    Q        And now much later, you say you didn't actually

5    run those searches yourself; right?

6    A        I did, using the secretary's -- it's the same

7    thing.  We used the secretaries all the time in the

8    course of our job, and we use databases and gain

9    information.  And that's how we compile the -- the

10   information.  I still did it on the investigating

11   officer.  And that's how it -- that's how it works.

12            You can check any of my reports in the past.

13   And we've never referred to a secretary pulling a

14   booking number for us or an urn number, but the urn

15   number is still there.

16   Q        So you -- your testimony now is that you didn't

17   run the searches yourself; right?

18   A        I did.

19   Q        You didn't personally log onto a computer and

20   run the searches yourself; fair?

21   A        In that case, no.  I didn't.

22   Q        But you can't recall who it was that ran them?

23   A        I'd have to look at the in-service that day and

24   speak with that secretary personally.

25   Q        And you didn't --

```
 1          THE COURT:  Why would you say that you ran
 2   something, but someone else did it?  You did it under
 3   penalty of perjury.  Why wouldn't you say, "I had my
 4   secretary run the searches"?
 5          THE WITNESS:  In the reference of that, sir,
 6   we --
 7          THE COURT:  Look, I've had dozens of officers
 8   testify.  And every officer I've ever seen here has
 9   always said they've ran it themselves, but why would you
10   say that?
11          THE WITNESS:  Now -- now, thinking about it,
12   it -- that's truthful, yeah.  That's true.  We -- we
13   don't run it.  It's just one of those things, when we do
14   report-writing -- it -- it sounds --
15          THE COURT:  But that's not accurate.  You're
16   stating it under penalty of perjury.  Did you tell the
17   Government lawyers that?  That you didn't run it?  Did
18   you tell them -- did you tell them you didn't actually
19   run it, that you had a secretary run it?
20          THE WITNESS:  We ran him by going through the
21   secretary and providing his information.  The secretary
22   doesn't have that information.  So by me -- that
23   secretary wouldn't know what to do, if it wasn't for us
24   going to her and saying, "Can you run this person for
25   me?"
```

1          And she goes, "Yep," because she has the

2     log-ins, the LACOS (phonetic) and all that stuff and

3     does the database checks, and then provides that

4     information to us.  So I, in turn, got the information.

5     She doesn't know -- the secretary doesn't understand

6     even the information that she's running.  She just knows

7     to check this database, this database with that

8     information.

9          So I think that's why we use that terminology

10    of "I ran that person" because the secretary couldn't

11    even testify on what she pulled.  She -- she gives that

12    information to us.

13          THE COURT:  Well, we -- we will continue this

14    hearing after today.  And I'm going to want you to track

15    her name down, and I want the secretary here for the

16    continuation of this evidentiary hearing.

17          MR. SNYDER:  And -- and just going back to that

18    first paragraph...

19          THE COURT:  Sit down, Counsel.

20    BY MR. SNYDER:

21    Q       In that paragraph, it said that you made

22    certain statements that were consistent with your prior

23    reports "along with additional statements"; right?

24          That's what that paragraph says?

25    A       Yes.

```
 1   Q        And this is one of the additional statements;
 2   right?
 3   A        The one that we're talking about right now?
 4   Q        Yeah.
 5   A        Yes.
 6   Q        So in your declaration, you said that you ran
 7   them; right?
 8   A        Yes.
 9   Q        And then you made additional statements that
10   were not in your declaration, which are memorialized in
11   this letter, which now says that someone else ran them;
12   right?
13            That's why -- that's why I have this letter;
14   fair?
15   A        Yes.
16   Q        I want to just make clear, one of the things
17   that you said was that you actually can't run these
18   searches; right?
19   A        Correct.
20   Q        Correct.  Okay.  It's just -- one final thing
21   on this topic before we go on, you say you made this
22   call to dispatch; right?
23   A        To?
24   Q        The secretary?
25   A        The secretaries --
```

```
1    Q        Okay.

2    A        -- at the station.

3    Q        Oh, okay.  So there's no recording of it at

4    all; is that what you're saying?

5    A        Correct.

6    Q        So you just had a in-person conversation with

7    the secretary at the station; that's your testimony?

8    A        That's what we do, yes.

9    Q        Now, I'm going to skip ahead to something --

10   sorry.  I'll -- I'll keep where I am.  One of the other

11   things you said in paragraph 5 of your declaration is

12   that at the same time as you ran Mr. Grey for warrants,

13   which you say that you did before arriving at his home,

14   you also learned that he was on the terrorist watchlist;

15   right?

16   A        Yes.

17   Q        You didn't call the FBI before going to

18   Mr. Grey's property; right?

19   A        Correct.

20   Q        You didn't call Homeland Security; right?

21   A        No.

22   Q        You didn't call the Terrorist Screening Center

23   or Threat Screening Center; right?

24   A        No.  Deputy Haven did.

25   Q        How do you know that?
```

1    A        It's one of the items that he told us when he

2    gave us all that information.

3    Q        Can you show me where in your declaration it

4    says that?

5    A        No.

6    Q        Is it in your declaration?

7    A        It's in course of getting that information from

8    Deputy Haven and me getting that information is what I

9    did at the station.  It's one of the -- the items of

10   just researching it.  And that's why it's in the report

11   that he's on the FBI terrorist watchlist.

12   Q        So your testimony is that before going to

13   Mr. Grey's house, you actually did have contact with

14   federal law enforcement, including people on the

15   terrorist -- at the Terrorist Screening Center?

16   A        Me?  No.

17   Q        Someone in your department who passed you

18   information?

19   A        Yes.

20   Q        So if the prosecutor said that you didn't know

21   any of this stuff about his history or anything like

22   that, that would be wrong; right?

23   A        All I knew is he was on the FBI terrorist

24   watchlist.

25   Q        And you knew that from?

```
 1   A          Deputy Haven had contacted --

 2   Q          Who?

 3   A          -- the center.

 4   Q          And he told you he called the center?

 5   A          Yes.

 6   Q          And he didn't tell you what they said?

 7   A          He didn't -- they didn't tell him anything.

 8   Q          Okay.  And you didn't personally call the

 9   Terrorist Screening Center; right?

10   A          No, because Deputy Haven had already contacted

11   them.

12   Q          All right.  I want to ask you to go now to

13   Exhibit E of your declaration.  So this is Exhibit 1 and

14   then the tab E.  And I'll ask you to go to the page that

15   is Bates 735, which is internal, I think, 14.

16   A          7 --

17   Q          Yeah.

18   A          735?

19   Q          Yep.  Yep.  And that's your name at the top of

20   that page; right?  Francisco?

21   A          Yes, it is.

22   Q          Okay.  And what we can see here is that at

23   9:10 p.m., you ran some searches; right?

24   A          Yes, using the CAD.

25   Q          Using the -- the what?
```

1    A        Our MDCs, the computers that are in our car.

2    Q        Right.  And you ran these searches, among other

3    things, against the Wanted Person System; right?

4    A        It's attached to it, yes.

5    Q        And just to be clear, your testimony a couple

6    minutes earlier was that you can't run searches; right?

7    A        On the CAD, I can.

8    Q        Okay.  But you -- you have access to your car;

9    right?

10   A        Yes, but only limited information comes up on

11   that versus what a secretary can pull up.

12   Q        Okay.  What information did the secretary give

13   you that is not part of the information you could get?

14   A        She can print out like a -- like a -- she can

15   put a picture on it that shows like past convictions and

16   stuff like that.  CAD doesn't show us any of that

17   information.

18   Q        Okay.  So you ran these searches at 9:10 p.m.;

19   right?  You can see the -- the time there, 21:10.

20            Do you see that?

21   A        Yes.

22   Q        And you're running wants and warrants checks on

23   Mr. Grey; right?

24   A        Yes.

25   Q        9:10 p.m. would have been after your arrest of

1    Mr. Grey; right?

2    A        Correct.

3    Q        And I guess your testimony is that here you are

4    rerunning the searches that had already been run in the

5    past, but for which we have no record to learn the same

6    information; right?

7    A        With -- when we get somebody in custody, we put

8    them in the back.  We run their information through the

9    computer, through the CAD.

10   Q        Now, if you look -- let's see, it is the second

11   line, there's a reference to "MDC11105."

12            Do you see that?

13            It's associated with the 1653 entry, MDC11105.

14   Do you see that?

15   A        Yes, I see that.

16   Q        That's a computer in your car; right?

17   A        Yes.

18   Q        And 11105 is the specific mobile data center

19   associated with your car; right?

20   A        Yeah.  I don't know that for sure, but that's

21   what it says on that paper, yes.

22   Q        Right.  That's why your name's on the top of

23   the sheet; right?

24   A        That's correct.

25   Q        So I want to ask you now to what's been marked

```
 1    as Exhibit 7, and I'll represent that the certification

 2    here is Exhibit 9.  This is a document that I obtained

 3    via subpoena from the sheriff's department.

 4              Just let me know when you're there.

 5    A       It says like --

 6    Q       Yeah, at 4-20-2023, that's the one.

 7    A       Yes, I see that piece of paper.

 8    Q       Okay.  So if we look at the top here, there's a

 9    beginning date and an ending date, which is

10    December 16th, 2022, to December 17th, 2022; right?

11    A       Yes.

12    Q       And if we go down a little bit below that --

13    skip one line -- we can see "MDC11105"; right?

14    A       Yes.

15    Q       And that's your car; right?

16    A       I don't -- I don't know which computer I had in

17    my car at that time, but if that's what the paper says,

18    yes.

19    Q       And if you go down, we can actually see the

20    text of the responses that you got back when you ran

21    those queries at 9:10 p.m., which may not -- can you see

22    the text of the responses or is it not there?

23    A       I see a bunch of texts.  I don't understand it.

24    It's a bunch of numbers and stuff like that.  It's --

25    you know, looks like computer code.
```

1          MR. SNYDER:  Unfortunately, Your Honor, the

2     full exhibit is not here.  So I'm going to take a second

3     and think about how to do this, but I can follow up on

4     it in a second.

5          THE COURT:  Okay.

6     BY MR. SNYDER:

7     Q       So let me ask you, when you -- when you ran

8     those searches at 9:10 p.m., you got information back;

9     right?

10    A       Yes.

11    Q       And that information included information about

12    the terrorist watchlist; right?

13    A       If it -- it popped up on that at that time, it

14    could have.  I don't remember seeing that at that time.

15    Q       Okay.  And there was actually a phone number

16    associated with the Terrorist Screening Center; right?

17    A       Yes.

18    Q       And again, you say that before going to the

19    home, you learned that Mr. Grey was on the terrorist

20    watchlist; right?

21    A       Yes.

22    Q       And you didn't call the FBI; right?

23    A       Because Deputy Haven already did.

24    Q       Okay.  But you didn't call the FBI; right?

25    A       No.  I did not, no.

```
1    Q        And you didn't call the number that was listed

2    there in the return; right?

3    A        No.

4    Q        Instead, even though in your telling you knew

5    Mr. Grey was on the terrorist watchlist, you didn't

6    contact anyone from federal law enforcement; right?

7    A        No.

8    Q        You pressed forward to Mr. Grey's house; right?

9    A        Yes.

10   Q        After dark; right?

11   A        Yes.

12   Q        In the mountains; right?

13   A        Yes.

14   Q        To, in your telling, investigative a missing

15   boxed truck; right?

16   A        Embezzled vehicle, yes.

17   Q        Which had been initially reported 11 days

18   earlier; right?

19   A        That's that first call for service, yes.

20   Q        At which time, nobody was dispatched at all;

21   right?

22   A        I don't know.

23   Q        Now, again, your testimony -- this is paragraph

24   4(C) -- is that when you went to Mr. Grey's property on

25   the night of December 16th, it was only to investigate a
```

1    missing U-Haul; right?

2         You were not there to conduct a criminal meth

3    investigation?

4    A       There was that second call for service that

5    had -- that I read the text of it that said that there's

6    possible manufacturing of meth inside the truck.  So

7    that was one of the things to investigate on top of the

8    embezzled vehicle, yes.

9    Q       Is it your testimony today that you were

10   conducting also a criminal meth investigation?

11   A       It was in the --

12           MR. MAGANA:  Objection, Your Honor.  That

13   misstates the testimony.

14           THE COURT:  Overruled.

15           THE WITNESS:  It was in the call for service

16   about possible manufacturing, so we were going up there

17   for the embezzled U-Haul.

18   BY MR. SNYDER:

19   Q       Okay.  So I guess I -- I'll go through a few

20   different documents with you.

21           I'm going to ask you first to look at your

22   declaration, which you signed under penalty of perjury,

23   and go to paragraph 4(C).  This is page 2.  And I'll ask

24   you to just follow along while I read it.

25           Lines 24 to 28, you said:  "I believe this was

1    an appropriate matter for the six-person special

2    assignment team to handle because we had sufficient

3    personnel to investigate a stolen vehicle in a

4    wilderness area safely and without the need to call for

5    additional support over the radio."

6           That's what you said in this case under oath;

7    right?

8    A       Yes.

9    Q       You didn't say anything about investigating

10   meth; right?

11   A       No.

12   Q       I want to ask you to turn to Exhibit 2, which

13   is your warrant affidavit, which you also signed under

14   penalty of perjury.

15   A       And this is exhibit what?

16   Q       Exhibit 2.  Now, if you go to the last page

17   there, that's -- that's your statement of probable

18   cause.  And you drafted this on the night of these

19   events; right?

20   A       Yes.

21   Q       And you knew it was going to a warrant judge;

22   right?

23   A       Yes.

24   Q       And what you wrote in Exhibit 2 was that the

25   purpose of going to Mr. Grey's property was to

```
 1    investigate a missing U-Haul; right?

 2            That was what you wrote in that document?

 3    A       Yes.

 4    Q       You didn't say anything about going to

 5    investigate a meth lab; right?

 6    A       Correct.

 7    Q       And when explaining the arrest, this is now the

 8    second paragraph -- I apologize -- the third paragraph,

 9    you wrote that you detained and arrested suspect, Grey,

10    for being in possession of an embezzled vehicle; right?

11            That's what you wrote?

12    A       Yes.

13    Q       I want to ask you to turn to Exhibit 3, which

14    is your police report in this case.  And earlier,

15    remember we talked about the process for preparing

16    police reports and the importance of including pertinent

17    information; right?

18    A       Yes.

19    Q       And in Exhibit 3, I'm now in the second

20    paragraph, you wrote:  "Sergeant Rios, Deputy Tirado,

21    Deputy Mendez, Deputy Tabanez, and Deputy Marin and I

22    went to the indicated area for the embezzled U-Haul";

23    right?

24    A       Yes.

25    Q       And nowhere in your report do you mention going
```

 1    there to investigate a meth lab; right?

 2    A        No.

 3    Q        But your testimony today is that that was

 4    actually the secondary purpose of going?

 5    A        No.  It was just in the call for service.  So

 6    if it was there, then we would investigate it.

 7    Q        So you were also investigating a potential meth

 8    lab?

 9    A        If it's in the call for service stating that

10    there's possibly a manufacturing of meth in the back of

11    the U-Haul and we arrive and it's there, yes.  We would

12    investigate it.

13    Q        Okay.  But you knew before you went; right?

14             You had this call before you went?

15    A        Yes.

16    Q        So it's not like something you learn for the

17    first time when you got there; right?

18    A        Correct.

19    Q        I'm going to read from you page 4, lines 3

20    through 8 of the Government's opposition.  The

21    Government wrote:  "The special assignment team is a

22    six-man group in the Santa Clarita area, which Deputy

23    Francisco believed had sufficient personnel to

24    investigate a stolen vehicle in a wilderness area safely

25    and without the need to call for additional support over

1    the radio.  They were near the beginning of their

2    ordinary shift from 4:00 p.m. to 2:00 a.m. and were,

3    therefore, well positioned to further investigate."

4              Are saying that that's not accurate?

5    A       That's accurate.

6    Q       Well, you're telling me now that your only

7    purpose was not simply to investigate a missing U-Haul.

8    It was also to -- a secondary purpose of investigating

9    this meth lab; right?

10             MR. MAGANA:  Objection, Your Honor.  This,

11   again, misstates the testimony.  What the deputy said

12   was that if they found a meth lab there, they would have

13   investigated it, not that it was their purpose in going

14   up there.

15             THE COURT:  Sustained.

16   BY MR. SNYDER:

17   Q       So just to be clear, you knew about this

18   secondhand anonymous tip before arriving to the

19   property; right?

20   A       As you said, it was "secondhand" info of that.

21   Yes, I did know that.  Right.

22   Q       Okay.  And when you went to the property, you

23   didn't, like, immediately see a meth lab; right?

24   A       No.

25   Q       Okay.  Let's actually talk about what happened

```
1    when you got there.  So shortly after arriving at the

2    property, you located Mr. Grey by the U-Haul; right?

3    A        Yes.

4    Q        And when you got there, you and Sergeant Rios,

5    you pointed your guns at him; right?

6    A        Yes.

7    Q        You put him in handcuffs; right?

8    A        Yes.

9    Q        You placed him under arrest?

10   A        Yes.

11   Q        And you took him over to your patrol car and

12   put him inside; right?

13   A        Yes.

14   Q        And after putting Mr. Grey in your patrol car,

15   you went back to the U-Haul; right?

16   A        Yes.

17   Q        And you met up again with Sergeant Rios and one

18   or two other officers; right?

19   A        Yes.

20   Q        And you confirm the license plate on the

21   U-Haul.  That this was the U-Haul you were looking for;

22   right?

23   A        Yeah.

24   Q        And you looked in the back of the U-Haul;

25   right?
```

1    A       Yes.

2    Q       Which is where the anonymous secondhand tipster

3    said that a meth lab would be; right?

4    A       Yes.

5    Q       And there was no meth in there; right?

6    A       No.

7    Q       If we just freeze things right there in that

8    moment, you say that you were on property for

9    embezzlement investigation.  That was your primary

10   purpose; right?

11   A       Yes.

12   Q       You arrested Mr. Grey; right?

13   A       Yes.

14   Q       You had him detained in the back of your car;

15   right?

16   A       Yes.

17   Q       You confirmed that the U-Haul was the one that

18   you were looking for; right?

19   A       Yes.

20   Q       But you did not turn around and leave; right?

21   A       No.

22   Q       In your declaration -- I'm now at paragraph

23   8 -- you say that what happened next was, and I'm

24   quoting you:  "The special assignment team conducted a

25   sweep of the exterior of the property for officer

```
 1   safety."

 2           Is that your testimony?

 3   A       Yes.

 4   Q       Okay.  Were you doing a meth investigation or

 5   doing a sweep for officer safety?

 6   A       Doing a protective sweep for officer safety.

 7   Q       Okay.  And so for the period of time between

 8   Mr. Grey's arrest and -- and -- and when you asked for

 9   his permission to go in the home, that was a sweep for

10   officer safety; right?

11   A       We did the protective sweep around the

12   property, yes.  Continue the investigation of the

13   embezzled vehicle.

14   Q       Okay.  And when did that end?

15   A       Not until I was done talking with Mr. Grey.

16   Q       And he gave you permission to go inside; right?

17   A       Yes.

18   Q       Okay.  So that 35-minute period between when

19   you arrive and when you ultimately get his permission to

20   go inside the home, that's a sweep of the exterior of

21   the property for officer safety; right?

22   A       No, the sweep was only probably three --

23   four minutes, if that.

24   Q       What was going on after that?

25   A       I had to talk with Mr. Grey.
```

1    Q        Okay.  Well, the videos are what they are.  You

2    know, the time was what it was.  And -- and I guess

3    my -- my more pointed question is:  During that period

4    of time, were you conducting a criminal meth

5    investigation around and, kind of, inside Mr. Grey's

6    home?

7    A        No.

8    Q        No.  Okay.  Now, if you had him arrested for

9    the U-Haul at that point, my first question is:

10   Wouldn't it have been more conducive for officer safety

11   to just leave?

12   A        No.  I can't leave the 30-foot U-Haul behind.

13   We have to do our CHP 180.  We have to do paperwork on

14   that.

15   Q        Okay.

16   A        And I also have to inventory the vehicle to

17   make sure there's nothing illegal in that, as well.  All

18   that stuff takes time.  A tow truck to get that removed

19   takes some time.  So we had to make sure that the area

20   was secure for us to do all that.

21   Q        Okay.  When'd you do the inventory?

22   A        The vehicle inventory was done -- we did a

23   preliminary check of the vehicle.  And the -- the

24   vehicle's actually towed earlier that morning.

25   Q        Yeah.  When did -- you said that you needed to

```
1   clear the area for safety so you could do the inventory.

2   When did you do the inventory?

3   A        We had to call the tow truck.

4   Q        Right?

5   A        And the tow truck said they couldn't respond

6   until earlier that morning.  And that's when that -- the

7   tow truck came out and that's when that CHP 180 was

8   completed.

9   Q        Okay.  So you didn't do one?

10  A        We were back at the station already.  And

11  another deputy was out there and he completed a report

12  for that recovery, as well.

13  Q        Okay.  But your testimony was that you needed

14  to do the sweep for officer safety so that you could do

15  the CHP 180 report and get it towed, but you didn't do a

16  CHP 180 report; right?

17  A        Because we were doing the protective sweep.

18  Q        Understood.  After -- after the protective

19  sweep was over, did you do the CHP 180 that night?

20  A        No, because Mr. Grey gave us permission to go

21  get his cell phone and keys.

22  Q        Okay.  And is it your testimony that a tow

23  truck was going to come after dark to that property that

24  night?

25  A        We hadn't requested anything yet because we
```

```
 1    haven't gotten to that point yet.  We're still making
 2    the -- the area secure.
 3    Q        Okay.  And so it's -- again, it's your
 4    testimony that the safest thing to do was not to take
 5    Mr. Grey back to the station.  It was to kind of go
 6    around the property during this period of time for
 7    however long that took; right?
 8    A        Yes, it's just very large property.
 9    Q        Okay.  So I want to ask you about some of the
10    things that happened during this period.  After
11    arresting Mr. Grey, as I said, the first thing you did
12    was you went to check the U-Haul; right?
13    A        Yes.
14    Q        After doing that, you had officers set up a
15    parameter around the home; right?
16    A        Yes.
17    Q        You instructed officers to check and see if
18    there was any movement in the RV; right?
19    A        Yes.
20    Q        At some point, you and the other officers went
21    around to the back of Mr. Grey's home; right?
22    A        Yes.
23    Q        You looked in the yard; right?
24    A        Yes.
25    Q        You inspected a -- a house on an adjacent lot;
```

```
 1    right?
 2    A          Right behind his house, yes.
 3    Q          Several other officers tried to, kind of, look
 4    in the home, see if they could see what was going on
 5    inside the home; right?
 6    A          Yeah.
 7    Q          At some point, Seargant Rios and another
 8    officer went to the front door; right?
 9    A          Yes.
10    Q          They knock on the front door and didn't get an
11    answer; right?
12    A          Yes.
13    Q          They opened the door, and they looked inside;
14    right?
15    A          Yes.
16    Q          And your testimony is that all of that was for
17    officer safety; right?
18    A          Correct.
19    Q          It's your testimony that that was not part of a
20    criminal meth investigation; right?
21    A          Correct.
22    Q          All right.  So I want to talk about some other
23    things.
24               MR. SNYDER:  And with the court's permission,
25    I'm going to play a few short video clips, which are
```

1    excerpted from exhibits that had been filed; is that

2    okay?

3             THE COURT:  That's fine.

4             MR. SNYDER:  So the first clip that we have is

5    Exhibit 5 to the motion.  The time stamp is 12:25

6    through 12:33.  I've marked it as Exhibit 12 to this

7    hearing.  And I'll ask Mr. Grey to please play

8    Exhibit 12.

9        (Whereupon, Defense's Exhibit 12 is marked hereto.)

10           (Whereupon, video is played in open court.)

11   BY MR. SNYDER:

12   Q        So what we saw on that video is Sergeant Rios;

13   right?  He's the -- he's the speaker?

14   A        Right.

15   Q        And at that point, he had opened the front door

16   to Mr. Grey's home without a warrant; right?

17   A        Yes.

18   Q        And he had spent some time looking inside the

19   home with another deputy; right?

20   A        Yes.

21   Q        And then he said:  "Do you see anything related

22   to meth or anything like that"; right?

23   A        That's what he said.

24   Q        Is it your testimony that opening Mr. Grey's

25   front door without a warrant and looking for meth or

```
1    anything like that inside his home was something done

2    for officer safety?

3    A        I can't speak on the behalf of another deputy.

4    He would have to testify to that as to his reasoning for

5    doing so.

6    Q        Okay.  And it's your -- your testimony is that

7    this was not part of a criminal meth investigation;

8    right?

9    A        Correct.

10   Q        Okay.  In addition to asking anything relating

11   to meth, Sergeant Rios also asked whether there was

12   anything to stay away from inside the home; right?

13   A        Yes.

14   Q        This is ten minutes after you arrived at the

15   property; right?

16   A        Yes.

17   Q        And he's already asking if there are things to

18   avoid inside Mr. Grey's home; right?

19   A        Yes.

20   Q        At some point after this, two of the deputies

21   went around to the back of Mr. Grey's house, and they

22   started inspecting items in his laundry area; right?

23   A        Yes.

24   Q        And after looking at them, they came back to

25   you and said they had found meth precursors; right?
```

```
 1    A       Yes.

 2            MR. SNYDER:  Again, with the Court's

 3    permission, I would like to play -- what I've -- what

 4    I've marked for this hearing as Exhibit 10, but it's

 5    Exhibit 4, time stamped 16:55 to 17:07; is that all

 6    right?

 7            THE WITNESS:  Go ahead.

 8            MR. SNYDER:  Thank you.

 9      (Whereupon, Defense's Exhibit 10 is marked hereto.)

10      (Whereupon, Defense's Exhibit 4 is marked hereto.)

11        (Whereupon, video is played in open court.)

12    BY MR. SNYDER:

13    Q       So in this clip, the deputies had just finished

14    telling you about the supposed meth precursors.  And

15    your response was:  "I'm going to question him some more

16    on that and see if he'll come clean.  And if he doesn't,

17    we're going to investigate that some more.  And then

18    we'll get a warrant for the house"; right?

19    A       That's what I said.

20    Q       Is it your testimony that inspecting the

21    cleaning supplies in Mr. Grey's laundry area was done

22    for officer safety?

23    A       No.  That was to investigate what my partner,

24    which has a -- he just went to a class for meth -- for

25    manufacturing narcotics, that he told me, "I want to
```

1    verify if it looked like any type of meth or meth lab

2    stuff."

3    Q        Okay.  So when they were around the back of the

4    house, that was not for officer safety.  That was a meth

5    investigation?

6    A        They went to the back to do a protective sweep.

7    And when they saw the chemicals, which he recognized to

8    be consistent with chemicals used to construct

9    methamphetamine, that's why he came back and reported

10   that to me.

11   Q        Okay.  And -- and you eventually did go and

12   inspect those; right?

13   A        Yes.

14   Q        And you found that it was apple cider vinegar

15   and bleach; right?

16   A        Yeah.  It didn't look consistent to me at all.

17   Q        Now, is it your testimony that questioning

18   Mr. Grey further about the cleaning supplies would have

19   been something that would have -- was done for officer

20   safety?

21   A        If I'm presented with something, I'm still

22   going to ask him to -- what the chemicals are to see

23   what they are.  And I just asked him a general question.

24   Q        And when you said that if Mr. Grey didn't come

25   clean, you were going to investigate some more, is it

1    your testimony that investigating the chemicals some

2    more was not referring to a criminal investigation?

3    A        If it was in fact what he said it was -- if it

4    was a meth lab, then we would investigate it further.

5    And then that's why I said we would get a warrant if it

6    was a meth lab.

7    Q        Okay.  And when you said that you would get a

8    warrant for the house -- in your testimony, that getting

9    a warrant for the house would have been for officer

10   safety or what would that have been for?

11   A        Well, we're going off -- we're speculating that

12   there was some type of meth lab.  There was no meth lab.

13   So there was nothing to investigate any further on that

14   because I've already looked at the chemicals and deemed

15   that there -- there was not a meth lab.

16           MR. SNYDER:  With the court's permission, I

17   want to play another portion of the video.  This is

18   Exhibit 4 to the motion, time stamped 18:50 to 19:40.

19   And I've marked it as Exhibit 11, is that all right?

20           THE COURT:  Go ahead.

21       (Whereupon, video is played in open court.)

22   BY MR. SNYDER:

23   Q        When you went to question Mr. Grey about the

24   chemicals, one of the things you said was, quote:

25   "You're not doing anything illegal here inside the house

1    or anything like that that I need to know about"; right?

2    A        Yes.

3    Q        You said, "if we go through your house, we're

4    not going to find anything"; right?

5    A        Yes.

6    Q        Is it your testimony that that questioning was

7    also for officer safety?

8    A        That was in regards to the possible meth lab

9    that my partner just told me about, which I haven't

10   confirmed yet.

11   Q        Is it your testimony that going through his

12   house and looking for anything illegal would have been

13   for officer safety?

14   A        That would not be for officer safety, no.

15   Q        When you said that you were going to come back

16   and that you wanted an answer from him about the

17   chemicals, is it your testimony that that was for

18   officer safety?

19   A        That was in regards to my partner telling me

20   there's a -- chemicals that were used for a meth lab in

21   the back, and that's why I asked him about that.

22   Q        Let me ask you this:  If Mr. Grey had responded

23   to those questions by saying, "Go ahead and check.  Go

24   in my house.  I have nothing to hide," what would have

25   you done?

1           MR. MAGANA:  Objection, Your Honor.  It's a

2    hypothetical.  Calls for speculation.

3           THE COURT:  Sustained.

4    BY MR. SNYDER:

5    Q       Would you have gone in Mr. Grey's house if he

6    had said, "Go ahead.  Go inside"?

7           MR. MAGANA:  Same objection, Your Honor.

8           THE COURT:  Sustained.

9    BY MR. SNYDER:

10   Q       At some point after this, one of the deputies

11   started running VIN numbers for the cars on Mr. Grey's

12   property to see if they were stolen; right?

13   A       Yes.

14   Q       Is it your testimony that running the VIN

15   numbers was for officer safety?

16   A       No.

17   Q       So just to be clear, you said in your

18   declaration under oath that the activity performed

19   during this time period, which you described as a sweep

20   of the exterior of the property, was for officer safety;

21   right?

22   A       Yes.

23   Q       And this was not a criminal meth investigation

24   that you were conducting during this time; right?

25          MR. MAGANA:  Objection, Your Honor.  Misstates

1    the testimony in the declaration.

2              THE COURT:  Overruled.

3              THE WITNESS:  The protective sweep was not for

4    the investigation.

5              MR. SNYDER:  Okay.

6              THE COURT:  For what investigation?  The meth?

7              THE WITNESS:  For the meth.

8    BY MR. SNYDER:

9    Q        And again, the meth investigation is not

10   something you mentioned in your declaration that you

11   filed in this case; right?

12   A        Because he wasn't arrested for meth.

13   Q        And you didn't mention it in your warrant

14   affidavit; right?

15   A        Correct.

16   Q        And you didn't mention it in your

17   contemporaneous police report; right?

18   A        Yes.

19   Q        Now, at some point after this 35-minutes of

20   activity you turned off your camera to debrief with

21   Sergeant Rios; right?

22   A        Yes.

23   Q        You and he debriefed for three minutes; right?

24   A        I don't remember the exact amount of time, but

25   we did do a debrief.

1    Q        Yeah.  That makes sense.  When you turned your

2    camera back on, you then went over to talk to Mr. Grey,

3    again; right?

4    A        Yes.

5    Q        And it was at that point after -- I'll tell

6    you, it was 35 minutes -- that you told Mr. Grey that

7    you had to take him to the station; right?

8    A        Yes.

9    Q        And you told him that his house would be

10   unsecured when you took him to the station; right?

11   A        Yes.

12   Q        And then you said that you could go inside and

13   get his phone and keys and lock the door; right?

14   A        Yes, I asked him if I could.

15   Q        I want to look quickly at what you wrote in

16   your arrest report about this period of time.  So if you

17   can turn please to Exhibit 3...

18            Now, in your arrest report, you don't say

19   anything about all the things that we just discussed;

20   right?

21   A        Yes, I did.

22   Q        You don't say anything about, let's say,

23   opening the front door to Mr. Grey's home and looking to

24   see if there's meth inside; right?

25            You don't say that?

1    A        No.

2    Q        You don't say -- say anything about inspecting

3    the laundry area; right?

4             You don't say that?

5    A        No.

6    Q        No.  You don't say anything about questioning

7    Mr. Grey related to meth or anything like that; right?

8    A        Correct.

9    Q        You don't say that you had contemplated

10   investigating further and getting a warrant; right?

11   A        Correct.

12   Q        If I were just reading your report, what it

13   would look like to me would be that you detained

14   Mr. Grey, you confirmed the U-Haul, and then he gave you

15   consent to enter his home; right?

16            Those are the only facts that you listed;

17   right?

18   A        There was more.

19   Q        Tell me -- tell me for this period of time

20   we're talking about -- after Mr. Grey's arrest, before

21   you go in the home -- what more is there?

22   A        In the report, he -- it said he told me that he

23   actually had an incident.  And I was investigating that,

24   as well, about the two people that came to his house and

25   shot his house up.

```
1    Q         That's true.  You do mention that, too.  That's
2    the only thing you mention; right?
3    A         Yes.
4    Q         You don't mention any of the activity that you
5    and your fellow officers engaged in; right?
6    A         Correct.
7    Q         And if I were just reading this report, I
8    wouldn't know that you had done any of that; right?
9    A         Yes.
10   Q         What it would look like is that you showed up
11   to the property; right?
12             That would be one thing I could learn; correct?
13   A         Yes.
14   Q         And then you arrested Mr. Grey; right?
15   A         Yes.
16   Q         You Mirandized Mr. Grey; right?
17   A         Yes.
18   Q         He gave you a little bit of information about
19   this prior incident; right?
20   A         A lot of information, yes.  And then he --
21                       (Cross-talk.)
22             THE WITNESS:  -- look at his cell phone.
23   BY MR. SNYDER:
24   Q         Sorry.  Go ahead.
25   A         That he wanted me to look at his cellphone to
```

1    prove this case because I have to investigate that, as

2    well as him being a victim of that.

3    Q        And then, the other fact that I would learn is

4    that you said that, you know, he asked you to get his

5    stuff from inside the home; right?

6            Those are the facts in your -- in your report?

7    A        Yes.

8    Q        And you don't mention any of this activity in

9    your warrant affidavit either; right?

10           All the activity that the officers did; right?

11   A        Correct.

12   Q        Let's go now to paragraph 10 of your

13   declaration.  In paragraph 10, you say that following

14   his arrest, Mr. Grey asked you to retrieve property from

15   inside his home, generally; right?

16   A        Yes, generally.

17   Q        You then say -- and I'm quoting:  "I believe

18   that a protective sweep of the interior of the residence

19   was necessary"; right?

20   A        Yes.

21   Q        You then set out a bunch of reasons

22   supposedly -- supposedly supporting that belief; right?

23   A        Yes.

24   Q        Every single one of the things that is

25   mentioned in that paragraph, you were aware of before

1    entering the home; right?

2    A        Yes.

3    Q        In fact, in your declaration, you say that you

4    made the decision to sweep the home before you even

5    entered; right?

6    A        Yes.

7    Q        Now, that's not what you said on the night of

8    Mr. Grey's arrest; right?

9    A        No.  We did a protective sweep of the house the

10   night of his arrest.

11   Q        Right.  But you didn't say on the night of his

12   arrest that you made the decision to sweep before

13   entering based on a bunch of factors; right?

14   A        No.  I said -- I said we were going to do a

15   protective sweep to my partners.

16   Q        After arresting Mr. Grey, you took him to be

17   booked at the police station; right?

18   A        Yes.

19            MR. SNYDER:  With the court's permission, I

20   want to play -- this is the last clip that I have.

21            THE COURT:  Okay.

22            MR. SNYDER:  This is from Exhibit 14, which is

23   time stamped 1:04 to 2:01.  I've marked it as

24   Exhibit 14; if Mr. Grey can play it...

25            (Whereupon, video is played in open court.)

```
 1   BY MR. SNYDER:

 2   Q        All right.  So that is what you said on the

 3   night of the arrest and search; right?

 4   A        Yes.

 5   Q        And that was immediately right after that

 6   activity; right?

 7   A        I don't know about immediately because we still

 8   had to drive all the way back.  And it's -- it's -- it's

 9   not immediately.

10   Q        I apologize.  That was the same night that

11   those events happened; right?

12   A        Yes.

13   Q        That was before you met with the prosecutors in

14   this case; right?

15   A        Yes.

16   Q        That was before we filed our suppression

17   motion; right?

18   A        Yes.

19   Q        Before they drafted your declaration in

20   response to this motion; right?

21   A        Yes.

22   Q        And you said something similar to what you said

23   on that video in your warrant affidavit, too; right?

24   A        Yes.

25   Q        You said something similar to what you said on
```

1    that video in your report, also; right?

2            MR. MAGANA:  Objection, Your Honor.  This is

3    vague.

4            THE COURT:  Overruled.

5            THE WITNESS:  Yeah, I -- I don't understand

6    that question.  Are you saying that I wrote that in my

7    report or...

8    BY MR. SNYDER:

9    Q       Sure.  If you go to Exhibit 3, go to page Bates

10   540.

11   A       Exhibit A?

12           THE COURTROOM DEPUTY:  3.

13   BY MR. SNYDER:

14   Q       Exhibit 3, yeah.

15   A       Page 540?

16   Q       Yeah.  So if you look at the second paragraph

17   to the end.  Starts with:  "Deputy Marin"; right?

18   A       Yes.

19   Q       It says:  "Deputy Marin stayed with the suspect

20   at the patrol vehicle while we entered the house to

21   retrieve the above items only."

22           Referring to the phone and keys; right?

23   A       Yes.

24   Q       And then you continue on to the next page and

25   you describe going into the home and finding drug

```
 1    paraphernalia; right?

 2    A        Yes.

 3    Q        And then in the second full paragraph, you say

 4    there -- kind of similar to what you said on the video:

 5    "At that point, prior to continuing to locate his phone

 6    and keys or conducting narcotics investigation, we

 7    conducted a sweep for officer safety"; right?

 8    A        Yes.

 9    Q        In your conversation with Mr. Grey, in your

10    warrant affidavit and in your report, you didn't mention

11    any of the factors that are listed in paragraph 10 of

12    your declaration; right?

13    A        I'd have to look at that report to refresh my

14    memory on that one.  I don't remember that.

15    Q        Can you -- can you think of anything -- does

16    anything jump to your mind?

17    A        Can I look at the declaration?

18    Q        Sure.  And that's --

19    A        What page is that?

20    Q        -- paragraph 10.  And then there are a bunch of

21    subparagraphs.

22    A        On which page?

23    Q        The internal -- the number at the top is 5 of

24    7.

25    A        Okay.  In which paragraph?
```

```
1    Q        Paragraph 10.

2             And my question, again, is:  In your report and

3    what you said to Mr. Grey, your statements on the night

4    of, you didn't mention any of these factors that are now

5    listed in paragraph 10; right?

6    A        Yes.

7    Q        And in paragraph 10, you didn't say anything

8    about making a decision to do the sweep based on

9    something you said inside the home; right?

10   A        Correct.

11   Q        The first time that you made the statements in

12   paragraph 10 was after we filed the suppression motion

13   in this case; right?

14   A        It was -- I don't -- I don't know when that

15   was.

16   Q        Well, the first -- the first time you made the

17   statements listed in paragraph 10, I guess is in

18   paragraph 10 of your declaration.  It's not something

19   you said on the night of.  It's not in your report.

20   It's not in your warrant affidavit; right?

21   A        No.  It's something that I talked about with

22   the -- with the agent there -- when we drafted the --

23   the declaration.

24   Q        Okay.  I want to talk about something else in

25   your warrant affidavit.  This is Exhibit 2.  And if you
```

```
 1    can go to the fourth paragraph of -- this is the last

 2    page.  The first line -- sorry.  The second line.  I can

 3    read it for you.

 4            It says:  "While inside the residence, in plain

 5    view, we saw drug paraphernalia and a bag containing

 6    methamphetamine"; right?  That's what you wrote?

 7    A       Yes.

 8    Q       You said something a little bit different in

 9    paragraph 11 of your declaration in this case; right?

10    A       Yes.

11    Q       In this case, you say that after entering the

12    cabin, Tirado moved to turn off the music and flagged

13    that there was a pipe next to the phone; right?

14    A       Yes.

15    Q       But you don't say anything about there being a

16    bag of meth; right?

17    A       Correct.

18    Q       That's because there was no bag of meth on that

19    table; right?

20    A       There was.

21    Q       Why don't you say it in your declaration?

22    A       It's in -- it was in general -- I didn't

23    describe everything else that's on the table either.

24    Just the fact that we went in and saw on that table is

25    what we listed.  There's multiple paraphernalia items
```

```
 1    and everything like that.  I didn't list those either.
 2    Q        The bag of meth was actually found in another
 3    part of the living room; right?
 4    A        There was multiple bags inside the living room.
 5    Q        Well, at the time that you guys entered the
 6    home, nobody called out, "I got a pipe and a bag of
 7    meth"; right?
 8    A        Not that I heard.
 9    Q        He said, "I have a pipe"; right?
10    A        Correct.
11    Q        And now, your declaration, paragraph 11, only
12    mentions the pipe; right?
13    A        Yes.
14    Q        All right.  Sticking briefly with this moment
15    in time, when you entered the home and Deputy Tirado
16    said that he saw that pipe, you didn't stop at that
17    point and seek a warrant; right?
18    A        No.
19    Q        It was only after entering the bedroom that you
20    said, and I'll quote you:  "We got a Barrett 50.  He's a
21    convicted felon.  Yeah, this whole house is ours now.
22    There's ammo on the bed.  He can't have all that.  I'm
23    going to call and get a warrant to get all this"; right?
24    A        Yes.
25    Q        Last, kind of, topic here:  Based on the
```

```
 1    documents that I received yesterday, it sounds like you

 2    met with the prosecutors in advance of this hearing;

 3    right?

 4    A        Yes.

 5    Q        Describe briefly what --  what you guys did to

 6    prepare?

 7    A        We went over the body cam videos.  And then we

 8    also went over the -- the -- the -- the -- the last

 9    statement that we have.  We --  we talked about that.

10    And then we just talked about the incident.

11    Q        And did they do like a mock cross-examination

12    or anything like that?

13    A        They asked me very few questions, just general

14    basis stuff.

15    Q        Was there an agent in the room?

16    A        Yes.

17    Q        Was she taking notes?

18    A        Yes, she was.

19    Q        And were there parts of your testimony that

20    they had identified as problem areas or things that you

21    needed to correct?

22    A        No.

23    Q        Were there answers during that preparation

24    where they suggested you say one thing as opposed to

25    your initial answer?
```

1    A        No.

2    Q        And again, I may have asked this before but

3    just to be clear:  You've been communicating during this

4    case with prosecutors and case agent, you say, only by

5    calls.  No texts or e-mails; right?

6    A        Correct.

7    Q        Did you or any other deputy disconnect the

8    surveillance cameras at Mr. Grey's home?

9    A        We went inside the room, but they might have

10   been disconnected.  But I wasn't sure who did -- who did

11   that.

12   Q        What happened to the surveillance videos?

13   A        I don't know.

14   Q        How much cash was taken from Mr. Grey's home?

15   A        We don't count his money.

16   Q        You didn't -- you don't know how much money was

17   there?

18   A        We -- one of our policies is we don't count

19   large sums of cash, we just bag it up and have a watch

20   commander video it.

21   Q        Do you have a tattoo of a skull, a snake, or a

22   cowboy?

23   A        No.

24   Q        I want to turn now to Exhibit 14, which is

25   something that we looked at earlier.  It contains

1    materials that were produced to me for the first time

2    yesterday afternoon.  And I'll ask you to turn to now

3    the first letter in there, which is stamped "protective

4    order."  Do you see that?

5    A       Which exhibit's that?

6    Q       This is Exhibit 14.

7            The first page behind the e-mail?

8    A       You've got them labeled in letters.  So exhibit

9    or number?

10   Q       Number 14.  Sorry.  It's at the back.  It

11   should be at the back.

12   A       An e-mail?

13   Q       Yeah.  The first page is an e-mail.  Do you see

14   that?

15   A       Yes.

16   Q       And then if you go to the next page...

17           THE COURT:  There is no next page.

18           THE COURTROOM DEPUTY:  There's an A and a B.

19           MR. SNYDER:  Sorry.  Tab A.  I apologize.

20           THE COURT:  Tab A?  Okay.

21           MR. SNYDER:  These are all coming together at

22   the last minute.

23   BY MR. SNYDER:

24   Q       So Exhibit 14 is, I'll represent to you, a

25   letter that I received from the prosecutors yesterday;

1   right?

2          You can see that the -- the letter is dated

3   December 5th?

4   A      Yes.

5   Q      And it refers to a citizen complaint that was

6   filed against you in October of 2019; right?

7   A      Yes.

8   Q      And you've talked about that complaint even

9   today with the prosecutor; right?

10  A      I did.

11  Q      And the basic description of that complaint is

12  that you and a trainee officer saw a camper on a public

13  street; right?

14  A      I was the training officer and a trainee.

15  Q      I'm -- I'm not enunciating very well.  I --

16  I -- what I intend to say was that you and a trainee --

17  so EE officer -- saw a camper on a public street; right?

18  A      According to the paper, yes.

19  Q      And -- and you ran the information related to

20  the camper for warrants; right?

21  A      I don't remember that incident at all.  It was

22  2019, and I've contacted thousands of people.  I don't

23  remember it all.  It was never even brought up to my

24  attention, really.

25  Q      It was never brought to your attention?

```
 1    A        Back in 2019, when it's -- it was unfounded

 2    with anything.

 3    Q        It -- there was a reprimand; right?

 4    A        In this, no.

 5    Q        It's your -- how many times have you been, kind

 6    of, reported in this way and had an investigation

 7    conducted?

 8    A        I've never had an investigation.

 9    Q        So is this the only time where you've had a

10    citizen complaint that resulted in an investigation or

11    reprimand?  Is that -- I mean, I'm trying to understand

12    how you don't remember this?

13    A        I've only had five complaints.

14             MR. MAGANA:  Objection.  This questioning calls

15    for speculation because he does not receive citizen

16    complaints.

17             THE COURT:  Overruled.

18             THE WITNESS:  Yes -- I've only -- in my

19    11 years, I've only had five complaints from citizens.

20    BY MR. SNYDER:

21    Q        So I'm reading here from the letter and it says

22    that it -- and this is the second paragraph below where

23    it says your name, it says:  "An internal review found

24    that your conduct was reasonable."

25             Do you see that?
```

```
1    A        Yes.

2    Q        So you'd agree that there was an internal

3    review; right?

4    A        Station level, yes.

5    Q        And during that process, they interviewed you;

6    right?

7    A        They would have, yes.

8    Q        Okay.

9    A        I don't remember it though is what I'm saying.

10   Q        Right.  But this is -- this is a citizen

11   complaint from 2019.  There's an internal review.  You

12   were interviewed.  And I'll represent to you that there

13   was a finding that you guys didn't document things

14   correctly.  You don't remember any of that?

15   A        No, I don't.

16   Q        Okay.  Well -- well, we can both remember

17   together, I -- I guess, with the letter because the

18   letter is there.  And you tell me whether or not you can

19   recall this:  So what the citizen said was that you went

20   to a -- a camper.  And you showed up at the front door,

21   and you said, "Hey, someone in here has a warrant."

22            You're saying you don't remember that; right?

23   A        I don't.

24   Q        Okay.  And then what happened was you and the

25   trainee officer took the citizens out of their car and
```

1    put them in a patrol car.

2          You're saying you don't remember that; right?

3    A      No, I don't.

4    Q      And then --

5          MR. MAGANA:  Your Honor, this is improper

6    impeachment.  He's already said he does not remember any

7    of these events, and he can not be cross-examined with

8    extrinsic evidence.

9          THE COURT:  Overruled.

10   BY MR. SNYDER:

11   Q      And then they said that you kept them in the

12   back of the police car for ten minutes.

13          You're saying you don't remember that; right?

14   A      No, I don't.

15   Q      Okay.  And then they say that -- and I'll read

16   this part carefully:  "But the reporting party alleged

17   that the deputies searched through items in the trailer,

18   including cabinets; that their belongings were scabbered

19   [sic]  -- scattered; and that a piece of artwork was

20   damaged."

21          You don't remember this; right?

22   A      No, I don't.

23   Q      And then this letter that I got from the

24   prosecutor says, quote:  "The deputies denied this."

25          You don't remember that; right?

```
 1   A         No.

 2   Q         And the next sentence is:  "An internal review

 3   found that the deputies conduct was reasonable"; right?

 4   A         Yes.

 5   Q         And then it says that you were counseled for

 6   failing to articulate your reasons for the pat-down or

 7   detaining occupants in the car.  You don't remember

 8   that; right?

 9   A         Correct.

10   Q         Now, the letter skips over an important

11   question, which is:  Did you go inside the trailer?

12   A         I would be pure speculation on how and why and

13   the basis for it because I don't remember it.  But if

14   the letter's saying that I went in, I guess we can go

15   based off of that.

16   Q         Well, actually, the letter doesn't address

17   that.

18   A         Exactly.  So I don't know.  I wasn't -- I don't

19   remember.

20   Q         Okay.  And you don't remember what you were

21   doing for ten minutes while these citizens were in the

22   back of the police car; right?

23   A         I can tell you speculatively-speaking of what

24   we would do if somebody had a warrant.  If you want to

25   hear that, I can tell you what we would do with that.
```

```
 1    Q          No.  I'm asking what you remember about this
 2    event.
 3    A          I told you.  I don't remember that event.  I
 4    contact thousands of people inside of campers, RVs,
 5    everything like that.
 6    Q          But you've only had five personnel complaints
 7    in 11 years?
 8    A          Yes.
 9    Q          And this one resulted in counseling; right?
10    A          Correct.
11    Q          Did the prosecutors ask you any of these
12    questions before sponsoring your testimony?
13    A          About this letter?
14    Q          Yeah.
15    A          They brought it to my attention, but I don't --
16    I don't remember.
17    Q          Did they show you the underlying investigation?
18    A          I read the first paragraph and the second
19    paragraph of the paper, yes.
20    Q          Today?
21    A          Only today.  Just right here in the room, right
22    before I came in.
23    Q          And that also didn't refresh your recollection
24    in any way; right?
25    A          I know I had a trainee named Wells at that
```

1    time.  I don't remember the lieutenant that signed that

2    report.  Velasco?  I don't -- I don't even know the --

3            MR. MAGANA:  Objection, Your Honor.  This is

4    asked and answered.  The witness has already said that

5    he does not remember.

6            THE COURT:  Overruled.

7    BY MR. SNYDER:

8    Q       Did they ask you whether these things happened?

9    A       If you're referring to the -- back in 2019 or

10   today?

11   Q       Yeah.  I'm asking you:  Did the prosecutors,

12   who are sponsoring your testimony -- did they ask you

13   whether these things in the report are true?

14   A       The -- if you're referring to the complaint I

15   received, yes.

16   Q       And what did you say to that?

17   A       I said -- well, I -- I don't remember that this

18   complaint even existed.  I know I have like five

19   complaints, but I don't -- I can't even tell you what

20   the other four are about.  So when they show me the

21   complaint, did this happen?

22           Yeah.  Yeah, it happened.  It's a complaint.  I

23   don't know any of the details about that.  So when they

24   asked me about that, that's what I told them.

25           Now, if I read in depth about it and I read

```
 1   into it and I went back to the station and brought a --

 2   talked to the lieutenant, "Hey, do you remember this,"

 3   and we conversed about it, then I could probably get

 4   more refreshed.  But ten minutes before I come here and

 5   only seeing a piece of paper, I can't recollect what

 6   happened on that event.

 7   Q        These people didn't file a lawsuit against you;

 8   right?

 9   A        No.

10   Q        They didn't ask for any money; right?

11   A        Not that I can remember, no.

12   Q        They -- they just filed a citizen complaint;

13   right?

14   A        Yes.

15   Q        I can see your incentive for lying about this,

16   but what was their incentive?

17            MR. MAGANA:  Objection, Your Honor.  This is

18   argumentative.

19            THE COURT:  Overruled.

20            THE WITNESS:  What was my reason to lie is what

21   you asked?

22   BY MR. SNYDER:

23   Q        No.  Why would these citizens fabricate a

24   complaint about you?

25   A        Well --
```

```
 1   Q        You denied it.
 2            THE COURT:  I don't think he said that.
 3            MR. SNYDER:  Well, the report --
 4            THE COURT:  He doesn't remember.  And I
 5   actually think he said that -- that it could have
 6   happened, he just doesn't remember.
 7            MR. SNYDER:  I apologize.  So the letter that I
 8   received from the Government, the last sentence of the
 9   first paragraph below "Clint Francisco" is:  "The
10   deputies deny this."
11            THE COURT:  Oh, I see.  Okay.  Okay.
12   BY MR. SNYDER:
13   Q        So why would they be making this up?
14            MR. MAGANA:  Objection, Your Honor.  This calls
15   for speculation.
16            THE COURT:  Well, I'm going to overrule that.
17   But what I've heard him say is that he's had a few
18   complaints -- five complaints, and that he doesn't
19   really remember them.  And I -- you know, I've given you
20   a lot of leeway, but --
21            MR. SNYDER:  It's my last question on this.
22            THE COURT:  I -- I didn't catch that sentence
23   because this is the first time I'm seeing it.  And I,
24   kind of, skipped over this.  Does that sentence mean --
25   let me ask the Government -- that the -- the deputies
```

```
1    denied the allegations in this complaint that you're

2    referencing or -- or what's the significance -- I can

3    see why defense counsel is asking about it, in other

4    words.

5            But I -- I didn't see it earlier, which is why

6    I kind of stepped in because I -- I see what he was

7    trying to say.  Did the deputies deny...

8            MS. MCKENNA:  Your Honor, would be referring to

9    a deny -- denial about a search of cabinets and any

10   damage to a piece of artwork.

11           THE COURT:  Oh, okay.  Okay.  So you can -- I

12   mean, you can ask him to confirm that if you want to,

13   Mr. Snyder.

14   BY MR. SNYDER:

15   Q       It sounds like you don't remember one way or

16   another what happened here; right?

17   A       It's -- and that's why we document things in

18   reports.  And if I had a report about it, then yes.  I

19   could refresh my memory on that, but --

20   Q       But if you've done something wrong, it wouldn't

21   be in your report; right?

22   A       If I did something wrong, I'd be up for an

23   investigation.  And I haven't had one of those.

24   Q       Okay.  I actually wasn't going to do this, but

25   in light of this recent production, you've also been
```

1    sued for lying in a police report; right?

2    A        Um, it was on my partner's report.  I was a --

3    I was a responding deputy with him.  So a bunch of

4    deputies responded, my name got thrown into it.

5    Q        Okay.  How many people were sued in the case?

6    A        I -- I don't remember.  It was probably two --

7    two or three.  I think the handling and me.

8    Q        And you're saying you were just thrown in

9    there?

10   A        Yes.

11   Q        Okay.  And the guy who sued you, Brian Norwood,

12   he said that what you did was that you falsified a

13   police report; right?

14   A        Correct.

15            MR. SNYDER:  I don't have any further

16   questions, Your Honor.

17            THE COURT:  Okay.

18            MR. MAGANA:  Sorry.  Permission to proceed,

19   Your Honor?

20            THE COURT:  Go ahead.

21                    **REDIRECT EXAMINATION**

22   BY MR. MAGANA:

23   Q        So before we get into, sort of, the substantive

24   portion of this, there's one thing from the defendant's

25   cross-examination that I want to be really specific

1    about from the beginning.  And I want to make sure it's

2    clear for the record:  You and I met on November 7th;

3    correct?

4    A        Yes.

5    Q        And during that time, did you bring to my

6    attention that there was an error regarding who ran the

7    searches in your declaration?

8    A        Yes, I did.

9    Q        Did I ask you about that beforehand or did you

10   bring it directly to my attention?

11   A        I brought it to your attention.

12   Q        And why did you do that?

13   A        Because when I read the report, it -- it didn't

14   seem correct.  That's why I brought it to your

15   attention.

16   Q        So did you do it because you wanted to be fully

17   honest with the court?

18   A        Yes.

19   Q        And were you aware that I was going to disclose

20   that to the defense attorney?

21   A        Yes, because I've never done this before.  So I

22   asked those questions -- just, I wasn't sure how

23   specific it had to be and that's why I brought it to

24   your attention if it had to be changed.

25   Q        Got it.  So the reason -- the reason you

```
 1    notified me about who ran that report was because you
 2    wanted to be honest with the court; correct?
 3    A      Yes.
 4    Q      So now, I'm going to go back to the beginning.
 5           THE COURT:  So Counsel?
 6           MR. MAGANA:  Yes, Your Honor.
 7           THE COURT:  Did he do an amended declaration?
 8    Did you let me know?  What happened?
 9           MR. MAGANA:  It was produced as a *Jencks*
10    disclosure, Your Honor.  The --
11           THE COURT:  But he -- but he -- but what I just
12    heard is that he misstated or said something that was
13    inaccurate in a declaration he filed in front of me that
14    I'm supposed to rely on.  And it didn't occur to you to
15    supplement and file an amended declaration and explain
16    what -- why or what happened.  And you did it instead
17    and gave it to defense counsel?
18           MR. MAGANA:  Your Honor, our perception was not
19    that it was literally inaccurate, but it -- that it was
20    an additional statement that would provide further
21    clarification.
22           THE COURT:  It's not an addition -- it's --
23    it's different though than what his declaration was
24    there.  He said in his declaration:  "I ran these
25    reports."
```

 1          And now, you're saying that, "oh, no.  He

 2   didn't run the reports.  His secretary ran the reports,

 3   who we're going to have in here.  And we're going to

 4   have Mr. Rios before this gets done."

 5          But I'm really troubled by your conduct here,

 6   Counsel.  You should have immediately -- when -- when

 7   anytime a witness submits something under penalty of

 8   perjury and you, as a lawyer, find out that it's

 9   inaccurate, you've got to come immediately to the court

10   and you have to file an amended declaration and explain

11   why and that you just learned it.  I should have had

12   something on November 8th.

13          MR. MAGANA:  Understood, Your Honor.  I

14   apologize to the court.

15          THE COURT:  Well, that undermines your

16   credibility, just so you understand.  It's not only his

17   credibility, but it's your credibility that you've

18   undermined by doing that.  You should know better,

19   Counsel.  And I expect better of you.

20          MR. MAGANA:  Yes, Your Honor.  And I --

21          THE COURT:  Go ahead.

22                  (Cross-talk.)

23          MR. MAGANA:  -- happen in the future.

24   BY MR. MAGANA:

25   Q       Officer Francisco, you received a report of an

```
1    embezzled vehicle; correct?

2    A        Yes.

3    Q        On December 16th?

4    A        Yes.

5    Q        And did that contain the name of a suspect?

6    A        It did.

7    Q        And what was that name?

8    A        It was Franz Grey.

9    Q        And were you familiar with the name Franz Grey

10   before that?

11   A        No.

12   Q        Did you make any attempt to gather information

13   about Mr. Grey prior to responding to the call for

14   service regarding the U-Haul?

15   A        Yes, I do.

16   Q        I misstated.  Not the call for service, the

17   embezzled vehicle report.

18   A        Yes.

19   Q        And what did you do?

20   A        I spoke with Deputy Haven to get the

21   preliminary information.  And then I had the secretary

22   run Franz Grey's name in the -- through our databases,

23   and she gave back, like, the CHEERS raps.  And then I

24   found out that he was -- had previous convictions for

25   felonies and -- and a warrant for 245 and stuff like
```

1    that.

2    Q        And now, is it common practice to run a wants

3    and warrants check prior to responding to a report of a

4    crime?

5    A        Yes.  Yeah.  We do that on every -- everything

6    that we work up or we go after or just from the common

7    criminal that we pull off the street, we -- we do a

8    workup just to see.

9    Q        But if you knew that you were going to meet

10   with a -- a specific person who was reported, would you

11   always run wants and warrants on them before

12   encountering them?

13   A        Yes.

14   Q        Why is that?

15   A        Just to see their previous criminal history.

16   Just to see how dangerous -- because we do a thing

17   called rib (phonetic) sheet with which we can check off.

18   And depending on the severity of it, that's -- we -- it

19   gives us, like, a security alert, like how dangerous

20   they can be.

21   Q        So outside of an emergency situation, would you

22   ever go on a call without at least attempting to learn

23   this information about the -- the suspect who is named

24   in the call?

25   A        No.

```
1   Q       And so tell me again, what information did you

2   obtain regarding Mr. Grey when this wants and warrants

3   check was run by the secretary?

4   A       That he was -- he was a convicted felon for a

5   hit-and-run and that he -- he only had the one

6   conviction on his record and he had a couple

7   misdemeanors and then that he had a warrant for the 245

8   and then a misdemeanor warrant for that and that he was

9   on the FBI terrorist watchlist.

10  Q       So based on what you learned about Mr. Grey,

11  did you have any concerns about interacting with him?

12  A       Yes, I did.

13  Q       What were those concerns?

14  A       Especially not knowing what he was wanted for

15  on the FBI terrorist watchlist, definitely had our

16  suspicions higher than just running the normal person

17  that's not because we look at the federal as a

18  serious -- serious offense.  And so I don't know why he

19  would be on that.  So yes, very alert.

20  Q       There's a moment in your -- in your body camera

21  footage when you state, quote, "we don't know what else

22  this guy is wanted for."

23          Do you know what you were referring to in that

24  moment?

25  A       That he was on the FBI terrorist watchlist.
```

```
 1    Q        And you didn't know the reason?

 2    A        I did not know, no.  Still don't.

 3    Q        And did you later learn that there was in fact

 4    more about the defendant that you didn't know in terms

 5    of convictions or anything else?

 6    A        Yes.

 7    Q        What did you learn?

 8    A        After I spoke with you, I found out about other

 9    criminal record out of other states.

10    Q        Such as?

11    A        There was a involuntary manslaughter.

12             MR. SNYDER:  Objection.  Relevance.

13             THE COURT:  Sustained.

14    BY MR. MAGANA:

15    Q        So I'll move on.

16             What did you -- what did you arrest the

17    defendant for?

18    A        The embezzled vehicle.

19    Q        And what was your purpose in going to

20    defendant's cabin that night?

21    A        To look for the embezzled vehicle on the

22    property.

23    Q        And were you aware that there was a -- an

24    anonymous tip regarding methamphetamine production?

25    A        In the call for service.  The -- the secondhand
```

```
 1    info in that call for service, yep.

 2    Q        But that was not the purpose of your going out

 3    on that investigation; correct?

 4    A        No.

 5    Q        When you arrested the defendant, did you

 6    discuss your reasons why you had arrested him?

 7    A        Yes.

 8    Q        And did he tell you the U-Haul was stuck?

 9    A        He did.

10    Q        Did it look stuck to you?

11    A        Yes, it did.

12    Q        So if the U-Haul looked like it was stuck, then

13    why did you arrest him for embezzling a U-Haul?

14    A        Just based on, you know, the length of time

15    and -- I mean, that U-Haul was stuck, and he knows it's

16    stuck.  And you -- you know that they're going to be

17    looking for their U-Haul.  You could -- a reasonable

18    amount of time just to go down and let them know what's

19    going on.  And especially knowing U-Haul, I took many

20    embezzled reports and they try to contact -- even they

21    go to their property and look for them, as well.

22            THE COURT:  Why don't you just call a -- a tow

23    truck and take the U-Haul away?

24            THE WITNESS:  The U-Haul was literally on a --

25            THE COURT:  Okay.  So then why did you think he
```

```
 1    was going to do anything with it then?  I mean, it's
 2    been sitting there for weeks; right?
 3              THE WITNESS:  Yeah.
 4              THE COURT:  You know, in other words -- it
 5    doesn't make any sense why you would arrest him.  You
 6    know it's stuck.  You could have called the U-Haul --
 7    tow truck.  And I'm just trying to understand why --
 8    what -- what was he going to do?  You know, the U-Haul
 9    was there.  And it wasn't going anywhere and, you know,
10    it is what it is.  And -- and, you know, certainly
11    accumulated loads of late penalties, you know?
12              But anyway, go ahead.
13              MR. MAGANA:  Well, I'll follow up on that,
14    Your Honor.
15    BY MR. MAGANA:
16    Q      Had the U-Haul been reported stolen?
17    A      Yes.
18    Q      And is -- when someone rents something and
19    keeps it for -- they rent it one for one night and they
20    keep it for over a month, is that probative of -- I
21    won't use the word "probative."
22              Does that indicate that they're unlikely to
23    bring it back?
24    A      Yes.
25    Q      So in your experience, when someone rents a
```

```
 1   vehicle and keeps it for a month longer than they rented

 2   it for, would you typically consider that vehicle

 3   embezzled after that amount of time?

 4   A      Yes.

 5   Q      The -- so did you find it credible that the

 6   defendant had not returned it simply because it was

 7   stuck, despite the fact that he had not ever made any

 8   attempts to contact U-Haul?

 9   A      Yes.  I knew that it was stuck, but I don't --

10   the reason for the arrest is the fact that he didn't

11   take the steps to notify them and that the vehicle is

12   reported stolen.  And when he's a named suspect on a

13   report, that's what we do.

14   Q      Understood.  And how -- just so everyone is

15   aware -- about how far is defendant's cabin from

16   Lake Aia (phonetic), like downtown Santa Clarita?

17   A      It's -- I mean, approximately like 20 minutes.

18   Q      So a short drive?

19   A      Yes.

20   Q      So given that you said earlier that you knew he

21   was arrested for misdemeanor assault -- or excuse me,

22   that he was wanted for misdemeanor assault with a deadly

23   weapon, why didn't you arrest him for that?

24   A      Um, because when I detain somebody or they're

25   arrested for another crime, I like to -- I don't like to
```

```
 1    give them all that information because they become
 2    agitated and they don't want to talk to you and
 3    everything like that.  So when I -- and I've done this
 4    numerous times where you -- hey, I -- I'm not here
 5    to prove a point.  I'm not here to tell them everything
 6    that they've done bad.  We just got to get to the bottom
 7    of it, and we're there for the U-Haul.  That's why I
 8    didn't tell them about that.
 9    Q        So did you book him on that warrant when you
10    reached the station?
11    A        Yes, we did.
12    Q        So upon your arrival at the property, you took
13    steps to secure the perimeter of that property; is that
14    correct?
15    A        Yes.
16    Q        Why did you do that?
17    A        To make sure that there is -- we tried to
18    conduct the investigation on the embezzlement, like the
19    paperwork that I explained earlier.  So I want to make
20    sure that there's no other people on the property that
21    could harm us.
22    Q        So I think defense counsel asked why you
23    couldn't, sort of, just grab Mr. Grey, put him in the
24    car, and leave immediately.
25             Tell me why you couldn't do that?
```

1    A        For -- if -- what if there was something inside

2    the truck that we didn't find.  I -- we -- we have -- we

3    have to look in the truck.  We've got to make sure what

4    the engine's missing.  We've got to document that the

5    engine's missing.  We've got to get serial numbers.

6        It's more involved than just taking somebody

7    away.  We have to -- we still have to give that stolen

8    property back to the U-Haul and that's what would --

9    does happen next and transpired.

10   Q        I was just -- I was just going to ask.  So did

11   you then remove the U-Haul?

12   A        We -- we were finishing the protective sweep.

13   And then when I contacted Mr. Grey, we went with the --

14   on his permission to go grab the keys and the cell

15   phone.  So we didn't get to that portion of that yet.

16   Q        So on your body camera video, about 14 minutes

17   after you arrive, you tell the deputies to -- and I'll

18   quote it:  "Hold the front and pull back to the cars."

19        What did you mean when you said that?

20   A        Just so I can do my interviews with the -- the

21   suspect at that time.

22   Q        Well, but -- but why were you telling the

23   deputies -- when you tell them to fall back to the cars,

24   what are you telling them?

25   A        Because we're on a dark hillside and we have

```
 1   loud music blaring out of this little house and we have

 2   a mobile home and we have a couple other cars on the

 3   property, we have to do a protective sweep near the

 4   house in the back.  I wanted to make sure that nobody

 5   came out and contacted us I had my back turned while I'm

 6   talking to Mr. Grey.

 7   Q       And so is that what you -- and so that's what

 8   you meant when you said "hold the front of the house"?

 9   A       Yes.

10   Q       While you were talking to the defendant, how

11   would you characterize your conversation?

12   A       Good.

13   Q       Did you have your -- and I know you said you

14   had your gun drawn initially when you approached, but

15   did you have your gun drawn when you were talking to

16   him?

17   A       No.

18   Q       Did you -- did the defendant at any point

19   appear scared or threatened?

20   A       No.

21   Q       Did he appear to be aware of his rights?

22   A       Yes.

23   Q       Would you say your interaction was

24   conversational?

25   A       Yes.
```

```
1    Q       So what else -- in addition to the embezzled

2    U-Haul, what else -- and the -- you know, the laundry

3    chemicals referred to earlier, what else did you discuss

4    with the defendant?

5    A       He told me that -- he kept referring to these

6    two guys that came up to his property and shot his house

7    up and that they were trying to rob him and stuff.  So I

8    was actually concerned for him, and that's why I was

9    investigating that, as well.

10   Q       And did you in fact investigate those claims?

11   A       Yes, I did.

12   Q       What did you do to investigate them?

13   A       He told me that they shot at his windows and

14   shot around the -- tons of bullets were coming through

15   the house.  And so I checked the back wall.  I checked

16   the -- the windows and checked to see if any bullet

17   impacts have happened in that area, and I also asked to

18   see if there's any video.

19           MR. MAGANA:  And so for the court's record, I

20   would just refer to Exhibit 4 at time 22:50.  I don't

21   believe we need to play it, but you can see the deputies

22   looking for bullet holes and discussing the report.

23   BY MR. MAGANA:

24   Q       So at some point, did you offer to lock up then

25   Mr. Grey's house following his arrest?
```

```
 1    A       Yes.

 2    Q       Why?

 3    A       To -- because he -- he was concerned about his

 4    property to -- that it was going to get burglarized or

 5    robbed.  So I wanted to secure his property.

 6    Q       And is that something you typically do?

 7    A       No.

 8    Q       So you did it only in response to his request?

 9    A       Because he requested it.

10    Q       And did he -- you mentioned -- I think you

11    mentioned it briefly, but did he ask to do anything

12    else?

13    A       Yeah, after -- during the course of our

14    conversation about the two men that came to shoot up his

15    place, he said that he actually captured video of it on

16    his surveillance cameras, of the shooting, and that I

17    could find that -- I guess he uploaded it to Youtube,

18    but it was in offline mode because they cut the

19    telephone cords.  So reasonable -- he said that it was

20    saved on his phone and that he wanted me to look at that

21    video on his phone.

22    Q       So before you entered his house, you -- you

23    determined that you were going to conduct a protective

24    sweep of the interior; is that correct?

25    A       Yes.
```

1    Q        What factors do you normally consider when

2    deciding if a protective sweep is necessary?

3    A        The -- all the elements that we had stated

4    previously:  His record, that he was being arrested for

5    a felony, that he has a 245 warrant, and then that

6    there's multiple cars on the property, there's a --

7    there's a mobile home.

8    Q        So why don't I -- I'll -- I'll slow it down a

9    little bit.  Was there anything on the property that

10   would lead you to believe there were multiple people

11   present?

12   A        There was multiple cars on the property.

13   Q        When you say "multiple cars," what do you mean?

14   A        There was a Tesla, a Camaro and a -- like a

15   motor home.

16   Q        And were there also multiple living structures?

17   A        There was a residence behind Mr. Grey's house.

18   Q        And if you had already conducted an exterior

19   sweep of that property, why didn't you know at that

20   point whether there was anyone inside it or not?

21   A        Because the windows and -- were boarded up.

22   They had curtains in the windows, and there's loud,

23   blaring music from inside the property.

24   Q        So you said there were indications that

25   multiple people could be present.  Was there anything to

```
1    indicate that those people could be dangerous?

2    A       Yes.

3    Q       And what would that be?

4    A       The -- you know, criminals hang out with

5    criminals.  And when -- I dealt with numerous situations

6    where we go near a house and somebody puts in --

7    themself with a firearm or something like that where it

8    turns into a confrontation.

9    Q       And I think -- I think you alluded to them

10   earlier, but in terms of things you knew about defendant

11   that might have suggested that the people he went

12   with -- was with would be dangerous?

13   A       Yes.

14   Q       And what were those things?

15   A       That he was on the FBI terrorist watchlist for

16   unknown reasons and that he -- he had the warrant for

17   the 245.  And also, that he -- he's been previously

18   convicted of a felony.

19   Q       And just to be clear, what is -- when you say

20   "245," what is that?

21   A       Assault with a deadly weapon.

22   Q       So you were concerned that there was

23   potentially someone else inside the house who could be

24   dangerous?

25   A       Yes, absolutely.
```

1    Q        So I'm going to play a few clips from your body

2    camera footage and ask you about them.

3    A        Okay.

4            MR. MAGANA:  Your Honor, I'd request permission

5    to play three clips and publish.  The first one is

6    Exhibit 4 at eight minutes and 50 seconds.

7            Sorry, Your Honor.  May I have just a moment to

8    start up my computer?

9            THE COURT:  Yeah.

10           MR. MAGANA:  So I'll ask counsel to go ahead to

11   eight minutes and 50 seconds on this video.

12           (Whereupon, video is played in open court.)

13   BY MR. MAGANA:

14   Q        So when you say, "make sure no one runs out the

15   back," why did you say that?

16   A        Because it's very common when people inside see

17   law enforcement outside that they start to scramble out

18   all -- all avenues of exit out of a house.

19           MR. MAGANA:  And so now, this is going to be a

20   slightly confusing request.  Rather than the time stamp

21   on the video, would you go on the clock at the top to

22   seven -- seven hours, seven -- 50 minutes and

23   50 seconds.

24           MS. MCKENNA:  It's at 19 hours.

25           MR. MAGANA:  Yeah, 19 hours, 50 -- and

1    50 seconds.  Perfect.

2           (Whereupon, video is played in open court.)

3           MR. MAGANA:  You can pause it there.

4    BY MR. MAGANA:

5    Q      So that's the comment we referred to earlier

6    about holding the house.  Why are you telling them to

7    "hold the front of the house"?

8    A      Because we haven't cleared the inside of the

9    house so there could still be people inside.

10           MR. MAGANA:  And referring to Exhibit 10 at

11    6:16.  That's the time stamp.

12           (Whereupon, video is played in open court.)

13    BY MR. MAGANA:

14    Q      So I hear Sergeant Rios saying, "No one's going

15    to pop out," and you saying, "He says, no."

16           Did you believe him at that time?

17    A      No.

18    Q      And would you say that Sergeant Rios asking

19    again, "No one's going to pop out," is indicative of his

20    concern that there is someone in there?

21           MR. SNYDER:  Objection.  Calls for speculation.

22           THE COURT:  Sustained.

23    BY MR. MAGANA:

24    Q      Were you concerned that there was someone in

25    there?

1    A        Yes.

2    Q        In your ten years as -- as a law -- of

3    experience as a law enforcement officer -- I think it

4    might be up to 11 now -- is it common for someone hidden

5    inside property to come out voluntarily when there are

6    multiple officers on the scene?

7    A        No.

8    Q        Why?

9    A        Because they're -- there are multiple reasons.

10   They can be afraid of apprehension because they have

11   arrest records or they're -- you know, they -- they just

12   don't want to have any interaction with law enforcement.

13   We've made numerous call-outs before at houses and

14   people don't come out.  And they end up being inside.

15   Q        So tell me a bit about Mr. Grey's cabin.  How

16   big was it?

17   A        It was fairly small.  It was -- it's like a --

18   it was a living room and a bedroom and a kitchen, like

19   another like little -- small, little foyer in the left

20   with just tons of -- tons of garbage and stuff inside of

21   it.

22   Q        And could you see into each of these rooms from

23   where you were standing at the front door?

24   A        No.

25   Q        So were there -- so there were other areas of

```
 1    the cabin that you could not see upon entering?

 2    A       Yes.

 3    Q       Is that part of why the protective sweep was

 4    necessary?

 5    A       Yes.

 6    Q       So in your ten years of experience as a law

 7    enforcement officer, is there a practical reason you

 8    needed to conduct a protective sweep rather than just

 9    running in, looking around very quickly, and trying to

10    find Mr. Grey's items?

11    A       Yes.

12    Q       What is that?

13    A       I had a similar incident where a house needed

14    to be searched for some evidence after a suspect ran

15    inside, and it was not cleared properly.  And I found

16    the -- the suspect hiding in a closet after doing our

17    search for that evidence.

18    Q       And do people generally when they're hiding

19    respond well to being suddenly discovered or having law

20    enforcement enter?

21    A       No.

22    Q       And before you entered the cabin, did you know

23    exactly where the defendant's phone was?

24    A       He said that it was on the dining room table.

25    Q       And did you know exactly where his keys were?
```

1    A        No.

2    Q        And how would you describe the dining room

3    table?

4    A        It was very cluttered.

5    Q        So did you know how long it would take you to

6    find the defendant's phone and keys?

7    A        No.

8    Q        So at the time you conducted the protective

9    sweep, you didn't know if you were going to be looking

10   for them for 30 seconds or ten minutes?

11   A        Correct.

12   Q        So when you then entered the defendant's cabin,

13   what, if anything, did you find while conducting the

14   sweep?

15   A        We found -- when we were going through the

16   dining room table, the -- they saw the methamphetamines

17   on the table and the pipe right near his cell phone.

18   And then we continued to do the protective sweep.

19   Q        So did you stop to investigate those things at

20   that time?

21   A        No.

22   Q        Why not?

23   A        Because that's the least of my worries at that

24   point.

25   Q        What were you concerned about?

```
1    A        Somebody hiding or possibly having a firearm or
2    something around the corner.
3    Q        Now, did finding meth or meth paraphernalia
4    form the basis for the protective sweep?
5    A        No.
6    Q        Did it, however, inform that people inside
7    could be dangerous?
8    A        Yes.
9    Q        Why?
10   A        Because people act erratic on methamphetamines
11   or any drug.
12   Q        You said earlier that you responded to this
13   call to investigate a stolen vehicle report?
14   A        Yes.
15   Q        During that time, did you encounter additional
16   potential evidence that could have suggested there was
17   methamphetamine manufacturing happening?
18   A        Just from that call for service.
19   Q        Well, did any of the deputies report anything
20   to you that they thought that there might have been, you
21   know, something meth-related going on?
22   A        Yeah.  Deputy Marin told me about -- in -- in
23   the beginning -- about the chemicals that he saw in the
24   back.
25   Q        So if you go to investigate one thing and you
```

```
 1   encounter evidence of another possible crime, are you
 2   required to investigate only the thing that you set out
 3   to investigate?
 4   A        No.
 5            MR. SNYDER:  I'll object to a hypothetical,
 6   too, then.
 7            THE COURT:  Sustained.
 8   BY MR. MAGANA:
 9   Q        When you found -- or when you received a report
10   that there was potential meth precursor chemicals, did
11   you investigate them?
12   A        Yes, sir.
13   Q        Did you feel that was within your
14   responsibility?
15   A        Yes.
16   Q        Did you determine that they were an issue or
17   not an issue?
18   A        They were not an issue.
19   Q        And so if they were not an issue, why didn't
20   you feel the need to include them in a subsequent
21   report?
22   A        Because I didn't arrest him for it so those
23   details aren't pertinent to that.
24            MR. MAGANA:  May I have just one moment,
25   Your Honor?
```

```
 1                 THE COURT:  Yep.

 2                 MR. MAGANA:  Thank you, Your Honor.

 3                 No further questions.

 4                 MS. MCKENNA:  Your Honor, I -- I apologize.

 5       Could we possibly just take a quick bathroom break?

 6                 THE COURT:  No.  We're going to end at 4:30

 7       anyway because we're -- we're not -- we're going to

 8       continue this on December 18th, so we'll continue the

 9       hearing.  So we're going to end in ten minutes.  So...

10                 MR. SNYDER:  If -- if counsel doesn't mind, do

11       you need to be here or do you want to take a break?

12                 MS. MCKENNA:  I -- I apologize.  I have a blood

13       sugar issue.  I would just need to eat first.

14                 THE COURT:  Okay.  Well, you can leave if you

15       want, and then come back.  Yeah.
```

16                        **RECROSS EXAMINATION**

```
17       BY MR. SNYDER:

18       Q      So one of the words that you used a number of

19       times was "concerned."  One of the things you said was

20       that you were particularly concerned about Mr. Grey

21       being on the terrorist watchlist; right?

22       A      Yes.

23       Q      You didn't call anyone from federal law

24       enforcement; right?

25       A      No.
```

```
1    Q        You didn't call Homeland Security; right?

2    A        No.

3    Q        You didn't call the Terrorist Screening Center

4    or the Threat Screening Center or anything like that;

5    right?

6    A        No.

7    Q        You said that you were concerned about the

8    sanctity of Mr. Grey's home and things being locked up

9    there; right?

10            That was your testimony?

11            MR. MAGANA:  Objection, Your Honor.  Misstates

12   testimony.

13            THE COURT:  Overruled.

14            THE WITNESS:  I didn't say the sanctity of his

15   house.  I don't -- what are you referring to?

16   BY MR. SNYDER:

17   Q        You said that you were worried about his home

18   being unlocked; right?

19            You said you were concerned about that?

20   A        Yes.

21   Q        Okay.  But then you also said that you don't,

22   as a matter of course, lock people's houses for them;

23   right?

24   A        Unless in this case, he requested it, yeah.

25   Right.
```

```
 1   Q        Right.  But not as a matter of course; right?
 2   Just to be clear.
 3   A        Not as a matter of course, no.
 4   Q        Did you actually lock up the house?
 5   A        Yes.
 6   Q        Are you sure about that?
 7   A        Yes.
 8   Q        When did you lock it up?
 9   A        We -- we just -- from the back, we just closed
10   the door.
11   Q        Did you lock the house with the keys?
12   A        No, because I -- we had a bunch of key chains
13   that we booked as evidence.  We weren't sure where these
14   keys were.  The house was in shambles.
15   Q        Okay.  You talked with the prosecutor about,
16   kind of, the basis for your protective sweep; right?
17   A        Yes.
18   Q        And you said -- one of the things you said was
19   that you have to consider all the elements; right?
20   A        Yes.
21   Q        And you said that, you know, at the time that
22   you made the decision, you didn't know whether there was
23   someone inside; right?
24   A        Correct.
25   Q        Now, on the video, you said that the house was
```

1    unsecured; right?

2    A        It was unlocked.

3    Q        And the reason that you were going to go into

4    the house was to get Mr. Grey's keys and lock the door;

5    right?

6    A        And the cell phone.

7    Q        Right.  If there was someone inside the house,

8    it wouldn't have been unsecured; right?

9    A        We don't know that.

10   Q        Well, what would be the point of going inside

11   and locking the door if there was a resident in the

12   house?  Why would you need to do that?

13   A        That's purely speculative.  I don't know why

14   they -- somebody would lock or unlock a door.  I -- I

15   don't -- that's not what I'm worried about that the door

16   being unlocked.  I'm worried somebody's inside the

17   house.

18   Q        But the point of you going inside the home, you

19   said, was to go and lock the door and get the phone;

20   right?

21   A        Yes.

22   Q        Okay.  But if there was someone inside the

23   house, they wouldn't need you to lock their door; right?

24   A        I don't know that.

25   Q        You said that the house was unsecured; right?

1    A        Yes.

2    Q        And Sergeant Rios, after looking inside

3    Mr. Grey's front door without a warrant, said that

4    there's nobody inside the house; right?

5    A        That they could see from that front door area.

6    Q        And just before you did the protective sweep --

7    actually, on one of the clips you said that you were

8    going to do a protective sweep, using your words, "just

9    in case, so nobody pops out"; right?

10   A        Yes.

11   Q        You didn't know whether there was someone

12   inside the home or whether there wasn't; right?

13            That's your testimony?

14   A        I did not know, no.

15   Q        And you had no evidence that there was an armed

16   and dangerous person in the home; right?

17   A        There could have been.

18   Q        Other than the generalities that you usually

19   use, you had nothing specific; right?

20   A        Not that second, no.

21            MR. MAGANA:  Objection, Your Honor.  Misstates

22   testimony.

23            THE COURT:  Overruled.

24   BY MR. SNYDER:

25   Q        One of the reasons that you gave was that

```
 1   criminals hang out with other criminals; right?

 2   A       Yes.

 3   Q       You also listed that, you know, Mr. Grey had

 4   this history -- you know that -- that gave -- gave you

 5   concern; right?

 6   A       Yes.

 7   Q       Mr. Grey was in the car at the time that this

 8   happened; right?

 9   A       Yes, he was.

10   Q       And during the, at this point, 40 minutes he'd

11   been at the property, you didn't see any evidence of

12   movement inside the home; right?

13   A       No.

14   Q       And -- and in fact the prosecutor played you a

15   number of -- of clips.  The first was the clip where you

16   said, "Make sure nobody runs out the back"; remember

17   that?

18   A       Yes.

19   Q       The time stamp on that was 7:45 p.m.; right?

20   A       Okay.

21   Q       That was about eight minutes after you arrived;

22   right?

23   A       Yes.

24   Q       And then at 7:50, he played you a clip where

25   you said, "Why don't you guys hold the front."
```

1            That was 13 minutes after you arrived; right?

2    A       Yes.

3    Q       And then he played you a clip from after that,

4    but I guess my question is:  After you had made sure

5    that nobody runs out and held the front and opened

6    Mr. Grey's front door without a warrant and looked

7    inside and had cleared the RV and the property on the

8    back and had run the cars for VIN numbers or anything

9    like that, you didn't have evidence of another person

10   being in the home; right?

11   A       Not that I know of, no.

12   Q       And you didn't have evidence of an armed and

13   dangerous person being in the home; right?

14   A       Correct.  The music's still blaring from

15   inside.

16   Q       It would just be, kind of, speculation and

17   generalities; right?

18   A       With everything that I've said, yes.

19   Q       What else did you say?

20   A       Well -- well, we talked about the -- his

21   background, the history, the dark -- in the dark area.

22   We've got no radio communication, no cell phone

23   communication, multiple cars on the property.  All of

24   that stuff was still very much in play.  It didn't -- it

25   didn't go away the longer I'm there.  That is still a

1    very live situation until it's either cleared or we

2    leave.

3    Q        Well, what was the point of clearing the

4    property for officer safety if you didn't learn

5    anything?  Didn't you say you spent 35 minutes clearing

6    the property for officer safety before this?

7    A        I wouldn't say 35 minutes.

8    Q        Well, I will represent to you that 35 minutes

9    passed.  And during that time you said that you were

10    clearing the property for officer safety; right?

11    A        I was walking back and forth to make it -- to

12    check the VIN number on the -- in the U-Haul truck and

13    checked the plate.  And I also conducted my interviews

14    with the suspect in the back of the car.  I wasn't

15    clearing the location the whole time, no.

16    Q        And then you said that going inside the home to

17    get someone's keys and lock the doors is not something

18    that you do, kind of, in every cases; right?

19    A        Correct.

20    Q        You were doing it here because you were

21    concerned about Mr. Grey's house being unlocked and you

22    wanted to help him; right?

23    A        Yeah.  It was a rare occurrence that this even

24    happens, yes.

25    Q        But there was no -- there's no urgent need, no

1    law enforcement purpose for you to go in the home;

2    right?

3    A        Only on his request is why I went in.

4    Q        Okay.  But you said that it was super

5    dangerous, and you knew that before going inside?

6              MR. MAGANA:  Objection, Your Honor.  Misstates

7    testimony.  He did not say it was "super dangerous."

8              THE COURT:  Sustained.

9    BY MR. SNYDER:

10   Q        Okay.  Well, you said that the reason you

11   needed to conduct the protective sweep inside the home

12   was because there are all these hazard inside the home

13   that have not yet been addressed; right?

14             That was your testimony?

15   A        Yes.

16   Q        But you went inside the home for a reason that

17   you don't usually go inside the home; right?

18             Right?

19   A        Yes.  Only on the basis that we get to do the

20   protective sweep.  Otherwise, you're right.  I would not

21   go inside the house.

22   Q        Let's -- well, that actually brings me to

23   another question which is:  When you were talking to

24   Mr. Grey, you told him that you were going to get the

25   phone and keys and then lock the door; right?

```
 1    A        Yes.

 2    Q        And then you turned around and you talked to

 3    Rios; right?

 4    A        Yes.

 5    Q        And you guys decided at that point with the

 6    camera recording that you were going to do a protective

 7    sweep; right?

 8    A        Yes.

 9    Q        Did you take two steps back to the car to tell

10    Mr. Grey, "Hey, Mr. Grey, I said that, you know, we're

11    only going in for these limited purposes.  What we're

12    actually going to do is a search of your house?"

13             Did you do that?

14    A        It wasn't a search.

15    Q        Well, you went into every room in his home?

16    A        It was a protective sweep.

17    Q        My question is:  Did you go back and tell him

18    that you were no longer going to do that and instead

19    were going to go into the other parts of his home?

20    A        No.

21             MR. SNYDER:  No further questions.

22             MR. MAGANA:  Redirect, Your Honor.

23             THE COURT:  I'm sorry?

24             MR. MAGANA:  Redirect, Your Honor.

25             THE COURT:  Yeah.  Go ahead.
```

```
 1              MR. MAGANA:  Very brief.
 2                  REDIRECT EXAMINATION (FURTHER)
 3    BY MR. MAGANA:
 4    Q        When you were on the exterior of the property,
 5    could you see inside the house?
 6    A        No.
 7    Q        Why not?
 8    A        There was boards everywhere and there's
 9    curtains.
10    Q        Could you hear what was going on inside the
11    house?
12    A        No.
13    Q        Why not?
14    A        The music was way too loud.
15    Q        Did you know to a certainty that there was
16    someone inside?
17    A        No.
18    Q        Did you believe that there could be someone
19    inside?
20    A        Yes.
21    Q        Did you believe that the person inside could
22    present a danger?
23    A        Yes.
24    Q        If there was one?
25    A        Yes.
```

```
1    Q         Do you -- in your training, are you aware of

2    any obligation to notify an individual who consents to

3    entry that you will conduct a protective sweep?

4    A         No.

5              MR. MAGANA:  No further questions, Your Honor.

6              THE COURT:  Anything else?

7              MR. SNYDER:  No, Your Honor.  Thank you.

8              THE COURT:  I just have a few questions.

9              So -- just so we're kind of following up with

10   the two lawyers that have been asking you --

11             THE WITNESS:  Yes, sir.

12             THE COURT:  -- you had no information from any

13   source that any other people lived there, other than the

14   defendant; is that correct?  Lived at the house?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Okay.  So then your concern about

17   whether or not someone else was there was just based on

18   everything that you've testified to today?

19             THE WITNESS:  Yes.

20             THE COURT:  Okay.  And the -- the -- so you --

21   you said that there was a -- that you knew before you

22   went to the -- to the house that there was an arrest

23   warrant for the defendant; right?

24             THE WITNESS:  Yes.

25             THE COURT:  And -- and at least that's what you
```

```
 1   said in your declaration.  And the defense counsel asked

 2   about whether or not -- why it wasn't in other part of

 3   your -- in the search warrant.

 4         So -- and the arrest warrant was for assault

 5   with a deadly weapon.  And so I'm just trying to

 6   understand why -- once you had -- knew that information,

 7   why didn't you just go in and arrest him for that and

 8   then be done with it?  I mean, that's far more serious

 9   than embezzling a -- you know, essentially a stuck

10   U-Haul van; right?

11         Why -- why go through all of this and keep it

12   premised -- everything you're doing premised on the

13   embezzlement of the U-Haul when assault with a deadly

14   weapon warrant -- that's a very serious thing.  And what

15   I'm hearing from you is that you didn't think that was

16   that important, that you were going to use these -- the

17   embezzlement as an issue to do that because once you

18   have the -- once you knew there was a warrant there, you

19   didn't need to do any of this stuff that we're here

20   today.  You just needed to go in and arrest him.  And in

21   fact -- so why?  I'm just curious why you did that.

22         THE WITNESS:  Yeah, because the assault with a

23   deadly weapon is very serious.

24         THE COURT:  Yeah.

25         THE WITNESS:  I do agree with you compared to
```

1    embezzled --

2            THE COURT:  Yeah, particularly once you -- once

3    you -- once you know the van is -- I mean, the truck is

4    stuck, then it becomes really less important because you

5    know -- that putting aside who should have called and

6    whether he got -- should have called them and everything

7    else --

8            THE WITNESS:  Yeah.

9            THE COURT:  -- you know that that's pretty

10   serious.  Why didn't you do -- why didn't you just go

11   ahead and arrest him.  And then it's all over and done

12   with.

13           THE WITNESS:  No, I understand that it's -- it

14   was a misdemeanor --

15           THE COURT:  Yeah.

16           THE WITNESS:  -- warrant.  It wasn't a felony

17   warrant.  So even if Mr. Grey took off running and he

18   ran into his house for having a misdemeanor, you know,

19   we're done at that point.  I don't enter homes for

20   misdemeanors.  It's like -- like you're saying, it's

21   very minimal on that portion.

22           So I think just due to the classification of

23   it.  And, you know, even with the embezzled vehicle --

24           THE COURT:  Yeah.

25           THE WITNESS:  -- somebody that runs into a

```
 1   house in an embezzled vehicle isn't even an issue for
 2   us.  Like, I'll write who and what suspects are in that
 3   house.  And that's what we'll do.  We'll leave it at
 4   that.  We'll write the paper on it.  And then, we'll --
 5   you know what I mean?  We'll -- that's where we leave
 6   it.  And then we don't --
 7              THE COURT:  Okay.
 8              THE WITNESS:  So it -- it's more of a, if I
 9   catch a guy on the street, walking down the road, the
10   guy got a 245 warrant, I don't know yet what it's for
11   because one, they don't -- they don't air it to us as a
12   felony or a misdemeanor.  We treat it as a -- because
13   there's a big difference in severity from a 245 -- I've
14   seen the weakest 245s where it's, you know, it's -- it's
15   not the same classification as somebody that got stomped
16   out by five people and that guy was totally defenseless;
17   right?
18              THE COURT:  Sure.
19              THE WITNESS:  We don't get that story.  So when
20   I hear 245 felony, I know the court's doing a good job
21   at it -- so when I hear misdemeanor, I'm not downplaying
22   it.  I still think it's a very serious crime.
23              THE COURT:  Sure.
24              THE WITNESS:  But I -- I used that based on my
25   tactic of, like, am I going to go beat this guy's door
```

 1   down for a misdemeanor 245?  And that -- the answer to

 2   that would be no.  So I was going based on that he was a

 3   named suspect on the embezzlement report of the felony.

 4        THE COURT:  So -- just so the -- so in terms of

 5   running the warrants check, again, irrespective of

 6   whether you ran it or a secretary ran it -- it's just so

 7   I understand.  It's -- based on your declaration, you

 8   ran it before you arrived at that property; right?

 9        THE WITNESS:  Correct.  I had the secretaries

10   run that information for us.

11        THE COURT:  Right.

12        THE WITNESS:  And they usually give us the

13   printouts.  And that's the papers that we read and we

14   look at in the office.  And then we usually go out with

15   that information.

16        THE COURT:  The printout is the one that's in

17   the record; right?  The print out that we have?  It's

18   the printout that we have?

19        THE WITNESS:  The record that you guys have in

20   the exhibit book --

21        THE COURT:  Yeah.

22        THE WITNESS:  -- I think that's just from

23   the -- the Defense pulling a record off the computer

24   that was ran from the MDC.  And even when he ran it --

25   like, when there's multiple deputies there and we all

1   have -- I use my partner's computer sometimes, and they

2   can use my computer.

3        And we run stuff all the time.  Like, if they

4   ran a VIN number, it doesn't necessarily mean I ran the

5   VIN number.  It could have been my partner that used my

6   computer to run that VIN number.

7        So that document that he pulled off of that was

8   from my MDC in my car.  And that was a warrant returned

9   from him because we use standard protocol to check

10  everybody's information even -- even if we know who they

11  are, just because it's -- we're trained to do that.  So

12  it's like second nature of what we do.  Anybody that we

13  run, we run them for their records and stuff like that

14  on the computer, which we know is CAD.

15       THE COURT:  Yeah.

16       THE WITNESS:  So -- and that's -- that's how

17  we -- that's how that document was probably produced.

18       THE COURT:  And -- and when you did the -- when

19  you had the -- you know, when you had knowledge of the

20  arrest warrant, why -- it's -- you know, you -- once you

21  arrest someone and you arrested him at his house, you

22  know you can usually do a search incident to arrest.

23  Why go forward with the search warrant?

24       THE WITNESS:  Just based on the fact that

25  because we were only there for the embezzled U-Haul.  I

1    wasn't -- was not there to do anything else.  And

2    like -- like we've discussed here today is if there's

3    other crimes, I don't turn a blind eye to it.  If

4    there's been a crime, I'm going to investigate it.  If I

5    see people tied up in a basement, I'm going to

6    investigate why do you have people tied up in your

7    basement.  I'm not going to say, "I'm only here for the

8    U-Haul, and I want to get out of here as fast as

9    possible."

10         That's -- that's not what I like to do.  So if

11   my partner tells me there's chemicals, I verify it,

12   nope, those aren't chemicals.  And now -- so the search

13   warrant was based on the fact that I -- we were done.  I

14   was getting his cell phone and keys to leave his

15   property and lock his property up.  And we did our

16   protective sweep because I would never enter the house

17   without doing one, and subsequently, found the ammo and

18   everything like that.  And then that's when I requested

19   a search warrant because he's not supposed to have ammo.

20         THE COURT:  Okay.  And did you see any signs

21   that Mr. Grey had tried to dislodge the -- the U-Haul.

22         THE WITNESS:  Yeah.  Yeah, we did.

23         THE COURT:  You did?

24         THE WITNESS:  I -- it looked like it would be a

25   multi-person -- like, it's a big U-Haul in the hill.  I

 1    still don't know how it got there, to tell you the

 2    truth.  But there was winches.  Like, it looks like they

 3    bought from Harbor Freight like five winches.  But it

 4    looks like it was parked up possibly on top of, like, a

 5    little plateau, and it looks like it slid down.

 6           THE COURT:  Okay.  And so -- okay.  Well, I

 7    think that's it on my end.

 8           Do any of you want to follow up at anything at

 9    this point?  Otherwise, we can...

10           MR. MAGANA:  Not from the Government,

11    Your Honor.

12           THE COURT:  Okay.

13           MR. MAGANA:  Your Honor, we would like to

14    cross-examine the defendant, but I understand that will

15    probably not be today.

16           THE COURT:  Well, I don't know that -- I mean,

17    if this is all that's done, I would -- I -- I -- the

18    defendant has his declaration; right?  Just the

19    declaration he submitted?

20           MR. SNYDER:  Yes.

21           THE COURT:  How long is it going to take?

22           MR. MAGANA:  Our cross would be limited to the

23    declaration, Your Honor.  I think, depending on how it

24    goes, we could probably get it done before 5:00 p.m.

25           THE COURT:  Okay.  Let's -- let's get it over

```
 1    with because I think -- I think I'm going to maybe
 2    limit -- just finish up today then if we can.  Unless
 3    you -- unless the two of you feel -- have any different
 4    feeling about the other witnesses.
 5              I mean, I -- I don't feel that strongly about
 6    it at this point.  If -- and I know I had asked for Rios
 7    to be here, but I'm -- you know, I'll leave it up to you
 8    guys.  If you want any other witnesses to be brought, we
 9    can do it in a couple weeks.
10              MR. SNYDER:  It's certainly our position that a
11    lot of this activity is warrantless.  It's the
12    Government's burden.  We don't have any particular need
13    to cross-examine these additional witnesses.
14              The record is what it is.  And if there's not
15    something there, then that's -- that's their
16    responsibility.  So...
17              THE COURT:  That's fine then.  Why don't we
18    just then end it today then.  And then close the record
19    today.  And then -- because I even -- if -- I think if I
20    wanted to bring you guys in the week of the 18th, I
21    doubt -- the holidays and everything -- I'd get people
22    here anyway, but maybe.  Let's -- I'll excuse this
23    witness then for now.  I'm going to excuse you for now
24    in case something comes up.  But you'll be excused, but
25    just with the understanding that there may be a need to
```

```
 1   call back.  And then we'll put the defendant on the

 2   stand.

 3              Okay.  Thank you.

 4              THE WITNESS:  I'll just wait outside?

 5              THE COURT:  Yeah.  You wait outside.

 6              THE WITNESS:  All right, sir.

 7        (Whereupon, the witness leaves the courtroom.)

 8              THE COURT:  Yeah.  Why don't we take a quick

 9   five-minute recess?  What?  Is that what you need?  I'd

10   rather keep -- what?

11                  THE COURT REPORTER:  No.

12              THE COURT:  Okay.  Let's keep going.

13              MR. SNYDER:  Your Honor, the -- the Defense

14   calls Mr. Grey who submitted a declaration.  As the

15   Court probably imagines, I'm going to be -- if things go

16   beyond the scope of his declaration -- objecting on

17   5th Amendment --

18              THE COURT:  These things are usually very

19   short; right?  So it shouldn't be more than a few

20   minutes.

21              MR. SNYDER:  Understood.  Thank you.

22              THE COURT:  Go ahead.  Okay.  Mr. Grey.  Go

23   around that way.  Yeah.  You know, can we -- he -- he

24   might --

25
```

1          **GOVERNMENT'S WITNESS, FRANZ GREY, SWORN.**

2              THE COURTROOM DEPUTY:  Please state your name.

3              THE WITNESS:  Franz Grey.

4              MR. MAGANA:  Permission to proceed, Your Honor?

5              THE COURT:  Yes.

6                     **DIRECT EXAMINATION**

7      BY MR. MAGANA:

8      Q       Good afternoon, Mr. Grey.  Yesterday you stated

9      in your declaration that Deputy Francisco told you that

10     he, quote, "had to arrest you"; is that right?

11     A       Yes.

12     Q       Now, you rented the U-Haul truck on

13     November 14th; is that correct?

14     A       Yes.

15     Q       And the deputy arrested you on the evening of

16     December 16th?

17     A       Yes.

18     Q       So you had that U-Haul for over a month?

19     A       Yes.

20     Q       And you had never made any attempt to contact

21     U-Haul about it?

22     A       My phones were out so I couldn't make any

23     calls.

24     Q       But you did have a car; right?

25     A       Yes.

```
1    Q        And so you could drive to the place where you

2    had rented the U-Haul?

3    A        Like I said on -- people had shot my house up.

4    So they were trying to rob my house so I couldn't make

5    it away without them robbing my house.

6             MR. SNYDER:  Your Honor, I'm also going to

7    object.  This is beyond the scope and not information

8    that was conveyed to the officer at the time.

9             THE COURT:  Sustained.

10            MR. SNYDER:  And I would ask for the last

11   answer to be stricken.

12            THE COURT:  It's stricken.  The answer is

13   stricken.

14            MR. MAGANA:  So -- I'll move on, Your Honor.

15   BY MR. MAGANA:

16   Q        So you stated in your declaration that you were

17   concerned that the deputies would be emboldened to enter

18   your home and that -- if -- if you were taken from the

19   scene with the door unlocked?

20   A        Yes.

21   Q        And you had a conversation with Officer

22   Francisco in which you asked him to get your keys and

23   your phone; correct?

24   A        He asked me to lock the place up first.  And I

25   wanted to get this over with and stop them from
```

```
 1   searching the house because they were searching for
 2   35 minutes.  And I wanted to put a stop to it.
 3   Q       Well --
 4   A       So I -- I tacitly agreed it so they would stop
 5   doing what they were doing.
 6   Q       But you never saw them go into your house;
 7   correct?
 8   A       I did.  I saw them open the door.
 9   Q       But never saw them go in your house; correct?
10   A       Officer Francisco, he took my glasses, first
11   off.  So I couldn't see, so I couldn't get a clear look.
12   Q       So you couldn't get a clear look at really
13   anything that was going on then, could you?
14   A       Not a clear look, but I saw them prowling the
15   yard and searching.  And they were asking about meth
16   precursors.  So I just deduct from that what they were
17   really doing.
18   Q       So you didn't have your glasses and you
19   couldn't really see; correct?
20   A       I mean, I can see.  That's why I have my
21   glasses off now.  I can see -- I can see fine.
22   Q       And -- but you didn't actually see anyone enter
23   your house until you gave them your consent; correct?
24   A       It looked to me like they were going inside of
25   the house.
```

1    Q        But you said you couldn't see because you

2    didn't have your glasses?

3    A        Not clearly.

4    Q        Now, when you and Officer Francisco had this

5    conversation about his going into your house to get your

6    phone and keys, his gun wasn't drawn; was it?

7    A        No.  But when somebody puts a AR-15 to your

8    head, you're kind of frightened.

9    Q        Is it your testimony that someone put an AR-15

10   to your head, Mr. Grey?

11   A        Yeah, closely.  Like -- like, 10 feet away.

12   That's close enough to my head.

13   Q        And then one of the deputies pointed an AR15 at

14   you?

15   A        Yes.

16   Q        But when you had your conversation with Deputy

17   Francisco, his gun was not drawn; correct?

18   A        No.

19   Q        And did he ever threaten to hurt you in any

20   way?

21   A        I've been tortured by deputies in the past and

22   even on the way back to the station, they said that

23   they're part of the Rattlesnakes Gang and they -- they

24   threatened.  And they threatened me before.  They bashed

25   my head in the wall before.

1    Q        So your testimony right now is that you were

2    afraid of the deputies?

3    A        Yes.

4            THE COURT:  Mr. Grey, just answer the questions

5    that are asked.  Listen to the questions and just answer

6    the questions that are asked.

7            MR. MAGANA:  Your Honor, I'd request permission

8    to play one clip from Exhibit 10 -- defense Exhibit 10

9    at five minutes and 30 seconds.  In just a moment, Alex.

10   BY MR. MAGANA:

11   Q        So you didn't tell the deputies that night that

12   you had a good relationship with the sheriff's

13   department?

14   A        I said I -- with the -- with the sheriff next

15   door -- the one who lives next door, some of them are

16   all right.  Some of them aren't all right.

17   Q        So you didn't tell them that you thought the

18   sheriffs were cool?

19   A        I was trying to diffuse the situation.

20           MR. MAGANA:  Would you play time five minutes,

21   30 seconds on Exhibit 10.

22          (Whereupon, video is played in open court.)

23   BY MR. MAGANA:

24   Q        So is your testimony there when you -- that

25   when you told him, "you guys are always cool," you were

1  lying to him?

2  A       Try -- trying to diffuse the situation.  When

3  you have dangerous people that are known to torture you,

4  you just tell them anything to stop them from torturing

5  you, again.

6  BY MR. MAGANA:

7  Q       And so your declaration is that you asked the

8  deputies to enter your home now in order to prevent them

9  from entering later; is that correct?

10  A       He said he was going to lock the door.  Then I

11  wanted to stop them from continuing to search.

12  Q       Now, you said in your declaration that that was

13  the reason that -- is it your testimony today that there

14  was no other reason that you asked them to enter your

15  cabin?

16  A       Yeah.  To get the phone, too.

17  Q       And that was because you wanted to report

18  another crime to the deputies; correct?

19  A       Yes.

20  Q       And you told them that some guys from Lancaster

21  had shot up your house?

22  A       Yes.

23  Q       And you told them that part of the reason you

24  didn't return the U-Haul was, like you said today,

25  because you were dealing with that shooting?

```
 1    A        Yes.

 2    Q        And you told them you had a video of that

 3    shooting on your phone?

 4    A        Yes.

 5    Q        And you wanted to show them that video?

 6    A        Yes.

 7    Q        So they needed to get that phone for that?

 8    A        Yes.

 9    Q        It was nighttime when the detectives arrested

10    you; correct?

11    A        Yes.

12    Q        And you said in your declaration there's an RV

13    on your property?

14    A        What's that?

15    Q        I'm sorry.  I'll enunciate.  You said in your

16    declaration that there is an RV on your property?

17    A        Yes.

18    Q        And there were at least two other cars in front

19    of your residence; right?

20    A        Yes.

21    Q        One Camaro and one Tesla?

22             MR. SNYDER:  Objection.  Beyond the scope.

23             THE COURT:  Sustained.

24    BY MR. MAGANA:

25    Q        Mr. Grey, you have a previous conviction for
```

1    voluntary manslaughter?

2            MR. SNYDER:  Objection.  Beyond the scope,

3    unless this is for impeachment.

4            THE COURT:  Sustained.

5            MR. MAGANA:  No further questions, Your Honor.

6            THE COURT:  Okay.

7                        **CROSS-EXAMINATION**

8    BY MR. SNYDER:

9    Q       Very, very briefly.

10            So when you say that you couldn't really see,

11    it was dark out that night; right?

12    A       Yes.

13    Q       And the light was on inside your house; right?

14    A       Yes.

15    Q       And so if the door to your home was opening,

16    could you see the light coming from inside your house?

17    A       Yes.  Plus, I could hear the music, the volume.

18    When -- when they'd open the door, the volume would

19    increase.

20    Q       Okay.  You mentioned that -- actually, you know

21    what?  Let me ask this one last question:  Did Francisco

22    ever follow up on that report regarding the other

23    officers?

24            Did you ever hear of someone doing an

25    investigation, writing a report, filing anything with

1    the sheriff's department?

2    A        None whatsoever.

3            MR. SNYDER:  No further -- no further

4    questions, Your Honor.

5            THE COURT:  Anything else?

6            MR. MAGANA:  No, Your Honor.

7            THE COURT:  Okay.  Thank you.

8            The witness is excused.

9            Okay.  So we'll need to set a -- a briefing

10   schedule.  And I'll do the same.  Since it's their

11   motion, I'll let the defendant go first.  And then the

12   Government do their opposition and then the reply.  I'm

13   thinking, because of the holidays and everything else,

14   to have the first brief due in mid-January and then a --

15   21-days for an opposition.  And then maybe 14 days for a

16   reply after that.

17           We'll set specific dates in the order that goes

18   out after today's hearing.

19           The -- the one thing I will want from you all

20   is a -- make sure all your citations to the record are

21   to the page and line number of the transcript.  You

22   don't need to repeat what is in -- I mean, you can

23   certainly -- I mean -- and that's going to be a little

24   repetitive.  You can't avoid it, but the idea is to, you

25   know, take what was heard today and to supplement the

1  briefing that's already before the court based on the

2  evidence that was presented today.

3        And then I may or may not have another oral

4  argument for you guys at that point.  I -- after I look

5  at it or I may just take it under submission at that

6  point.

7        Do we have a trial date coming up?  Do we need

8  any sort of waiver or anything like that?

9        MR. MAGANA:  Yes, Your Honor.  We currently

10  have a trial date set for December 12th.  The court

11  previously vacated the pretrial conference.

12        THE COURT:  Yep.

13        MR. MAGANA:  And we would ask for a finding of

14  excludable time based on the pending motion and --

15        THE COURT:  Okay.

16        MR. MAGANA:  -- in the interest of justice.

17        THE COURT:  Okay.  Can you -- well, I need

18  to -- if it's just based on the pending motion, do I

19  need to take the waiver from the defendant or can I do

20  it just on the basis of -- of that?  I know that's one

21  of their grounds.  I mean, since he's here, I can take

22  an oral waiver.

23        MR. SNYDER:  Your Honor, if I could just

24  briefly be heard?

25        THE COURT:  Yeah.

1            MR. SNYDER:  We understand the -- the court's

2    schedule and -- and understand the exclusions and the

3    Speedy Trial Act.  Mr. Grey is not inclined to waive

4    and -- and so we would just do it -- I think it would be

5    based on the pending --

6            THE COURT:  Motion?

7            MR. SNYDER:  Yeah.

8            THE COURT:  Okay.  So can I ask the Government

9    counsel then to just submit a proposed order --

10           MR. MAGANA:  Yes, Your Honor.

11           THE COURT:  -- based on that?  And then --

12           MR. MAGANA:  I would just add one additional --

13           THE COURT:  Sure.

14           MR. MAGANA:  We would add one additional point

15    in the proposed order, which would be an ends of

16    justice --

17           THE COURT:  Yes.

18           MR. MAGANA:  -- as well, just in case the court

19    rules on the motion and there's still a week or two left

20    before we get to the trial date.

21           THE COURT:  Okay.

22           MR. MAGANA:  So that time remains excluded.

23           THE COURT:  That's good.  Yes, do that.  And --

24    and then we'll go from there.

25           MR. MAGANA:  Yep.

```
 1            THE COURT:  Go ahead.
 2            MR. MAGANA:  All right.  The other thing I just
 3   wanted to say, just briefly, is I am responsible for at
 4   least multiple weeks of the continuance because we were
 5   originally supposed to have a suppression hearing, and
 6   then I got sick.  So I think it's only fair to put that
 7   on the record, too.
 8            THE COURT:  Okay.  Okay.
 9            And so then can I have the -- then the two of
10   you at a minimum -- given the scheduling, if we have a
11   mid-January date -- and is that sufficient time for you,
12   Mr. Snyder?  Or do you need -- given the holidays and
13   everything else?  Do you need -- I mean, I just did that
14   off the top of my head.  Do you want more time to
15   prepare the opening brief?
16            MR. SNYDER:  I think it should be fine.  I have
17   a -- a very significant thing on December 28th, which is
18   work-related thing.
19            THE COURT:  Okay.
20            MR. SNYDER:  Maybe what I -- what I could
21   propose is that we talk among ourselves and --
22                     (Cross-talk.)
23            THE COURT:  I actually would -- usually better
24   when you guys work it out, the schedule.  That works
25   because I know you guys have trials and stuff in other
```

1    courts.  And -- and although, these days -- until

2    recently, I was always the second-most junior judge.

3    For almost ten years, I was the second-most junior

4    judge.  But with all the new judges, I've moved up now.

5         So now -- now, you know, how -- you all know

6    that -- that when it comes to trial setting and stuff

7    like that, if there is a conflict in trials, you defer

8    to the senior judge, as far as that goes.  But usually,

9    we -- you know, we all talk to each other and get along

10   and we can work it out among each other, too, if that's

11   an issue.

12        But why don't you guys work out a schedule

13   and -- and -- that works for your schedules, and then

14   submit that in the proposed order.

15        MR. SNYDER:  Okay.

16        MR. MAGANA:  Yes, Your Honor.

17        THE COURT:  And then -- and I think we'll keep

18   the record then the way it is, and then we'll go from

19   there then; okay?

20        Okay.  And thank you.

21        We're adjourned for the day.

22           (Whereupon, proceeding adjourned.)

23                     - - -

24

25

UNITED STATES DISTRICT COURT

**C E R T I F I C A T E**

UNITED STATES OF AMERICA          :

              vs.                 :   No. CR 23-0031-FMO-1

FRANZ GREY                        :

I, MARIA BUSTILLOS, OFFICIAL COURT REPORTER, IN AND FOR THE

UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF

CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION 753,

TITLE 28, UNITED STATES CODE, THE FOREGOING IS A TRUE AND

CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE

REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE

REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

/S/_____          //____

MARIA R. BUSTILLOS                       DATE
OFFICIAL REPORTER

| / | 2 | 35-minutes [1] - 81:19 | 85 [1] - 26:12 | 53:9, 63:5, 65:25, |
|---|---|---|---|---|

**/S** [1] - 165:22

**1**

**1** [2] - 28:19, 56:13
**10** [19] - 4:4, 5:1, 76:4, 76:9, 85:12, 85:13, 89:11, 89:20, 90:1, 90:5, 90:7, 90:12, 90:17, 90:18, 125:10, 155:11, 156:8, 156:21
**10(D** [1] - 38:17
**10(E** [1] - 38:21
**10(E)** [1] - 38:23
**106** [1] - 3:6
**11** [15] - 14:4, 28:15, 29:9, 29:10, 29:18, 30:13, 30:25, 35:8, 61:17, 78:19, 91:9, 92:11, 97:19, 101:7, 126:4
**11105** [1] - 58:18
**12** [4] - 4:3, 74:6, 74:8, 74:9
**1200** [1] - 2:6
**12254** [1] - 1:21
**12:25** [1] - 74:5
**12:33** [1] - 74:6
**12th** [1] - 161:10
**12TH** [1] - 2:11
**13** [2] - 3:6, 137:1
**131** [1] - 3:6
**14** [10] - 46:12, 56:15, 86:22, 86:24, 94:24, 95:6, 95:10, 95:24, 118:16, 160:15
**141** [1] - 3:7
**14th** [2] - 29:11, 152:13
**152** [1] - 3:8
**159** [1] - 3:8
**16** [1] - 34:24
**1653** [1] - 58:13
**16:55** [1] - 76:5
**16th** [14] - 24:16, 27:18, 27:21, 29:18, 30:22, 30:24, 31:23, 34:7, 35:22, 41:18, 59:10, 61:25, 110:3, 152:16
**17:07** [1] - 76:5
**17th** [2] - 27:2, 59:10
**180** [5] - 70:13, 71:7, 71:15, 71:16, 91:9
**18:50** [1] - 78:18
**18th** [2] - 131:8, 150:20
**19** [2] - 124:24, 124:25
**19:40** [1] - 78:18
**1:04** [1] - 86:23
**1ST** [1] - 1:22

**2** [10] - 22:19, 26:17, 26:19, 27:6, 39:11, 62:23, 63:12, 63:16, 63:24, 90:25
**20** [3] - 23:4, 23:7, 116:17
**2012** [2] - 5:1, 22:22
**2019** [8] - 6:6, 7:4, 23:24, 96:6, 96:22, 97:1, 98:11, 102:9
**2022** [11] - 24:9, 24:12, 24:21, 27:2, 27:18, 30:8, 31:23, 32:9, 34:25, 59:10
**2023** [3] - 1:19, 46:21, 46:25
**21-days** [1] - 160:15
**213** [1] - 1:24
**213)894-1344** [1] - 2:12
**213)894-4407** [1] - 2:17
**213)894-500-9350** [1] - 2:7
**21:10** [1] - 57:19
**22:50** [1] - 120:20
**23-00031-FMO** [1] - 5:5
**23-0031-FMO-1** [2] - 1:10, 165:6
**24** [2] - 12:24, 62:25
**245** [9] - 110:25, 112:7, 122:5, 123:17, 123:20, 145:10, 145:13, 145:20, 146:1
**245s** [1] - 145:14
**26-foot** [1] - 32:10
**28** [2] - 62:25, 165:13
**28th** [1] - 163:17
**29** [1] - 37:4
**2:00** [1] - 66:2
**2:01** [1] - 86:23
**2ND** [1] - 2:16

**3**

**3** [10] - 37:3, 37:7, 37:25, 43:16, 64:13, 64:19, 65:19, 88:9, 88:12, 88:14
**3..** [1] - 82:17
**30** [3] - 128:10, 156:9, 156:21
**30-foot** [1] - 70:12
**312** [2] - 2:6, 2:10
**321** [1] - 2:16
**33570** [1] - 35:3
**35** [7] - 26:10, 27:14, 82:6, 138:5, 138:7, 138:8, 154:2
**35-minute** [1] - 69:18

**350** [1] - 1:22

**4**

**4** [10] - 4:4, 28:6, 28:10, 31:21, 65:19, 76:5, 76:10, 78:18, 120:20, 124:6
**4(A** [1] - 28:19
**4(A)** [1] - 28:24
**4(B** [2] - 34:17, 38:11
**4(C** [2] - 40:15, 61:24
**4(C)** [1] - 62:23
**4-20-2023** [1] - 59:6
**40** [1] - 136:10
**4455** [1] - 1:23
**48** [1] - 27:2
**4:00** [1] - 66:2
**4:30** [1] - 131:6

**5**

**5** [8] - 33:25, 41:25, 42:1, 43:13, 48:2, 54:11, 74:5, 89:23
**50** [9] - 26:6, 27:13, 92:20, 124:6, 124:11, 124:22, 124:23, 124:25, 125:1
**54** [1] - 1:17
**540** [2] - 88:10, 88:15
**5:00** [1] - 149:24
**5th** [11] - 27:6, 29:9, 29:15, 30:8, 30:14, 32:9, 33:2, 33:12, 46:20, 96:3, 151:17

**6**

**6** [2] - 1:19, 3:3
**6:16** [1] - 125:11
**6th** [2] - 7:10, 12:17

**7**

**7** [4] - 43:16, 56:16, 59:1, 89:24
**735** [2] - 56:15, 56:18
**74** [1] - 4:3
**753** [1] - 165:12
**76** [2] - 4:4, 4:4
**7:45** [1] - 136:19
**7:50** [1] - 136:24
**7th** [3] - 46:25, 47:14, 107:2

**8**

**8** [3] - 38:14, 65:20, 68:23

**85** [1] - 26:12
**894-2739** [1] - 1:24
**8th** [1] - 109:12

**9**

**9** [1] - 59:2
**90012** [4] - 1:23, 2:7, 2:11, 2:16
**9:10** [6] - 5:3, 56:23, 57:18, 57:25, 59:21, 60:8

**A**

**a.m** [1] - 66:2
**A.M** [1] - 5:3
**able** [1] - 9:1
**ABOVE** [1] - 165:15
**ABOVE-ENTITLED** [1] - 165:15
**absolutely** [2] - 13:17, 123:25
**abstract** [3] - 22:7, 46:2, 46:3
**abundance** [3] - 6:5, 8:20, 12:20
**academy** [2] - 22:22, 22:24
**access** [4] - 44:11, 48:17, 49:14, 57:8
**accessed** [1] - 42:19
**accessible** [1] - 44:10
**according** [3] - 28:9, 34:6, 96:18
**account** [1] - 19:11
**accumulated** [1] - 115:11
**accuracy** [1] - 10:19
**accurate** [8] - 10:23, 14:21, 18:7, 18:17, 45:16, 51:15, 66:4, 66:5
**act** [1] - 129:10
**Act** [1] - 162:3
**acted** [1] - 8:14
**actions** [7] - 6:8, 6:21, 16:12, 17:8, 39:7, 39:24, 40:7
**activities** [3] - 16:16, 17:6, 17:11
**activity** [8] - 28:3, 80:18, 81:20, 84:4, 85:8, 85:10, 87:6, 150:11
**actual** [4] - 6:20, 11:10, 12:24, 29:17
**add** [2] - 162:12, 162:14
**addition** [4] - 12:17, 75:10, 108:22, 120:1
**additional** [8] - 8:21, 11:10, 22:13, 35:12, 47:7, 52:23, 53:1,

108:20, 129:15, 150:13, 162:12, 162:14
**address** [3] - 6:2, 33:8, 100:16
**addressed** [1] - 139:13
**adequate** [1] - 9:9
**adjacent** [1] - 72:25
**adjourned** [2] - 164:21, 164:22
**admissibility** [1] - 11:17
**advance** [1] - 93:2
**advanced** [1] - 41:5
**affidavit** [22] - 17:21, 18:3, 18:12, 18:14, 19:1, 24:16, 26:4, 26:23, 26:25, 32:24, 39:11, 39:17, 40:1, 40:9, 40:12, 63:13, 81:14, 85:9, 87:23, 89:10, 90:20, 90:25
**affidavits** [3] - 17:19, 17:25, 18:7
**afraid** [2] - 126:10, 156:2
**afternoon** [7] - 5:8, 5:11, 5:12, 7:11, 46:11, 95:2, 152:8
**agent** [10] - 19:25, 20:9, 20:11, 21:12, 21:13, 21:14, 21:18, 90:22, 93:15, 94:4
**Agent** [1] - 47:3
**agitated** [1] - 117:2
**ago** [2] - 6:23, 47:12
**agree** [7] - 12:14, 17:25, 34:20, 40:12, 41:6, 98:2, 143:25
**agreed** [2] - 12:22, 154:4
**ahead** [16] - 12:13, 13:22, 54:9, 76:7, 78:20, 79:23, 80:6, 84:24, 106:20, 109:21, 115:12, 124:10, 140:25, 144:11, 151:22, 163:1
**Aia** [1] - 116:16
**air** [1] - 145:11
**alert** [2] - 111:19, 112:19
**Alex** [1] - 156:9
**ALIX** [1] - 2:5
**allegations** [1] - 105:1
**alleged** [1] - 99:16
**allowed** [1] - 7:4
**allows** [1] - 44:3
**alluded** [1] - 123:9
**almost** [1] - 164:3
**aloud** [2] - 46:25, 47:18
**amended** [3] - 108:7,

166

108:15, 109:10
**Amendment** [1] - 151:17
**America** [1] - 5:5
**AMERICA** [3] - 1:7, 2:4, 165:5
**ammo** [3] - 92:22, 148:17, 148:19
**amount** [3] - 81:24, 114:18, 116:3
**AND** [3] - 165:10, 165:13, 165:15
**AND/OR** [1] - 165:19
**Angeles** [1] - 47:4
**ANGELES** [6] - 1:18, 1:23, 2:7, 2:11, 2:16, 5:1
**anonymous** [4] - 36:7, 66:18, 68:2, 113:24
**answer** [8] - 73:11, 79:16, 93:25, 146:1, 153:11, 153:12, 156:4, 156:5
**answered** [1] - 102:4
**answers** [1] - 93:23
**ANY** [1] - 165:18
**anytime** [1] - 109:7
**anyway** [4] - 5:25, 115:12, 131:7, 150:22
**apologize** [9] - 43:24, 47:10, 64:8, 87:10, 95:19, 104:7, 109:14, 131:4, 131:12
**appear** [2] - 119:19, 119:21
**appearances** [1] - 5:7
**appeared** [1] - 6:9
**apple** [1] - 77:14
**apprehension** [1] - 126:10
**approached** [1] - 119:14
**appropriate** [5] - 36:25, 40:18, 40:22, 41:22, 63:1
**appropriately** [1] - 8:14
**APRIL** [1] - 5:1
**AR-15** [2] - 155:7, 155:9
**AR15** [1] - 155:13
**ARE** [1] - 165:19
**area** [14] - 23:14, 63:4, 64:22, 65:22, 65:24, 70:19, 71:1, 72:2, 75:22, 76:21, 83:3, 120:17, 135:5, 137:21
**areas** [2] - 93:20, 126:25
**argument** [3] - 7:14, 11:25, 161:4
**argumentative** [1] - 103:18

**armed** [2] - 135:15, 137:12
**arrest** [30] - 17:25, 57:25, 64:7, 67:9, 69:8, 82:16, 82:18, 83:20, 85:14, 86:8, 86:10, 86:12, 87:3, 113:16, 114:13, 115:5, 116:10, 116:23, 120:25, 126:11, 130:22, 142:22, 143:4, 143:7, 143:20, 144:11, 147:20, 147:21, 147:22, 152:10
**arrested** [15] - 16:10, 47:20, 64:9, 68:12, 70:8, 81:12, 84:14, 114:5, 114:6, 116:21, 116:25, 122:4, 147:21, 152:15, 158:9
**arresting** [2] - 72:11, 86:16
**arrests** [2] - 27:13, 27:14
**arrival** [1] - 117:12
**arrive** [3] - 65:11, 69:19, 118:17
**arrived** [4] - 75:14, 136:21, 137:1, 146:8
**arriving** [3] - 54:13, 66:18, 67:1
**articulate** [1] - 100:6
**artwork** [2] - 99:19, 105:10
**aside** [1] - 144:5
**assault** [6] - 116:21, 116:22, 123:21, 143:4, 143:13, 143:22
**assessment** [1] - 11:23
**assigned** [2] - 27:10, 27:11
**assignment** [21] - 24:9, 24:19, 25:1, 25:8, 25:10, 26:1, 26:5, 26:13, 27:10, 27:18, 34:3, 36:15, 36:17, 36:25, 40:19, 40:23, 40:25, 41:22, 63:2, 65:21, 68:24
**assignments** [3] - 25:11, 25:13, 25:15
**assisted** [1] - 27:12
**associated** [6] - 7:19, 7:20, 48:13, 58:13, 58:19, 60:16
**AT** [1] - 5:3
**ATF** [1] - 47:3
**attached** [6] - 6:11, 22:5, 33:25, 45:21, 46:12, 57:4
**attempt** [2] - 110:12,

152:20
**attempting** [1] - 111:22
**attempts** [1] - 116:8
**attended** [4] - 47:3
**attention** [9] - 17:7, 96:24, 96:25, 101:15, 107:6, 107:10, 107:11, 107:15, 107:24
**ATTORNEY** [2] - 2:5, 2:9
**attorney** [1] - 107:20
**AUSA** [2] - 5:10, 47:3
**available** [4] - 8:24, 9:3, 9:18, 9:20
**avenues** [1] - 124:18
**avoid** [2] - 75:18, 160:24
**aware** [8] - 7:9, 30:16, 85:25, 107:19, 113:23, 116:15, 119:21, 142:1

**B**

**background** [1] - 137:21
**backseat** [1] - 6:18
**bad** [3] - 15:10, 15:13, 117:6
**bag** [6] - 91:5, 91:16, 91:18, 92:2, 92:6, 94:19
**bags** [1] - 92:4
**Barrett** [1] - 92:20
**based** [18] - 41:24, 86:13, 90:8, 92:25, 100:15, 112:10, 114:14, 142:17, 145:24, 146:2, 146:7, 147:24, 148:13, 161:1, 161:14, 161:18, 162:5, 162:11
**basement** [2] - 148:5, 148:7
**bashed** [1] - 155:24
**basic** [1] - 96:11
**basis** [7] - 7:25, 93:14, 100:13, 129:4, 133:16, 139:19, 161:20
**Bates** [2] - 56:15, 88:9
**bathroom** [1] - 131:5
**bearing** [1] - 10:9
**beat** [1] - 145:25
**become** [1] - 117:1
**becomes** [1] - 144:4
**bed** [1] - 92:22
**bedroom** [2] - 92:19, 126:18
**beforehand** [1] - 107:9
**beginning** [5] - 59:9,

66:1, 107:1, 108:4, 129:23
**behalf** [2] - 5:13, 75:3
**BEHALF** [2] - 2:4, 2:14
**behind** [4] - 70:12, 73:2, 95:7, 122:17
**belief** [1] - 85:22
**belongings** [1] - 99:18
**below** [3] - 59:12, 97:22, 104:9
**better** [3] - 109:18, 109:19, 163:23
**between** [3] - 21:12, 69:7, 69:18
**beyond** [4] - 151:16, 153:7, 158:22, 159:2
**big** [3] - 126:16, 145:13, 148:25
**binder** [5] - 26:18, 28:20, 37:4, 37:8, 46:13
**bit** [5] - 59:12, 84:18, 91:8, 122:9, 126:15
**blaring** [3] - 119:1, 122:23, 137:14
**bleach** [1] - 77:15
**blind** [1] - 148:3
**blood** [1] - 131:12
**boarded** [1] - 122:21
**boards** [1] - 141:8
**body** [4] - 93:7, 112:20, 118:16, 124:1
**book** [3] - 29:4, 117:9, 146:20
**booked** [2] - 86:17, 133:13
**booking** [1] - 50:14
**bottom** [3] - 26:22, 27:4, 117:6
**bought** [1] - 149:3
**Bouquet** [1] - 35:3
**boxed** [1] - 61:15
**Brandice** [1] - 47:4
**break** [2] - 131:5, 131:11
**Brian** [1] - 106:11
**brief** [4] - 6:2, 141:1, 160:14, 163:15
**briefing** [2] - 160:9, 161:1
**briefly** [16] - 6:11, 6:13, 7:7, 12:14, 17:19, 18:22, 19:14, 22:21, 26:20, 37:2, 92:14, 93:5, 121:11, 159:9, 161:24, 163:3
**bring** [7] - 12:16, 22:13, 46:6, 107:5, 107:10, 115:23, 150:20
**brings** [1] - 139:22
**brought** [10] - 7:4, 17:6, 96:23, 96:25, 101:15, 103:1, 107:11, 107:14,

107:23, 150:8
**bullet** [2] - 120:16, 120:22
**bullets** [1] - 120:14
**bunch** [7] - 59:23, 59:24, 85:21, 86:13, 89:20, 106:3, 133:12
**burden** [2] - 5:19, 150:12
**burglarized** [1] - 121:4
**BUSTILLOS** [3] - 1:20, 165:10, 165:23
**but..** [1] - 29:13
**BY** [54] - 2:5, 2:10, 2:15, 3:6, 3:6, 3:8, 3:8, 13:24, 16:2, 16:13, 17:3, 21:17, 29:6, 46:15, 52:20, 60:6, 62:18, 66:16, 74:11, 78:22, 80:4, 80:9, 81:8, 87:1, 88:8, 88:13, 95:23, 97:20, 99:10, 102:7, 103:22, 104:12, 106:22, 109:24, 113:14, 115:15, 120:23, 124:13, 125:4, 125:13, 125:23, 130:8, 131:17, 132:16, 135:24, 139:9, 141:3, 152:7, 153:15, 156:10, 156:23, 157:6, 158:24, 159:8

**C**

**C.S.R** [1] - 1:21
**CA** [3] - 2:7, 2:11, 2:16
**cabin** [9] - 91:12, 113:20, 116:15, 126:15, 127:1, 127:22, 128:12, 157:15
**cabinets** [2] - 99:18, 105:9
**CAD** [5] - 56:24, 57:7, 57:16, 58:9, 147:14
**calculation** [1] - 30:1
**California** [9] - 42:12, 42:14, 43:5, 43:19, 43:23, 44:2, 44:3, 49:9, 49:17
**CALIFORNIA** [5] - 1:2, 1:18, 1:23, 5:1, 165:12
**call-outs** [1] - 126:13
**cam** [1] - 93:7
**Camaro** [1] - 122:14, 158:21
**camera** [6] - 81:20, 82:2, 112:20, 118:16, 124:2, 140:6
**cameras** [1] - 94:8,

121:16
**camper** [5] - 7:25, 96:12, 96:17, 96:20, 98:20
**campers** [1] - 101:4
**can..** [1] - 149:9
**Canyon** [1] - 35:3
**captured** [1] - 121:15
**car** [23] - 7:24, 23:11, 45:5, 57:1, 57:8, 58:16, 58:19, 59:15, 59:17, 67:11, 67:14, 68:14, 98:25, 99:1, 99:12, 100:7, 100:22, 117:24, 136:7, 138:14, 140:9, 147:8, 152:24
**care** [1] - 18:15
**career** [1] - 24:23
**carefully** [1] - 99:16
**cars** [10] - 80:11, 118:18, 118:23, 119:2, 122:6, 122:12, 122:13, 137:8, 137:23, 158:18
**case** [33] - 6:25, 9:24, 10:1, 10:5, 10:9, 15:4, 15:7, 15:12, 18:23, 19:6, 19:16, 19:23, 22:17, 31:16, 32:21, 38:9, 40:15, 50:21, 63:6, 64:14, 81:11, 85:1, 87:14, 90:13, 91:9, 91:11, 94:4, 106:5, 132:24, 135:9, 150:24, 162:18
**CASE.....................**
[1] - 3:3
**cases** [1] - 138:18
**cash** [2] - 94:14, 94:19
**Castaic** [2] - 23:5, 23:7
**catch** [2] - 104:22, 145:9
**caution** [3] - 6:5, 8:20, 12:20
**cell** [8] - 21:19, 71:21, 84:22, 118:14, 128:17, 134:6, 137:22, 148:14
**cellphone** [1] - 84:25
**center** [4] - 45:4, 56:3, 56:4, 58:18
**Center** [7] - 54:22, 54:23, 55:15, 56:9, 60:16, 132:3, 132:4
**CENTRAL** [2] - 1:2, 165:11
**certain** [2] - 24:20, 52:22
**certainly** [4] - 11:3, 115:10, 150:10, 160:23
**certainty** [1] - 141:15

**certification** [1] - 59:1
**CERTIFY** [1] - 165:12
**chains** [1] - 133:12
**chance** [2] - 22:2, 39:12
**changed** [2] - 16:24, 107:24
**changes** [8] - 20:20, 20:22, 20:24, 20:25, 21:1, 21:3, 21:4, 22:3
**characterize** [1] - 119:11
**CHARGED** [1] - 165:18
**CHARLES** [3] - 2:15, 3:6, 3:8
**Charles** [1] - 5:13
**check** [24] - 34:21, 38:18, 38:22, 42:2, 42:7, 42:10, 42:16, 43:22, 47:22, 48:3, 48:6, 49:16, 50:12, 52:7, 70:23, 72:12, 72:17, 79:23, 111:3, 111:17, 112:3, 138:12, 146:5, 147:9
**checked** [4] - 120:15, 120:16, 138:13
**checks** [2] - 52:3, 57:22
**CHEER** [1] - 42:11
**CHEERS** [6] - 42:11, 42:12, 43:5, 44:1, 49:8, 110:23
**chemicals** [13] - 77:7, 77:8, 77:22, 78:1, 78:14, 78:24, 79:17, 79:20, 120:3, 129:23, 130:10, 148:11, 148:12
**CHP** [5] - 70:13, 71:7, 71:15, 71:16, 71:19
**cider** [1] - 77:14
**CIRCUIT** [1] - 165:18
**citations** [1] - 160:20
**citizen** [6] - 96:5, 97:10, 97:15, 98:10, 98:19, 103:12
**citizens** [4] - 97:19, 98:25, 100:21, 103:23
**claimed** [1] - 7:19
**claiming** [1] - 35:1
**claims** [2] - 22:11, 120:10
**clarification** [1] - 108:21
**clarify** [1] - 9:21
**Clarita** [4] - 27:10, 27:25, 65:22, 116:16
**class** [1] - 76:24
**classification** [2] - 144:22, 145:15
**clean** [2] - 76:16, 77:25

**cleaning** [2] - 76:21, 77:18
**clear** [16] - 13:2, 32:20, 35:19, 43:25, 53:16, 57:5, 66:17, 71:1, 80:17, 94:3, 107:2, 123:19, 133:2, 154:11, 154:12, 154:14
**cleared** [4] - 125:8, 127:15, 137:7, 138:1
**clearing** [4] - 138:3, 138:5, 138:10, 138:15
**clearly** [1] - 155:3
**clerk** [2] - 13:15
**CLINT** [2] - 3:5, 13:13
**Clint** [4] - 13:11, 13:20, 47:5, 104:9
**clip** [7] - 74:4, 76:13, 86:20, 136:15, 136:24, 137:3, 156:8
**clips** [5] - 73:25, 124:1, 124:5, 135:7, 136:15
**clock** [1] - 124:21
**close** [2] - 150:18, 155:12
**closed** [1] - 133:9
**closely** [1] - 155:11
**closet** [1] - 127:16
**cluttered** [1] - 128:4
**code** [1] - 59:25
**CODE** [1] - 165:13
**collateral** [1] - 7:2
**coming** [4] - 95:21, 120:14, 159:16, 161:7
**commander** [1] - 94:20
**comment** [2] - 8:15, 125:5
**common** [4] - 111:2, 111:6, 124:16, 126:4
**communicate** [3] - 21:7, 21:8, 21:18
**communicating** [1] - 94:3
**communication** [2] - 137:22, 137:23
**compared** [1] - 143:25
**compile** [1] - 50:9
**compiled** [1] - 31:9
**complaint** [13] - 7:17, 96:5, 96:8, 96:11, 97:10, 98:11, 102:14, 102:18, 102:21, 102:22, 103:12, 103:24, 105:1
**complaints** [7] - 97:13, 97:16, 97:19, 101:6, 102:19, 104:18
**complete** [1] - 14:23
**completed** [2] - 71:8,

71:11
**completely** [1] - 45:16
**complicated** [1] - 25:14
**computer** [13] - 45:3, 45:6, 50:19, 58:9, 58:16, 59:16, 59:25, 124:8, 146:23, 147:1, 147:2, 147:6, 147:14
**computers** [1] - 57:1
**concern** [3] - 125:20, 136:5, 142:16
**concerned** [11] - 120:8, 121:3, 123:22, 125:24, 128:25, 131:19, 131:20, 132:7, 132:19, 138:21, 153:17
**concerns** [2] - 112:11, 112:13
**conclude** [1] - 10:24
**conducive** [1] - 70:10
**conduct** [9] - 62:2, 97:24, 100:3, 109:5, 117:18, 121:23, 127:8, 139:11, 142:3
**conducted** [6] - 68:24, 89:7, 97:7, 122:18, 128:8, 138:13
**conducting** [5] - 62:10, 70:4, 80:24, 89:6, 128:13
**CONFERENCE** [2] - 165:17, 165:20
**conference** [1] - 161:11
**confirm** [2] - 67:20, 105:12
**confirmed** [3] - 68:17, 79:10, 83:14
**conflict** [1] - 164:7
**CONFORMANCE** [2] - 165:16, 165:19
**confrontation** [1] - 123:8
**confusing** [1] - 124:20
**consent** [2] - 83:15, 154:23
**consents** [1] - 142:2
**consider** [4] - 8:7, 116:2, 122:1, 133:19
**considered** [2] - 41:4, 41:5
**consistent** [4] - 47:5, 52:22, 77:8, 77:16
**construct** [1] - 77:8
**contact** [7] - 21:14, 55:13, 61:6, 101:4, 114:20, 116:8, 152:20
**contacted** [5] - 56:1, 56:10, 96:22, 118:13, 119:5
**contacts** [1] - 21:13

**contain** [2] - 14:25, 110:5
**containing** [1] - 91:5
**contains** [1] - 94:25
**contemplated** [1] - 83:9
**contemporaneous** [1] - 81:17
**context** [1] - 8:8
**continuance** [3] - 7:12, 13:1, 163:4
**continuation** [1] - 52:16
**continue** [5] - 52:13, 69:12, 88:24, 131:8
**continued** [1] - 128:18
**continuing** [2] - 89:5, 157:11
**controlled** [2] - 44:19, 44:25
**conversation** [7] - 54:6, 89:9, 119:11, 121:14, 153:21, 155:5, 155:16
**conversational** [1] - 119:24
**conversed** [1] - 103:3
**conveyed** [4] - 153:8
**convicted** [3] - 92:21, 112:4, 123:18
**conviction** [3] - 47:23, 112:6, 158:25
**convictions** [3] - 57:15, 110:24, 113:5
**cool** [2] - 156:18, 156:25
**copy** [1] - 9:25
**cords** [1] - 121:19
**corner** [1] - 129:2
**correct** [60] - 14:5, 14:22, 18:21, 19:18, 29:20, 33:19, 38:7, 39:22, 41:17, 43:21, 44:8, 46:8, 53:19, 53:20, 54:5, 54:19, 58:2, 58:24, 64:6, 65:18, 73:18, 73:21, 75:9, 81:15, 83:8, 83:11, 84:6, 84:12, 85:11, 90:10, 91:17, 92:10, 93:21, 94:6, 100:9, 101:10, 106:14, 107:3, 107:14, 108:2, 110:1, 114:3, 117:14, 121:24, 128:11, 133:24, 137:14, 138:19, 142:14, 146:9, 152:13, 153:23, 154:7, 154:9, 154:19, 154:23, 155:17, 157:9, 157:18, 158:10
**CORRECT** [1] - 165:14

**Correctional** [1] - 23:5
**corrections** [1] - 8:12
**correctly** [1] - 98:14
**Counsel** [4] - 52:19, 108:5, 109:6, 109:19
**counsel** [13] - 5:7, 5:10, 9:2, 10:14, 11:24, 12:5, 105:3, 108:17, 117:22, 124:10, 131:10, 143:1, 162:9
**counseled** [1] - 100:5
**counseling** [1] - 101:9
**count** [2] - 94:15, 94:18
**County** [6] - 10:2, 23:4, 42:13, 43:18, 47:4, 47:20
**county** [1] - 23:23
**couple** [5] - 10:20, 57:5, 112:6, 119:2, 150:9
**course** [12] - 5:20, 6:25, 8:7, 15:18, 24:23, 45:2, 50:8, 55:7, 121:13, 132:22, 133:1, 133:3
**COURT** [144] - 1:1, 1:15, 1:21, 5:3, 5:11, 5:15, 5:22, 5:25, 6:3, 7:6, 9:5, 9:11, 9:22, 10:13, 10:16, 11:1, 11:8, 11:13, 13:4, 13:14, 13:22, 16:1, 16:7, 16:23, 21:16, 29:3, 29:14, 29:17, 29:22, 29:25, 30:4, 46:14, 51:1, 51:7, 51:15, 52:13, 52:19, 60:5, 62:14, 66:15, 74:3, 78:20, 80:3, 80:8, 81:2, 81:6, 86:21, 88:4, 95:17, 95:20, 97:17, 99:9, 102:6, 103:19, 104:2, 104:4, 104:11, 104:16, 104:22, 105:11, 106:17, 106:20, 108:5, 108:7, 108:11, 108:22, 109:15, 109:21, 113:13, 114:22, 114:25, 115:4, 124:9, 125:22, 130:7, 131:1, 131:6, 131:14, 132:13, 135:23, 139:8, 140:23, 140:25, 142:6, 142:8, 142:12, 142:16, 142:20, 142:25, 143:24, 144:2, 144:9, 144:15, 144:24, 145:7, 145:18, 145:23,

146:4, 146:11, 146:16, 146:21, 147:15, 147:18, 148:20, 148:23, 149:6, 149:12, 149:16, 149:21, 149:25, 150:17, 151:5, 151:8, 151:11, 151:12, 151:18, 151:22, 152:5, 153:9, 153:12, 156:4, 158:23, 159:4, 159:6, 160:5, 160:7, 161:12, 161:15, 161:17, 161:25, 162:6, 162:8, 162:11, 162:13, 162:17, 162:21, 162:23, 163:1, 163:8, 163:19, 163:23, 164:17, 165:10, 165:11
**court** [19] - 5:21, 7:16, 8:5, 8:6, 74:10, 76:11, 78:21, 86:25, 107:17, 108:2, 109:9, 109:14, 124:12, 125:2, 125:12, 156:22, 161:1, 161:10, 162:18
**Court** [1] - 151:15
**Court's** [1] - 76:2
**court's** [7] - 37:4, 73:24, 78:16, 86:19, 120:19, 145:20, 162:1
**courtesy** [2] - 8:22, 8:25
**COURTHOUSE** [1] - 1:22
**courtroom** [1] - 151:7
**COURTROOM** [6] - 5:4, 13:16, 13:18, 88:12, 95:18, 152:2
**courts** [1] - 164:1
**cover** [1] - 12:15
**cowboy** [1] - 94:22
**Cox** [1] - 5:10
**CR** [3] - 1:10, 5:5, 165:6
**credibility** [3] - 109:16, 109:17
**credible** [1] - 116:5
**crime** [14] - 15:16, 15:21, 16:10, 16:12, 26:1, 40:20, 41:9, 111:4, 116:25, 130:1, 145:22, 148:4, 157:18
**crimes** [2] - 41:3, 148:3
**criminal** [13] - 28:2, 42:12, 42:19, 62:2, 62:10, 70:4, 73:20,

75:7, 78:2, 80:23, 111:7, 111:15, 113:9
**criminals** [4] - 123:4, 123:5, 136:1
**cross** [8] - 7:5, 11:25, 93:11, 99:7, 106:25, 149:14, 149:22, 150:13
**Cross** [3] - 84:21, 109:22, 163:22
**CROSS** [3] - 3:4, 13:23, 159:7
**CROSS-EXAMINATION** [2] - 13:23, 159:7
**cross-examination** [4] - 7:5, 11:25, 93:11, 106:25
**cross-examine** [2] - 149:14, 150:13
**cross-examined** [1] - 99:7
**Cross-talk** [3] - 84:21, 109:22, 163:22
**curious** [1] - 143:21
**curtains** [2] - 122:22, 141:9
**custody** [4] - 5:14, 22:25, 23:3, 58:7
**cut** [1] - 121:18

**D**

**damage** [1] - 105:10
**damaged** [1] - 99:20
**danger** [1] - 141:22
**dangerous** [12] - 25:14, 111:16, 111:19, 123:1, 123:12, 123:24, 129:7, 135:16, 137:13, 139:5, 139:7, 157:3
**Daniel** [1] - 31:24
**dark** [6] - 61:10, 71:23, 118:25, 137:21, 159:11
**data** [3] - 45:4, 48:18, 58:18
**database** [3] - 52:3, 52:7
**databases** [11] - 43:4, 44:9, 44:19, 44:21, 44:25, 49:4, 49:14, 49:15, 49:24, 50:8, 110:22
**date** [14] - 10:19, 25:4, 29:10, 31:14, 32:18, 34:7, 41:21, 46:20, 59:9, 161:7, 161:10, 162:20, 163:11
**DATE** [1] - 165:23
**dated** [1] - 96:2
**dates** [1] - 160:17
**days** [10] - 28:15,

29:9, 29:10, 29:18, 30:13, 30:25, 35:8, 61:17, 160:15, 164:1
**daytime** [1] - 31:24
**deadly** [5] - 116:22, 123:21, 143:5, 143:13, 143:23
**dealing** [1] - 157:25
**dealt** [1] - 123:5
**debrief** [2] - 81:20, 81:25
**debriefed** [1] - 81:23
**DECEMBER** [1] - 1:19
**December** [29] - 24:16, 27:2, 27:18, 27:21, 29:9, 29:15, 29:18, 30:8, 30:14, 30:22, 30:24, 31:23, 32:9, 33:2, 33:12, 34:7, 34:24, 35:22, 41:18, 46:20, 59:10, 61:25, 96:3, 110:3, 131:8, 152:16, 161:10, 163:17
**decide** [1] - 11:19
**decided** [1] - 140:5
**deciding** [2] - 19:11, 122:2
**decision** [4] - 86:4, 86:12, 90:8, 133:22
**decisions** [3] - 39:7, 39:24, 40:8
**declaration** [86] - 13:12, 18:23, 18:25, 19:5, 19:8, 19:15, 19:16, 19:19, 20:14, 21:24, 22:3, 22:6, 22:17, 24:8, 25:25, 28:5, 28:9, 28:19, 30:17, 30:23, 31:10, 31:11, 31:19, 31:22, 32:25, 34:1, 34:6, 34:18, 34:24, 38:9, 40:14, 42:1, 43:7, 43:10, 43:14, 44:16, 45:9, 45:12, 45:19, 45:22, 46:1, 48:1, 48:19, 48:24, 49:22, 53:6, 53:10, 54:11, 55:3, 55:6, 56:13, 62:22, 68:22, 80:18, 81:1, 81:10, 85:13, 86:3, 87:19, 89:12, 89:17, 90:18, 90:23, 91:9, 91:21, 92:11, 107:7, 108:7, 108:13, 108:15, 108:23, 108:24, 109:10, 143:1, 146:7, 149:18, 149:19, 149:23, 151:14, 151:16, 152:9, 153:16, 157:7, 157:12, 158:12, 158:16
**declarations** [2] -

29:9, 29:10, 29:18, 30:13, 30:25, 35:8, 61:17, 160:15, 164:1
**daytime** [1] - 31:24
**deadly** [5] - 116:22, 123:21, 143:5, 143:13, 143:23
**dealing** [1] - 157:25
**dealt** [1] - 123:5
**debrief** [2] - 81:20, 81:25
**debriefed** [1] - 81:23
**DECEMBER** [1] - 1:19
**December** [29] - 24:16, 27:2, 27:18, 27:21, 29:9, 29:15, 29:18, 30:8, 30:14, 30:22, 30:24, 31:23, 32:9, 33:2, 33:12, 34:7, 34:24, 35:22, 41:18, 46:20, 59:10, 61:25, 96:3, 110:3, 131:8, 152:16, 161:10, 163:17
**decide** [1] - 11:19
**decided** [1] - 140:5
**deciding** [2] - 19:11, 122:2
**decision** [4] - 86:4, 86:12, 90:8, 133:22
**decisions** [3] - 39:7, 39:24, 40:8
**declaration** [86] - 13:12, 18:23, 18:25, 19:5, 19:8, 19:15, 19:16, 19:19, 20:14, 21:24, 22:3, 22:6, 22:17, 24:8, 25:25, 28:5, 28:9, 28:19, 30:17, 30:23, 31:10, 31:11, 31:19, 31:22, 32:25, 34:1, 34:6, 34:18, 34:24, 38:9, 40:14, 42:1, 43:7, 43:10, 43:14, 44:16, 45:9, 45:12, 45:19, 45:22, 46:1, 48:1, 48:19, 48:24, 49:22, 53:6, 53:10, 54:11, 55:3, 55:6, 56:13, 62:22, 68:22, 80:18, 81:1, 81:10, 85:13, 86:3, 87:19, 89:12, 89:17, 90:18, 90:23, 91:9, 91:21, 92:11, 107:7, 108:7, 108:13, 108:24, 109:10, 146:7, 149:18, 149:19, 149:23, 151:14, 151:16, 152:9, 153:16, 157:7, 157:12, 158:12, 158:16
**declarations** [2] -

18:22, 47:6
**deduct** [1] - 154:16
**deemed** [1] - 78:14
**defendant** [15] - 113:4, 113:17, 114:5, 116:6, 119:10, 119:18, 120:4, 123:10, 142:14, 142:23, 149:14, 149:18, 151:1, 160:11, 161:19
**Defendant** [1] - 1:13
**defendant's** [8] - 5:16, 47:2, 106:24, 113:20, 116:15, 127:23, 128:6, 128:12
**DEFENDANT'S** [1] - 1:16
**DEFENDANTS** [1] - 2:14
**DEFENDER** [1] - 2:15
**defense** [7] - 12:5, 105:3, 107:20, 108:17, 117:22, 143:1, 156:8
**Defense** [4] - 8:21, 10:14, 146:23, 151:13
**DEFENSE'S** [3] - 3:3, 3:4, 4:2
**Defense's** [3] - 74:9, 76:9, 76:10
**defenseless** [1] - 145:16
**defer** [1] - 164:7
**definitely** [1] - 112:15
**denial** [1] - 105:9
**denied** [3] - 99:24, 104:1, 105:1
**deny** [2] - 104:10, 105:9
**deny..** [1] - 105:7
**department** [10] - 11:4, 14:4, 22:20, 36:3, 45:4, 48:20, 55:17, 59:3, 156:13, 160:1
**Department** [1] - 47:21
**department-issued** [1] - 45:4
**DEPOSIT** [1] - 165:19
**depth** [1] - 102:25
**deputies** [23] - 14:9, 75:20, 76:13, 80:10, 99:17, 99:24, 100:3, 104:10, 104:25, 105:7, 106:4, 118:17, 118:23, 120:21, 129:19, 146:25, 153:17, 155:13, 155:21, 156:2, 156:11, 157:8, 157:18

**deputy** [16] - 5:20, 5:23, 6:1, 13:25, 23:25, 27:24, 66:11, 71:11, 74:19, 75:3, 88:17, 88:19, 94:7, 106:3, 129:22, 152:15

**Deputy** [30] - 7:18, 13:11, 27:22, 27:24, 28:10, 30:21, 31:4, 31:24, 32:23, 34:5, 36:20, 40:17, 42:7, 47:5, 47:20, 48:3, 54:24, 55:8, 56:1, 56:10, 60:23, 64:20, 64:21, 65:22, 92:15, 110:20, 152:9, 155:16

**DEPUTY** [6] - 5:4, 13:16, 13:18, 88:12, 95:18, 152:2

**deputy's** [2] - 6:5, 12:18

**describe** [4] - 88:25, 91:23, 93:5, 128:2

**described** [2] - 25:25, 80:19

**description** [1] - 96:11

**despite** [1] - 116:7

**details** [2] - 102:23, 130:23

**detain** [1] - 116:24

**detained** [3] - 64:9, 68:14, 83:13

**detaining** [1] - 100:7

**detective** [2] - 31:16, 32:21

**detectives** [1] - 158:9

**detention** [1] - 8:16

**determination** [1] - 12:3

**determine** [1] - 130:16

**determined** [7] - 8:19, 9:12, 36:24, 40:17, 41:21, 42:17, 121:23

**develop** [1] - 15:4

**device** [2] - 45:1, 45:4

**difference** [1] - 145:13

**different** [8] - 7:21, 9:15, 37:5, 47:9, 62:20, 91:8, 108:23, 150:3

**diffuse** [2] - 156:19, 157:2

**dining** [3] - 127:24, 128:2, 128:16

**DIRECT** [2] - 3:4, 152:6

**directly** [2] - 35:20, 107:10

**disagree** [1] - 11:14

**disclose** [2] - 12:19, 107:19

**disclosure** [2] - 8:18, 108:10

**disconnect** [1] - 94:7

**disconnected** [1] - 94:10

**discovered** [1] - 127:19

**discovery** [1] - 9:19

**discuss** [2] - 114:6, 120:3

**discussed** [3] - 22:18, 82:19, 148:2

**discussing** [1] - 120:22

**dislodge** [1] - 148:21

**dispatch** [2] - 34:25, 53:22

**dispatched** [4] - 33:21, 36:12, 41:14, 61:20

**dispute** [2] - 38:15, 38:21

**DISTRICT** [5] - 1:1, 1:2, 1:5, 165:11

**division** [3] - 22:25, 23:4, 23:8

**DIVISION** [1] - 1:3

**DO** [1] - 165:12

**document** [10] - 11:21, 29:22, 46:10, 59:2, 64:2, 98:13, 105:17, 118:4, 147:7, 147:17

**documentary** [1] - 22:10

**documentation** [1] - 8:17, 11:12

**documented** [3] - 6:19, 8:3, 8:16

**documents** [6] - 11:6, 18:1, 21:20, 22:13, 62:20, 93:1

**done** [22] - 24:20, 28:22, 31:3, 45:5, 69:15, 70:22, 75:1, 76:21, 77:19, 79:25, 84:8, 105:20, 107:21, 109:4, 117:3, 117:6, 143:8, 144:11, 144:19, 148:13, 149:17, 149:24

**door** [28] - 73:8, 73:10, 73:13, 74:15, 74:25, 82:13, 82:23, 98:20, 126:23, 133:10, 134:4, 134:11, 134:14, 134:15, 134:19, 134:23, 135:3, 135:5, 137:6, 139:25, 145:25, 153:19, 154:8, 156:15, 157:10, 159:15, 159:18

**doors** [1] - 138:17

**double** [2] - 38:18, 38:22

**double-check** [2] - 38:18, 38:22

**doubt** [1] - 150:21

**down** [13] - 21:3, 26:22, 27:7, 52:15, 52:19, 59:12, 59:19, 100:6, 114:18, 122:8, 145:9, 146:1, 149:5

**downplaying** [1] - 145:21

**downtown** [1] - 116:16

**dozens** [1] - 51:7

**draft** [2] - 20:2, 20:14

**drafted** [4] - 18:15, 63:18, 87:19, 90:22

**drawn** [4] - 119:14, 119:15, 155:6

**drive** [3] - 87:8, 118:18, 153:1

**drug** [7] - 24:20, 26:6, 26:12, 27:13, 88:25, 91:5, 129:11

**drug-related** [1] - 27:13

**due** [2] - 144:22, 160:14

**during** [23] - 14:6, 17:13, 26:9, 27:11, 28:11, 31:24, 33:5, 42:16, 46:25, 47:19, 70:3, 72:6, 72:10, 80:19, 80:24, 93:23, 94:3, 98:5, 107:5, 121:13, 129:15, 136:10, 138:9

**duty** [1] - 27:21

### E

**e-mail** [7] - 12:17, 21:8, 46:10, 46:19, 95:7, 95:12, 95:13

**e-mails** [3] - 13:3, 21:20, 94:5

**EAST** [1] - 2:16

**eat** [1] - 131:13

**EE** [1] - 96:17

**eight** [3] - 124:6, 124:11, 136:21

**either** [4] - 85:9, 91:23, 92:1, 138:1

**electronic** [2] - 44:16, 44:25

**electronically** [1] - 45:6

**elements** [3] - 16:12, 122:3, 133:19

**elevated** [3] - 22:25, 23:3, 23:8

**embezzled** [25] - 28:7, 30:10, 32:4, 32:10, 33:3, 39:18, 40:10, 41:24, 61:16, 62:8, 62:17, 64:10, 64:22,

69:13, 110:1, 110:17, 113:18, 113:21, 114:20, 116:3, 120:1, 144:1, 144:23, 145:1, 147:25

**embezzlement** [5] - 68:9, 117:18, 143:13, 143:17, 146:3

**embezzling** [2] - 114:13, 143:9

**emboldened** [1] - 153:17

**emergency** [1] - 111:21

**encounter** [2] - 129:15, 130:1

**encountering** [1] - 111:12

**end** [7] - 69:14, 88:17, 126:14, 131:6, 131:9, 149:7, 150:18

**ending** [1] - 59:9

**ends** [1] - 162:15

**enforcement** [11] - 35:20, 44:22, 55:14, 61:6, 124:17, 126:3, 126:12, 127:7, 127:20, 131:24, 139:1

**engaged** [1] - 84:5

**engine's** [2] - 118:4, 118:5

**enter** [8] - 83:15, 127:20, 144:19, 148:16, 153:17, 154:22, 157:8, 157:14

**entered** [8] - 12:23, 86:5, 88:20, 92:5, 92:15, 121:22, 127:22, 128:12

**entering** [6] - 86:1, 86:13, 91:11, 92:19, 127:1, 157:9

**entirely** [1] - 19:17

**ENTITLED** [1] - 165:15

**entry** [2] - 58:13, 142:3

**enunciate** [1] - 158:15

**enunciating** [1] - 96:15

**erratic** [1] - 129:10

**error** [1] - 107:6

**especially** [2] - 112:14, 114:19

**ESQ** [3] - 2:5, 2:10, 2:15

**essentially** [3] - 6:10, 6:23, 143:9

**established** [1] - 6:25

**evening** [1] - 152:15

**event** [3] - 101:2, 101:3, 103:6

**events** [4] - 16:9,

63:19, 87:11, 99:7

**eventually** [2] - 21:24, 77:11

**everywhere** [1] - 141:8

**evidence** [17] - 7:2, 8:6, 12:1, 15:16, 15:20, 16:10, 99:8, 127:14, 127:17, 129:16, 130:1, 133:13, 135:15, 136:11, 137:9, 137:12, 161:2

**EVIDENCE** [1] - 1:17

**evidentiary** [2] - 5:16, 52:16

**EVIDENTIARY** [1] - 1:16

**exact** [5] - 24:13, 25:2, 25:4, 28:16, 81:24

**exactly** [6] - 21:5, 25:2, 42:5, 100:18, 127:23, 127:25

**EXAMINATION** [6] - 13:23, 106:21, 131:16, 141:2, 152:6, 159:7

**examination** [5] - 7:5, 8:9, 11:25, 93:11, 106:25

**examine** [2] - 149:14, 150:13

**examined** [1] - 99:7

**example** [3] - 11:10, 22:6, 48:11

**excerpted** [1] - 74:1

**excludable** [1] - 161:14

**excluded** [1] - 162:22

**exclusions** [1] - 162:2

**excuse** [3] - 116:21, 150:22, 150:23

**excused** [2] - 150:24, 160:8

**exhibit** [9] - 29:5, 37:5, 45:21, 46:1, 46:12, 60:2, 63:15, 95:8, 146:20

**Exhibit** [50] - 22:6, 26:17, 26:19, 27:6, 28:19, 33:25, 37:3, 37:4, 37:7, 37:25, 39:11, 45:23, 46:2, 46:12, 56:13, 59:1, 59:2, 63:12, 63:16, 63:24, 64:13, 64:19, 74:5, 74:6, 74:8, 74:9, 76:4, 76:5, 76:9, 76:10, 78:18, 78:19, 82:17, 86:22, 86:24, 88:9, 88:11, 88:14, 90:25, 94:24, 95:6, 95:24, 120:20, 124:6, 125:10, 156:8, 156:21

**exhibit's** [1] - 95:5

**exhibits** [7] - 7:7, 22:5, 22:8, 22:14, 46:4, 46:6, 74:1
**existed** [1] - 102:18
**exit** [1] - 124:18
**expect** [1] - 109:19
**experience** [3] - 115:25, 126:3, 127:6
**explain** [3] - 32:20, 108:15, 109:10
**explained** [2] - 32:21, 117:19
**explaining** [1] - 64:7
**expression** [1] - 40:3
**exterior** [5] - 68:25, 69:20, 80:20, 122:18, 141:4
**extremely** [2] - 7:17, 8:4
**extrinsic** [2] - 7:2, 99:8
**eye** [1] - 148:3

**F**

**fabricate** [1] - 103:23
**facial** [1] - 40:3
**Facility** [1] - 23:5
**fact** [19] - 7:17, 30:18, 36:14, 38:8, 39:23, 40:6, 45:12, 78:3, 85:3, 86:3, 91:24, 113:3, 116:7, 116:10, 120:10, 136:14, 143:21, 147:24, 148:13
**factfinder** [1] - 8:5
**factors** [4] - 86:13, 89:11, 90:4, 122:1
**facts** [4] - 8:12, 17:1, 83:16, 85:6
**factually** [1] - 18:17
**failing** [1] - 100:6
**fair** [3] - 50:20, 53:14, 163:6
**fairly** [1] - 126:17
**fall** [1] - 118:23
**falsified** [1] - 106:12
**familiar** [2] - 44:1, 110:9
**far** [6] - 36:7, 41:13, 41:16, 116:15, 143:8, 164:8
**fast** [1] - 148:8
**FBI** [9] - 54:17, 55:11, 55:23, 60:22, 60:24, 112:9, 112:15, 112:25, 123:15
**FEDERAL** [1] - 2:14
**federal** [4] - 55:14, 61:6, 112:17, 131:23
**FEE** [1] - 165:18
**FEES** [1] - 165:18
**feet** [1] - 155:11
**fellow** [1] - 84:5

**felon** [1] - 92:21, 112:4
**felonies** [1] - 110:25
**felony** [8] - 42:23, 47:23, 122:5, 123:18, 144:16, 145:12, 145:20, 146:3
**FERNANDO** [1] - 1:5
**few** [8] - 13:25, 62:19, 73:25, 93:13, 104:17, 124:1, 142:8, 151:19
**file** [9] - 6:6, 11:4, 11:5, 11:22, 12:19, 13:2, 103:7, 108:15, 109:10
**filed** [13] - 12:21, 22:17, 24:15, 38:9, 39:11, 40:14, 74:1, 81:11, 87:16, 90:12, 96:6, 103:12, 108:13
**filing** [2] - 45:19, 159:25
**final** [1] - 53:20
**findings** [2] - 7:22, 8:13
**fine** [9] - 5:22, 11:15, 27:9, 27:12, 28:18, 74:3, 150:17, 154:21, 163:16
**finish** [1] - 150:2
**finished** [1] - 76:13
**finishing** [1] - 118:12
**firearm** [3] - 27:14, 123:7, 129:1
**firearm-related** [1] - 27:14
**first** [44] - 5:20, 5:23, 7:11, 7:12, 8:25, 20:2, 20:14, 23:18, 28:14, 28:23, 29:1, 29:5, 30:24, 41:12, 46:1, 46:11, 46:18, 46:24, 47:11, 52:18, 61:19, 62:21, 65:17, 70:9, 72:11, 74:4, 90:11, 90:16, 91:2, 95:1, 95:3, 95:7, 95:13, 101:18, 104:9, 104:23, 124:5, 131:13, 136:15, 153:24, 154:10, 160:11, 160:14
**five** [10] - 97:13, 97:19, 101:6, 102:18, 104:18, 145:16, 149:3, 151:9, 156:9, 156:20
**five-minute** [1] - 151:9
**flagged** [1] - 91:12
**Flex** [1] - 44:10
**FLOOR** [1] - 2:11
**folder** [1] - 13:14
**follow** [6] - 30:20,

60:3, 62:24, 115:13, 149:8, 159:22
**follow-up** [1] - 30:20
**following** [6] - 32:4, 47:7, 47:23, 85:13, 120:25, 142:9
**footage** [2] - 112:21, 124:2
**FOR** [3] - 165:10, 165:11, 165:18
**FOREGOING** [1] - 165:13
**form** [1] - 129:4
**FORMAT** [1] - 165:16
**forth** [2] - 45:10, 138:11
**forthcoming** [1] - 47:1
**forward** [3] - 13:8, 61:8, 147:23
**four** [5] - 5:6, 6:23, 27:6, 69:23, 102:20
**fourth** [2] - 46:20, 91:1
**foyer** [1] - 126:19
**frame** [3] - 11:24, 11:25, 24:24
**FRANCISCO** [2] - 3:5, 13:13
**Francisco** [16] - 7:19, 13:11, 13:20, 13:25, 47:5, 47:20, 56:20, 65:23, 104:9, 109:25, 152:9, 153:22, 154:10, 155:4, 155:17, 159:21
**Franz** [6] - 5:6, 5:13, 110:8, 110:9, 110:22, 152:3
**FRANZ** [5] - 1:12, 2:14, 3:7, 152:1, 165:7
**Freddy** [4] - 30:9, 31:7, 32:9, 33:2
**free** [1] - 38:23
**freeze** [1] - 68:7
**Freight** [1] - 149:3
**frightened** [1] - 155:8
**front** [21] - 13:5, 26:20, 26:22, 28:20, 73:8, 73:10, 74:15, 74:25, 82:23, 98:20, 108:13, 118:18, 119:8, 125:7, 126:23, 135:3, 135:5, 136:25, 137:5, 137:6, 158:18
**full** [2] - 60:2, 89:3
**fully** [1] - 107:16
**FURTHER** [2] - 3:7, 141:2
**future** [1] - 109:23

**G**

**gain** [1] - 50:8

**Gang** [1] - 155:23
**garbage** [1] - 126:20
**gather** [1] - 110:12
**general** [3] - 77:23, 91:22, 93:13
**generalities** [2] - 135:18, 137:17
**generally** [5] - 8:23, 19:22, 85:15, 85:16, 127:18
**generated** [1] - 43:18
**given** [6] - 7:23, 12:4, 104:19, 116:20, 163:10, 163:12
**glasses** [4] - 154:10, 154:18, 154:21, 155:2
**government** [4] - 44:19, 44:25, 45:1, 45:6
**Government** [9] - 7:9, 7:13, 51:17, 65:21, 104:8, 104:25, 149:10, 160:12, 162:8
**Government's** [6] - 5:19, 6:22, 7:3, 7:13, 65:20, 150:12
**GOVERNMENT'S** [2] - 13:13, 152:1
**government-controlled** [2] - 44:19, 44:25
**grab** [2] - 117:23, 118:14
**Grey** [68] - 5:6, 5:13, 33:15, 35:5, 35:16, 42:7, 42:11, 42:17, 47:19, 47:22, 48:3, 48:6, 50:2, 54:12, 57:23, 58:1, 60:19, 61:5, 64:9, 67:2, 67:14, 68:12, 69:15, 69:25, 71:20, 72:5, 72:11, 74:7, 77:18, 77:24, 78:23, 79:22, 82:2, 82:6, 83:7, 83:14, 84:14, 84:16, 85:14, 86:16, 86:24, 89:9, 90:3, 110:8, 110:9, 110:13, 112:2, 112:10, 117:23, 118:13, 119:6, 131:20, 136:3, 136:7, 139:24, 140:10, 144:17, 148:21, 151:14, 151:22, 152:3, 152:8, 155:10, 156:4, 158:25, 162:3
**GREY** [2] - 1:12, 2:14, 3:7, 152:1, 165:7
**Grey's** [35] - 33:6, 33:8, 34:15, 35:2, 42:2, 54:18, 55:13,

61:8, 61:24, 63:25, 69:8, 70:5, 72:21, 74:16, 74:24, 75:18, 75:21, 76:21, 80:5, 80:11, 82:23, 83:20, 86:8, 94:8, 94:14, 110:22, 120:25, 122:17, 126:15, 127:10, 132:8, 134:4, 135:3, 137:6, 138:21
**grounds** [2] - 7:5, 161:21
**group** [1] - 65:22
**guess** [10] - 13:10, 26:19, 58:3, 62:19, 70:2, 90:17, 98:17, 100:14, 121:17, 137:4
**gun** [7] - 24:20, 26:10, 26:12, 119:14, 119:15, 155:6, 155:17
**guns** [1] - 67:5
**guy** [5] - 106:11, 112:22, 145:9, 145:10, 145:16
**guys** [17] - 9:13, 13:5, 92:5, 93:5, 98:13, 120:6, 136:25, 140:5, 146:19, 150:8, 150:20, 156:25, 157:20, 161:4, 163:24, 163:25, 164:12

**H**

**hand** [3] - 6:25, 10:10, 35:25
**handcuffed** [1] - 6:14
**handcuffing** [1] - 6:17
**handcuffs** [1] - 67:7
**handful** [1] - 7:9
**handle** [1] - 63:2
**handles** [1] - 25:11
**handling** [1] - 106:7
**hang** [2] - 123:4, 136:1
**happy** [1] - 13:2
**Harbor** [1] - 149:3
**harm** [1] - 117:21
**harmful** [1] - 15:7
**Haul** [61] - 28:7, 28:14, 29:8, 30:9, 31:7, 32:4, 32:9, 32:11, 33:2, 33:3, 33:21, 34:6, 35:1, 35:3, 35:17, 39:18, 62:1, 62:17, 64:1, 64:22, 65:11, 66:7, 67:2, 67:15, 67:21, 67:24, 68:17, 70:9, 70:12, 72:12, 83:14, 110:14, 114:8,

114:12, 114:13, 114:15, 114:17, 114:19, 114:23, 114:24, 115:6, 115:8, 115:16, 116:8, 117:7, 118:8, 118:11, 120:2, 138:12, 143:10, 143:13, 147:25, 148:8, 148:21, 148:25, 152:12, 152:18, 152:21, 153:2, 157:24
**haul** [1] - 30:25
**Haven** [19] - 27:22, 27:24, 28:10, 30:12, 30:21, 31:4, 31:24, 32:23, 34:5, 36:20, 40:17, 42:7, 48:3, 54:24, 55:8, 56:1, 56:10, 60:23, 110:20
**hazard** [1] - 139:12
**head** [5] - 155:8, 155:10, 155:12, 155:25, 163:14
**hear** [7] - 100:25, 124:14, 141:10, 145:20, 145:21, 159:17, 159:24
**heard** [5] - 92:8, 104:17, 108:12, 160:25, 161:24
**HEARING** [1] - 1:16
**hearing** [20] - 5:16, 7:12, 7:23, 9:2, 12:24, 13:3, 22:14, 23:21, 37:5, 46:7, 47:2, 52:14, 52:16, 74:7, 76:4, 93:2, 131:9, 143:15, 160:18, 163:5
**held** [1] - 137:5
**HELD** [1] - 165:15
**help** [1] - 138:22
**helped** [1] - 28:21
**helpful** [1] - 37:6
**helps** [1] - 15:4
**Henthorn** [1] - 8:18
**HEREBY** [1] - 165:12
**hereto** [3] - 74:9, 76:9, 76:10
**hidden** [2] - 39:8, 126:4
**hide** [1] - 79:24
**hiding** [3] - 127:16, 127:18, 129:1
**higher** [2] - 25:14, 112:16
**hill** [1] - 148:25
**hillside** [1] - 118:25
**history** [7] - 22:19, 42:12, 42:20, 55:21, 111:15, 136:4, 137:21
**hit** [1] - 112:5
**hit-and-run** [1] - 112:5

**hold** [4] - 118:18, 119:8, 125:7, 136:25
**holding** [1] - 125:6
**holes** [1] - 120:22
**holidays** [3] - 150:21, 160:13, 163:12
**home** [50] - 8:16, 54:13, 60:19, 69:9, 69:20, 70:6, 72:15, 72:21, 73:4, 73:5, 74:16, 74:19, 75:1, 75:12, 75:18, 82:23, 83:15, 83:21, 85:5, 85:15, 86:1, 86:4, 88:25, 90:9, 92:6, 92:15, 94:8, 94:14, 119:2, 122:7, 122:15, 132:8, 132:17, 134:18, 135:12, 135:16, 136:12, 137:10, 137:13, 138:16, 139:1, 139:11, 139:12, 139:16, 139:17, 140:15, 140:19, 153:18, 157:8, 159:15
**Homeland** [2] - 54:20, 132:1
**homes** [1] - 144:19
**honest** [2] - 107:17, 108:2
**Honor** [63] - 5:8, 5:12, 5:18, 5:24, 8:11, 9:17, 10:6, 10:18, 11:7, 13:10, 15:24, 16:5, 16:21, 21:15, 29:2, 46:9, 60:1, 62:12, 66:10, 80:1, 80:7, 80:25, 88:2, 99:5, 102:3, 103:17, 104:14, 105:8, 106:16, 106:19, 108:6, 108:10, 108:18, 109:13, 109:20, 115:14, 124:4, 124:7, 130:25, 131:2, 131:4, 132:11, 135:21, 139:6, 140:22, 140:24, 142:5, 142:7, 149:11, 149:13, 149:23, 151:13, 152:4, 153:6, 153:14, 156:7, 159:5, 160:4, 160:6, 161:9, 161:23, 162:10, 164:16
**HONORABLE** [1] - 1:5
**hours** [8] - 7:23, 12:12, 12:24, 27:2, 31:25, 124:22, 124:24, 124:25
**house** [73] - 29:18, 42:2, 55:13, 61:8,

72:25, 73:2, 75:21, 76:18, 77:4, 78:8, 78:9, 78:25, 79:3, 79:12, 79:24, 80:5, 82:9, 83:24, 83:25, 86:9, 88:20, 92:21, 119:1, 119:4, 119:8, 120:6, 120:15, 120:25, 121:22, 122:17, 123:6, 123:23, 124:18, 125:6, 125:7, 125:9, 127:13, 132:15, 133:4, 133:11, 133:14, 133:25, 134:4, 134:7, 134:12, 134:17, 134:23, 134:25, 135:4, 138:21, 139:21, 140:12, 141:5, 141:11, 142:14, 142:22, 144:18, 145:1, 145:3, 147:21, 148:16, 153:3, 153:4, 153:5, 154:1, 154:6, 154:9, 154:23, 154:25, 155:5, 157:21, 159:13, 159:16
**houses** [2] - 126:13, 132:22
**how'd** [1] - 21:18
**HR** [2] - 11:4
**hurt** [1] - 155:19
**hypothetical** [2] - 80:2, 130:5

**I**

**idea** [2] - 11:24, 160:24
**identified** [2] - 35:5, 93:20
**illegal** [3] - 70:17, 78:25, 79:12
**imagines** [1] - 151:15
**immediately** [7] - 66:23, 87:5, 87:7, 87:9, 109:6, 109:9, 117:24
**impacts** [1] - 120:17
**impeached** [1] - 7:1
**impeachment** [2] - 99:6, 159:3
**importance** [1] - 64:16
**important** [10] - 14:13, 14:15, 18:1, 18:6, 18:9, 37:13, 45:15, 100:10, 143:16, 144:4
**improper** [1] - 99:5
**IN** [5] - 5:3, 165:10, 165:15, 165:16, 165:19

**in-person** [1] - 54:6
**in-service** [1] - 50:23
**inaccurate** [4] - 8:13, 108:13, 108:19, 109:9
**inaccurately** [1] - 8:2
**incentive** [2] - 103:15, 103:16
**incident** [12] - 6:22, 7:4, 8:21, 10:9, 17:6, 17:7, 83:23, 84:19, 93:10, 96:21, 127:13, 147:22
**incidents** [1] - 23:13
**inclined** [1] - 162:3
**include** [10] - 10:25, 15:3, 15:9, 16:15, 16:19, 17:5, 17:8, 22:20, 37:13, 130:20
**included** [3] - 36:11, 37:3, 60:11
**includes** [2] - 15:6, 31:13
**including** [3] - 55:14, 64:16, 99:18
**incorporated** [2] - 26:23, 26:25
**increase** [1] - 159:19
**indicate** [3] - 11:11, 115:22, 123:1
**indicated** [1] - 64:22
**indications** [1] - 122:24
**indicative** [1] - 125:19
**individual** [3] - 6:12, 35:1, 142:2
**individuals** [1] - 6:13
**info** [2] - 66:20, 114:1
**inform** [1] - 129:6
**information** [72] - 8:4, 10:5, 10:22, 11:10, 12:6, 12:11, 15:1, 15:3, 15:6, 15:7, 15:9, 16:15, 17:5, 28:11, 31:13, 31:18, 32:17, 32:24, 35:7, 35:11, 35:13, 36:19, 37:14, 40:16, 41:19, 42:14, 43:4, 48:15, 48:16, 49:7, 50:2, 50:9, 50:10, 51:21, 51:22, 52:4, 52:6, 52:8, 52:12, 55:2, 55:7, 55:8, 55:18, 57:10, 57:12, 57:13, 57:17, 58:6, 58:8, 60:8, 60:11, 64:17, 84:18, 84:20, 96:19, 110:12, 110:21, 111:23, 112:1, 117:1, 142:12, 143:6, 146:10, 146:15, 147:10, 153:7
**informed** [1] - 32:2
**initial** [2] - 33:17,

93:25
**inside** [62] - 62:6, 67:12, 69:16, 69:20, 70:5, 73:5, 73:13, 74:18, 75:1, 75:12, 75:18, 78:25, 80:6, 82:12, 82:24, 85:5, 85:15, 90:9, 91:4, 92:4, 94:9, 100:11, 101:4, 118:1, 122:20, 122:23, 123:23, 124:16, 125:8, 125:9, 126:5, 126:14, 126:20, 127:15, 129:6, 133:23, 134:7, 134:10, 134:16, 134:18, 134:22, 135:2, 135:4, 135:12, 136:12, 137:7, 137:15, 138:16, 139:5, 139:11, 139:12, 139:16, 139:17, 139:21, 141:5, 141:10, 141:16, 141:19, 141:21, 154:24, 159:13, 159:16
**inspect** [1] - 77:12
**inspected** [1] - 72:25
**inspecting** [3] - 75:22, 76:20, 83:2
**instead** [4] - 21:4, 61:4, 108:16, 140:18
**instructed** [1] - 72:17
**intend** [1] - 96:16
**intended** [1] - 12:19
**interacting** [1] - 112:11
**interaction** [2] - 119:23, 126:12
**interest** [1] - 161:16
**interior** [2] - 85:18, 121:24
**internal** [6] - 56:15, 89:23, 97:23, 98:2, 98:11, 100:2
**interviewed** [2] - 98:5, 98:12
**interviews** [2] - 118:20, 138:13
**inventory** [5] - 70:16, 70:21, 70:22, 71:1, 71:2
**investigate** [28] - 41:3, 61:25, 62:7, 63:3, 64:1, 64:5, 65:1, 65:6, 65:12, 65:24, 66:3, 66:7, 76:17, 76:23, 77:25, 78:4, 78:13, 85:1, 120:10, 120:12, 128:19, 129:13, 129:25, 130:2, 130:3, 130:11, 148:4, 148:6

172

173

**investigated** [2] - 27:12, 66:13
**investigating** [12] - 10:1, 10:3, 15:18, 27:13, 50:10, 63:9, 65:7, 66:8, 78:1, 83:10, 83:23, 120:9
**investigation** [28] - 30:20, 31:15, 32:19, 36:14, 38:6, 62:3, 62:10, 68:9, 69:4, 69:12, 70:5, 73:20, 75:7, 77:5, 78:2, 80:23, 81:4, 81:6, 81:9, 89:6, 97:6, 97:8, 97:10, 101:17, 105:23, 114:3, 117:18, 159:25
**investigations** [4] - 24:21, 26:6, 26:10, 26:12
**investigative** [3] - 16:16, 17:5, 61:14
**involuntary** [1] - 113:11
**involved** [4] - 6:9, 26:6, 26:10, 118:6
**irrelevant** [1] - 38:6
**irrespective** [1] - 146:5
**IS** [2] - 165:13, 165:16
**issue** [11] - 6:2, 8:10, 8:17, 130:16, 130:17, 130:18, 130:19, 131:13, 143:17, 145:1, 164:11
**issued** [1] - 45:4
**issues** [1] - 6:25
**it'll** [1] - 5:25
**it..** [1] - 86:24
**item** [5] - 5:4, 6:5, 6:8, 12:18
**items** [8] - 9:17, 55:1, 55:9, 75:22, 88:21, 91:25, 99:17, 127:10

**J**

**January** [2] - 160:14, 163:11
**Jencks** [1] - 108:9
**job** [2] - 50:8, 145:20
**joined** [3] - 5:9, 24:9, 25:1
**JUDGE** [1] - 1:5
**judge** [7] - 18:4, 19:6, 45:13, 63:21, 164:2, 164:4, 164:8
**judges** [1] - 164:4
**judicial** [2] - 14:15, 18:1
**JUDICIAL** [2] - 165:17, 165:20
**jump** [1] - 89:16

**junior** [3] - 24:2, 164:2, 164:3
**jury** [1] - 8:5
**justice** [2] - 161:16, 162:16

**K**

**keep** [6] - 54:10, 115:20, 143:11, 151:10, 151:12, 164:17
**keeps** [2] - 115:19, 116:1
**kept** [3] - 44:18, 99:11, 120:5
**key** [1] - 133:12
**keys** [15] - 71:21, 82:13, 88:22, 89:6, 118:14, 127:25, 128:6, 133:11, 133:14, 134:4, 138:17, 139:25, 148:14, 153:22, 155:6
**kind** [17] - 11:25, 21:13, 35:25, 49:8, 70:5, 72:5, 73:3, 89:4, 92:25, 97:5, 104:24, 105:6, 133:16, 137:16, 138:18, 142:9, 155:8
**kitchen** [1] - 126:18
**knife** [1] - 6:15
**knock** [1] - 73:10
**knowing** [2] - 112:14, 114:19
**knowledge** [1] - 147:19
**known** [4] - 39:25, 40:8, 44:6, 157:3
**knows** [2] - 52:6, 114:15

**L**

**L.A** [4] - 10:2, 42:13, 43:18, 47:20
**lab** [21] - 37:17, 38:3, 38:6, 39:21, 40:17, 41:19, 64:5, 65:1, 65:8, 66:9, 66:12, 66:23, 68:3, 77:1, 78:4, 78:6, 78:12, 78:15, 79:8, 79:20
**labeled** [1] - 95:8
**LACOS** [1] - 52:2
**Lake** [1] - 116:16
**Lancaster** [1] - 157:20
**large** [2] - 72:8, 94:19
**LASD** [1] - 34:25
**last** [12] - 10:20, 12:4, 63:16, 86:20, 91:1, 92:25, 93:8, 95:22,

104:8, 104:21, 153:10, 159:21
**late** [1] - 115:11
**laundry** [4] - 75:22, 76:21, 83:3, 120:2
**law** [13] - 7:1, 35:20, 44:22, 55:14, 61:6, 124:17, 126:2, 126:3, 126:12, 127:6, 127:19, 131:23, 139:1
**lawsuit** [1] - 103:7
**lawyer** [1] - 109:8
**lawyers** [2] - 51:17, 142:10
**lead** [1] - 122:10
**learn** [4] - 43:4, 58:5, 65:16, 84:12, 85:3, 111:22, 113:3, 113:7, 138:4
**learned** [6] - 42:25, 47:22, 54:14, 60:19, 109:11, 112:10
**least** [7] - 12:4, 41:7, 111:22, 128:23, 142:25, 158:18, 163:4
**leave** [11] - 33:24, 68:20, 70:11, 70:12, 117:24, 131:14, 138:2, 145:3, 145:5, 148:14, 150:7
**leaves** [1] - 151:7
**leeway** [1] - 104:20
**left** [3] - 22:24, 126:19, 162:19
**length** [1] - 114:14
**less** [1] - 144:4
**LESS** [1] - 165:18
**letter** [14] - 46:20, 53:11, 53:13, 95:3, 95:25, 96:2, 97:21, 98:17, 98:18, 99:23, 100:10, 100:16, 101:13, 104:7
**letter's** [1] - 100:14
**letters** [1] - 95:8
**level** [1] - 98:4
**license** [1] - 67:20
**lie** [2] - 18:11, 103:20
**lied** [1] - 8:1
**lieutenant** [2] - 102:1, 103:2
**light** [3] - 105:25, 159:13, 159:16
**limit** [1] - 150:2
**limited** [4] - 43:18, 57:10, 140:11, 149:22
**line** [6] - 27:7, 58:11, 59:13, 91:2, 160:21
**lines** [2] - 62:25, 65:19
**list** [1] - 92:1
**listed** [9] - 33:8, 43:1, 61:1, 83:16, 89:11, 90:5, 90:17, 91:25,

136:3
**listen** [1] - 156:5
**literally** [2] - 108:19, 114:24
**live** [1] - 138:1
**lived** [3] - 7:21, 142:13, 142:14
**lives** [1] - 156:15
**living** [4] - 92:3, 92:4, 122:16, 126:18
**loads** [1] - 115:11
**local** [2] - 43:8, 43:23
**locate** [1] - 89:5
**located** [1] - 67:2
**location** [1] - 138:15
**lock** [15] - 82:13, 120:24, 132:22, 133:4, 133:8, 133:11, 134:4, 134:14, 134:19, 134:23, 138:17, 139:25, 148:15, 153:24, 157:10
**locked** [1] - 132:8
**locking** [1] - 134:11
**log** [4] - 49:15, 49:16, 50:19, 52:2
**log-in** [2] - 49:15, 49:16
**log-ins** [1] - 52:2
**longest** [1] - 5:25
**Look** [1] - 12:6
**look** [39] - 13:5, 15:10, 15:13, 24:25, 25:3, 28:21, 37:1, 37:2, 38:23, 39:10, 39:13, 39:14, 40:4, 50:23, 51:7, 58:10, 59:8, 62:21, 73:3, 77:16, 82:15, 83:13, 84:10, 84:22, 84:25, 88:16, 89:13, 89:17, 112:17, 113:21, 114:10, 114:21, 118:3, 121:20, 146:14, 154:11, 154:12, 154:14, 161:4
**looked** [12] - 31:16, 32:22, 67:24, 72:23, 73:13, 77:1, 78:14, 94:25, 114:12, 137:6, 148:24, 154:24
**looking** [14] - 38:12, 40:2, 67:21, 68:18, 74:18, 74:25, 75:24, 79:12, 82:23, 114:17, 120:22, 127:9, 128:9, 135:2
**looks** [4] - 59:25, 149:2, 149:4, 149:5
**Los** [1] - 47:4
**LOS** [6] - 1:18, 1:23, 2:7, 2:11, 2:16, 5:1
**lost** [1] - 7:14

**loud** [3] - 119:1, 122:22, 141:14
**lying** [3] - 103:15, 106:1, 157:1

**M**

**MADAMREPORTER. COM** [1] - 1:24
**MAGANA** [80] - 2:10, 3:6, 3:8, 5:8, 15:24, 16:5, 16:21, 21:15, 62:12, 66:10, 80:1, 80:7, 80:25, 88:2, 97:14, 99:5, 102:3, 103:17, 104:14, 106:18, 106:22, 108:6, 108:9, 108:18, 109:13, 109:20, 109:23, 109:24, 113:14, 115:13, 115:15, 120:19, 120:23, 124:4, 124:10, 124:13, 124:19, 124:25, 125:3, 125:4, 125:10, 125:13, 125:23, 130:8, 130:24, 131:2, 132:11, 135:21, 139:6, 140:22, 140:24, 141:1, 141:3, 142:5, 149:10, 149:13, 149:22, 152:4, 152:7, 153:14, 153:15, 156:7, 156:10, 156:20, 156:23, 157:6, 158:24, 159:5, 160:6, 161:9, 161:13, 161:16, 162:10, 162:12, 162:14, 162:18, 162:22, 162:25, 163:2, 164:16
**Magana** [2] - 5:9, 47:3
**mail** [7] - 12:17, 21:8, 46:10, 46:19, 95:7, 95:12, 95:13
**mails** [3] - 13:3, 21:20, 94:5
**maintained** [1] - 44:21
**man** [6] - 23:16, 23:23, 25:21, 41:1, 41:6, 65:22
**manager** [3] - 30:9, 31:7, 32:9
**manslaughter** [2] - 113:11, 159:1
**manufactured** [1] - 38:25
**manufacturing** [5] - 62:6, 62:16, 65:10, 76:25, 129:17

**MARIA** [3] - 1:20, 165:10, 165:23
**Marin** [4] - 64:21, 88:17, 88:19, 129:22
**marked** [10] - 23:11, 26:17, 58:25, 74:6, 74:9, 76:4, 76:9, 76:10, 78:19, 86:23
**MARKED** [1] - 4:2
**material** [2] - 7:9, 10:7
**materials** [3] - 10:8, 95:1
**matter** [10] - 7:2, 36:25, 40:18, 40:22, 41:22, 47:6, 63:1, 132:22, 133:1, 133:3
**MATTER** [1] - 165:15
**MCKENNA** [15] - 5:24, 6:1, 6:4, 8:11, 9:7, 9:17, 10:6, 10:15, 10:18, 11:7, 11:9, 105:8, 124:24, 131:4, 131:12
**McKenna** [2] - 2:5, 5:10
**MDC** [3] - 48:10, 146:24, 147:8
**MDC11105** [3] - 58:11, 58:13, 59:13
**MDCs** [1] - 57:1
**mean** [24] - 11:3, 11:19, 13:4, 17:21, 40:3, 97:11, 104:24, 105:12, 114:15, 115:1, 116:17, 118:19, 122:13, 143:8, 144:3, 145:5, 147:4, 149:16, 150:5, 154:20, 160:22, 160:23, 161:21, 163:13
**meaningful** [1] - 18:4
**means** [2] - 18:11, 18:14
**meant** [2] - 43:24, 119:8
**meet** [1] - 111:9
**meeting** [3] - 19:24, 47:1, 47:12
**meetings** [4] - 20:1, 20:4, 20:6, 20:7
**member** [1] - 27:17
**memorialized** [1] - 53:10
**memory** [3] - 28:18, 89:14, 105:19
**men** [1] - 121:14
**Mendez** [1] - 64:21
**mention** [10] - 38:14, 64:25, 81:13, 81:16, 84:1, 84:2, 84:4, 85:8, 89:10, 90:4
**mentioned** [12] - 12:18, 37:17, 38:8, 38:11, 38:17, 38:20, 44:15, 81:10, 85:25,

121:10, 121:11, 159:20
**mentions** [1] - 92:12
**mess** [1] - 37:17
**message** [1] - 21:9
**messages** [1] - 21:20
**met** [4] - 67:17, 87:13, 93:2, 107:2
**meth** [62] - 33:18, 35:16, 36:11, 37:17, 37:21, 37:22, 38:3, 38:5, 39:21, 40:11, 40:17, 41:13, 41:19, 62:2, 62:6, 62:10, 63:10, 64:5, 65:1, 65:7, 65:10, 66:9, 66:12, 66:23, 68:3, 68:5, 69:4, 70:4, 73:20, 74:22, 74:25, 75:7, 75:11, 75:25, 76:14, 76:24, 77:1, 77:4, 78:4, 78:6, 78:12, 78:15, 79:8, 79:20, 80:23, 81:6, 81:7, 81:9, 81:12, 82:24, 83:7, 91:16, 91:18, 92:2, 92:7, 129:3, 129:21, 130:10, 154:15
**meth-related** [1] - 129:21
**methamphetamine** [4] - 77:9, 91:6, 113:24, 129:17
**methamphetamines** [2] - 128:16, 129:10
**mid** [2] - 160:14, 163:11
**mid-January** [2] - 160:14, 163:11
**might** [8] - 12:8, 15:7, 36:4, 94:9, 123:11, 126:4, 129:20, 151:24
**mind** [2] - 89:16, 131:10
**minimal** [1] - 144:21
**minimum** [1] - 163:10
**minute** [3] - 12:4, 95:22, 151:9
**minutes** [26] - 8:1, 57:6, 69:23, 75:14, 81:23, 82:6, 99:12, 100:21, 103:4, 116:17, 118:16, 124:6, 124:11, 124:22, 128:10, 131:9, 136:10, 136:21, 137:1, 138:5, 138:7, 138:8, 151:20, 154:2, 156:9, 156:20
**Mirandized** [1] - 84:16
**misdemeanor** [8] - 112:8, 116:21, 116:22, 144:14,

144:18, 145:12, 145:21, 146:1
**misdemeanors** [2] - 112:7, 144:20
**misleading** [1] - 18:20
**missing** [10] - 28:14, 33:11, 34:13, 37:24, 61:14, 62:1, 64:1, 66:7, 118:4, 118:5
**misstated** [2] - 108:12, 110:16
**misstates** [8] - 16:6, 16:22, 62:13, 66:11, 80:25, 132:11, 135:21, 139:6
**mobile** [5] - 45:4, 58:18, 119:2, 122:7
**mock** [1] - 93:11
**mode** [1] - 121:18
**moment** [7] - 68:8, 92:14, 112:20, 112:24, 124:7, 130:24, 156:9
**money** [3] - 94:15, 94:16, 103:10
**month** [5] - 10:14, 47:12, 115:20, 116:1, 152:18
**months** [10] - 23:4, 23:7, 24:14, 24:19, 25:7, 25:8, 26:5, 26:13, 26:15, 27:11
**Moreno** [3] - 30:9, 31:7, 32:9, 33:2, 33:5, 33:17, 34:10, 35:11, 35:16, 35:23, 36:1
**morning** [2] - 70:24, 71:6
**most** [2] - 164:2, 164:3
**mostly** [1] - 19:19
**MOTION** [1] - 1:16
**motion** [15] - 5:16, 5:19, 19:12, 37:5, 47:2, 74:5, 78:18, 87:17, 87:20, 90:12, 160:11, 161:14, 161:18, 162:6, 162:19
**motor** [1] - 122:15
**mountains** [1] - 61:12
**move** [3] - 13:8, 113:15, 153:14
**moved** [2] - 91:12, 164:4
**movement** [2] - 72:18, 136:12
**MR** [157] - 5:8, 5:12, 5:18, 7:7, 12:14, 13:10, 13:21, 13:24, 15:24, 16:2, 16:5, 16:13, 16:21, 17:3, 21:15, 21:17, 29:2, 29:6, 30:3, 30:6, 46:9, 46:15, 52:17,

52:20, 60:1, 60:6, 62:12, 62:18, 66:10, 66:16, 73:24, 74:4, 74:11, 76:2, 76:8, 76:12, 78:16, 78:22, 80:1, 80:4, 80:7, 80:9, 80:25, 81:5, 81:8, 84:23, 86:19, 86:22, 87:1, 88:2, 88:8, 88:13, 95:19, 95:21, 95:23, 97:14, 97:20, 99:5, 99:10, 102:3, 102:7, 103:17, 103:22, 104:3, 104:7, 104:12, 104:14, 104:21, 105:14, 106:15, 106:18, 106:22, 108:6, 108:9, 108:18, 109:13, 109:20, 109:23, 109:24, 113:12, 113:14, 115:13, 115:15, 120:19, 120:23, 124:4, 124:10, 124:13, 124:19, 124:25, 125:3, 125:4, 125:10, 125:13, 125:21, 125:23, 130:5, 130:8, 130:24, 131:2, 131:10, 131:17, 132:11, 132:16, 135:21, 135:24, 139:6, 139:9, 140:21, 140:22, 140:24, 141:1, 141:3, 142:5, 142:7, 149:10, 149:13, 149:20, 149:22, 150:10, 151:13, 151:21, 152:4, 152:7, 153:6, 153:10, 153:14, 153:15, 156:7, 156:10, 156:20, 156:23, 157:6, 158:22, 158:24, 159:2, 159:5, 159:8, 160:3, 160:6, 161:9, 161:13, 161:16, 161:23, 162:1, 162:7, 162:10, 162:12, 162:14, 162:18, 162:22, 162:25, 163:2, 163:16, 163:20, 164:15, 164:16
**MS** [15] - 5:24, 6:1, 6:4, 8:11, 9:7, 9:17, 10:6, 10:15, 10:18, 11:7, 11:9, 105:8, 124:24, 131:4, 131:12
**multi** [1] - 148:25

**multi-person** [1] - 148:25
**multiple** [13] - 91:25, 92:4, 122:6, 122:10, 122:12, 122:13, 122:16, 122:25, 126:6, 126:9, 137:23, 146:25, 163:4
**music** [5] - 91:12, 119:1, 122:23, 141:14, 159:17
**music's** [1] - 137:14
**must** [1] - 24:21

## N

**name** [19] - 13:18, 13:20, 23:10, 25:10, 33:6, 34:15, 34:16, 34:19, 49:21, 52:15, 56:19, 97:23, 106:4, 110:5, 110:7, 110:9, 110:22, 152:2
**name's** [1] - 58:22
**named** [4] - 101:25, 111:23, 116:12, 146:3
**narcotics** [3] - 38:25, 76:25, 89:6
**nature** [1] - 147:12
**near** [5] - 26:22, 66:1, 119:3, 123:6, 128:17
**necessarily** [1] - 147:4
**necessary** [4] - 13:4, 85:19, 122:2, 127:4
**need** [22] - 13:5, 63:4, 65:25, 79:1, 120:21, 130:20, 131:11, 131:13, 134:12, 134:23, 138:25, 143:19, 150:12, 150:25, 151:9, 160:9, 160:22, 161:7, 161:17, 161:19, 163:12, 163:13
**needed** [9] - 17:1, 70:25, 71:13, 93:21, 127:8, 127:13, 139:11, 143:20, 158:7
**neighbor** [4] - 35:2, 35:12, 35:15, 36:4
**never** [10] - 28:25, 50:13, 96:23, 96:25, 97:8, 107:21, 148:16, 152:20, 154:6, 154:9
**new** [4] - 25:8, 35:10, 41:19, 164:4
**next** [11] - 26:18, 32:8, 68:23, 88:24, 91:13, 95:16, 95:17, 100:2, 118:9, 156:14,

156:15

**night** [17] - 25:23, 25:24, 61:25, 63:18, 71:19, 71:24, 86:7, 86:10, 86:11, 87:3, 87:10, 90:3, 90:19, 113:20, 115:19, 156:11, 159:11
**nighttime** [1] - 158:9
**nobody** [10] - 33:20, 36:3, 41:14, 61:20, 92:6, 119:4, 135:4, 135:9, 136:16, 137:5
**none** [1] - 160:2
**nonetheless** [1] - 36:10
**normal** [1] - 112:16
**normally** [1] - 122:1
**North** [1] - 23:4
**NORTH** [2] - 2:6, 2:10
**Norwood** [1] - 106:11
**notes** [2] - 20:11, 93:17
**nothing** [6] - 10:24, 48:13, 70:17, 78:13, 79:24, 135:19
**notified** [1] - 108:1
**notify** [2] - 116:11, 142:2
**November** [8] - 7:10, 12:17, 29:11, 46:25, 47:14, 107:2, 109:12, 152:13
**nowhere** [1] - 64:25
**number** [22] - 5:4, 7:15, 7:16, 14:13, 24:20, 45:25, 48:17, 50:14, 50:15, 60:15, 61:1, 89:23, 95:9, 95:10, 131:18, 136:15, 138:12, 147:4, 147:5, 147:6, 160:21
**numbers** [7] - 37:6, 43:15, 59:24, 80:11, 80:15, 118:5, 137:8
**numerous** [3] - 117:4, 123:5, 126:13

**O**

**oath** [3] - 31:12, 63:6, 80:18
**object** [3] - 11:3, 130:5, 153:7
**objecting** [1] - 151:16
**objection** [21] - 15:24, 16:5, 16:21, 21:15, 62:12, 66:10, 80:1, 80:7, 80:25, 88:2, 97:14, 102:3, 103:17, 104:14, 113:12, 125:21, 132:11, 135:21, 139:6, 158:22, 159:2

**obligation** [1] - 142:2
**observed** [1] - 17:8
**obtain** [1] - 112:2
**obtained** [1] - 59:2
**obviously** [3] - 15:4, 18:11, 21:23
**occupants** [1] - 100:7
**occur** [1] - 108:14
**occurrence** [1] - 138:23
**October** [3] - 22:22, 23:1, 96:6
**OF** [16] - 1:2, 1:7, 1:15, 2:4, 2:4, 2:9, 2:14, 2:14, 165:5, 165:11, 165:14, 165:17, 165:20
**offense** [1] - 112:18
**offer** [1] - 120:24
**office** [3] - 30:9, 32:10, 146:14
**OFFICE** [3] - 2:4, 2:9, 2:14
**officer** [47] - 6:10, 6:23, 9:25, 10:21, 11:1, 11:9, 11:11, 13:9, 23:20, 23:25, 24:5, 28:1, 50:11, 51:8, 68:25, 69:5, 69:6, 69:10, 69:21, 70:10, 71:14, 73:8, 73:17, 75:2, 76:22, 77:4, 77:19, 78:9, 79:7, 79:13, 79:14, 79:18, 80:15, 80:20, 89:7, 96:12, 96:14, 96:17, 98:25, 109:25, 126:3, 127:7, 138:4, 138:6, 138:10, 153:8, 154:10
**Officer** [2] - 153:21, 155:4
**officers** [18] - 6:21, 8:14, 9:23, 10:2, 10:3, 10:4, 24:2, 36:11, 51:7, 67:18, 72:14, 72:17, 72:20, 73:3, 84:5, 85:10, 126:6, 159:23
**OFFICIAL** [1] - 1:21, 165:10, 165:23
**offline** [1] - 121:18
**old** [1] - 10:10
**OLGUIN** [1] - 1:5
**Olmos** [2] - 47:4
**ON** [3] - 1:16, 2:4, 2:14
**once** [12] - 12:20, 23:3, 34:9, 34:12, 37:7, 143:6, 143:17, 143:18, 144:2, 144:3, 147:20
**One** [1] - 131:19
**one** [64] - 6:14, 7:15, 12:18, 12:23, 23:16, 27:6, 28:25, 29:7,

30:12, 33:23, 44:9, 44:24, 45:21, 47:12, 51:13, 53:1, 53:3, 53:16, 53:20, 54:10, 55:1, 55:9, 59:6, 59:13, 62:7, 67:17, 68:17, 71:9, 78:24, 80:10, 84:12, 85:24, 89:14, 93:24, 94:18, 101:9, 105:15, 105:23, 106:24, 112:5, 115:19, 124:5, 124:14, 129:25, 130:24, 131:18, 133:18, 135:7, 135:25, 141:24, 145:11, 146:16, 148:17, 155:13, 156:8, 156:15, 158:21, 159:21, 160:19, 161:20, 162:12, 162:14
**one's** [2] - 125:14, 125:19
**ones** [1] - 47:9
**open** [10] - 74:10, 76:11, 78:21, 86:25, 124:12, 125:2, 125:12, 154:8, 156:22, 159:18
**opened** [3] - 73:13, 74:15, 137:5
**opening** [4] - 74:24, 82:23, 159:15, 163:15
**opinion** [1] - 6:17
**opportunity** [4] - 7:14, 12:5, 20:20, 45:18
**opposed** [1] - 93:24
**opposing** [1] - 11:24
**opposition** [3] - 65:20, 160:12, 160:15
**or..** [1] - 88:7
**oral** [2] - 161:3, 161:22
**order** [10] - 5:21, 12:21, 12:22, 43:4, 95:4, 157:8, 160:17, 162:9, 162:15, 164:14
**ordinary** [1] - 66:2
**original** [3] - 30:16, 31:3, 35:8
**originally** [3] - 30:13, 30:25, 163:5
**otherwise** [2] - 139:20, 149:9
**ourselves** [1] - 163:21
**outs** [1] - 126:13
**outside** [4] - 111:21, 124:17, 151:4, 151:5
**outstanding** [1] - 47:23
**overrule** [1] - 104:16
**Overruled** [1] - 97:17

**overruled** [12] - 16:1, 16:7, 16:23, 21:16, 62:14, 81:2, 88:4, 99:9, 102:6, 103:19, 132:13, 135:23
**own** [8] - 10:1, 10:4, 10:5, 11:22, 19:17, 23:20, 30:19

**P**

**p.m** [8] - 56:23, 57:18, 57:25, 59:21, 60:8, 66:2, 136:19, 149:24
**packet** [2] - 17:22, 26:19
**PAGE** [2] - 3:2, 165:16
**page** [24] - 17:20, 26:22, 27:5, 29:1, 29:3, 29:4, 43:15, 46:18, 46:20, 56:14, 56:20, 62:23, 63:16, 65:19, 88:9, 88:15, 88:24, 89:19, 89:22, 91:2, 95:7, 95:13, 95:17, 160:21
**page..** [2] - 26:20, 95:16
**paper** [7] - 58:21, 59:7, 59:17, 96:18, 101:19, 103:5, 145:4
**papers** [1] - 146:13
**paperwork** [2] - 70:13, 117:19
**paragraph** [51] - 22:19, 28:6, 28:10, 28:19, 28:23, 28:24, 29:12, 31:21, 34:17, 38:11, 38:14, 38:17, 38:21, 40:15, 41:25, 42:1, 43:13, 46:24, 47:11, 47:17, 48:1, 52:21, 52:24, 54:11, 61:23, 62:23, 64:8, 64:20, 68:22, 85:12, 85:13, 85:25, 88:16, 89:3, 89:11, 89:20, 89:25, 90:1, 90:5, 90:7, 90:12, 90:17, 90:18, 91:1, 91:9, 92:11, 97:22, 101:18, 101:19, 104:9
**paragraph..** [1] - 52:18
**parameter** [1] - 72:15
**paraphernalia** [4] - 89:1, 91:5, 91:25, 129:3
**parked** [1] - 149:4
**part** [14] - 6:14, 7:22, 14:15, 18:17, 30:8, 57:13, 73:19, 75:7, 92:3, 99:16, 127:3, 143:2, 155:23,

157:23
**particular** [3] - 10:2, 10:8, 150:12
**particularly** [2] - 131:20, 144:2
**parties** [1] - 6:9
**partner** [5] - 76:23, 79:9, 79:19, 147:5, 148:11
**partner's** [2] - 106:2, 147:1
**partners** [1] - 86:15
**parts** [2] - 93:19, 140:19
**party** [1] - 99:16
**passed** [2] - 55:17, 138:9
**past** [4] - 50:12, 57:15, 58:5, 155:21
**pat** [1] - 100:6
**pat-down** [1] - 100:6
**patrol** [13] - 23:8, 23:9, 23:10, 23:13, 23:25, 25:15, 27:24, 31:24, 41:2, 67:11, 67:14, 88:20, 99:1
**pause** [1] - 125:3
**penalties** [1] - 115:11
**penalty** [6] - 19:3, 51:3, 51:16, 62:22, 63:14, 109:7
**pending** [3] - 161:14, 161:18, 162:5
**people** [25] - 7:24, 55:14, 83:24, 96:22, 101:4, 103:7, 106:5, 117:20, 122:10, 122:25, 123:1, 123:11, 124:16, 125:9, 126:14, 127:18, 129:6, 129:10, 142:13, 145:16, 148:5, 148:6, 150:21, 153:3, 157:3
**people's** [1] - 132:22
**perception** [1] - 108:18
**perfect** [1] - 125:1
**performed** [1] - 80:18
**perimeter** [1] - 117:13
**period** [9] - 26:9, 69:7, 69:18, 70:3, 72:6, 72:10, 80:19, 82:16, 83:19
**perjury** [6] - 19:3, 51:3, 51:16, 62:22, 63:14, 109:8
**permission** [13] - 69:9, 69:16, 69:19, 71:20, 73:24, 76:3, 78:16, 86:19, 106:18, 118:14, 124:4, 152:4, 156:7
**person** [18] - 6:11, 6:17, 7:21, 16:11,

176

36:4, 36:7, 40:23, 51:24, 52:10, 54:6, 63:1, 111:10, 112:16, 135:16, 137:9, 137:13, 141:21, 148:25
**Person** [1] - 57:3
**personal** [2] - 16:11, 25:4
**personally** [4] - 16:19, 50:19, 50:24, 56:8
**personnel** [10] - 6:6, 10:7, 10:8, 11:4, 11:5, 11:6, 12:19, 63:3, 65:23, 101:6
**Persons** [1] - 44:6
**pertinent** [12] - 14:25, 15:3, 15:6, 15:9, 15:12, 15:20, 16:14, 16:25, 17:4, 37:13, 64:16, 130:23
**phone** [29] - 20:4, 21:1, 21:8, 21:10, 21:11, 21:19, 60:15, 71:21, 82:13, 84:22, 88:22, 89:5, 91:13, 118:15, 121:20, 121:21, 127:23, 128:6, 128:17, 134:6, 134:19, 137:22, 139:25, 148:14, 153:23, 155:6, 157:16, 158:3, 158:7
**phones** [1] - 152:22
**phonetic** [3] - 52:2, 111:17, 116:16
**phonetic)** [1] - 47:4
**pick** [1] - 9:1
**picture** [1] - 57:15
**piece** [5] - 35:10, 59:7, 99:19, 103:5, 105:10
**pieces** [1] - 28:11
**pipe** [6] - 91:13, 92:6, 92:9, 92:12, 92:16, 128:17
**place** [3] - 121:15, 153:1, 153:24
**placed** [4] - 31:7, 34:9, 35:23, 67:9
**placing** [1] - 6:18
**plain** [1] - 91:4
**Plaintiffs** [1] - 1:8
**PLAINTIFFS** [1] - 2:4
**plate** [2] - 67:20, 138:13
**plateau** [1] - 149:5
**play** [12] - 73:25, 74:7, 76:3, 78:17, 86:20, 86:24, 120:21, 124:1, 124:5, 137:24, 156:8, 156:20
**played** [11] - 74:10, 76:11, 78:21, 86:25, 124:12, 125:2,

125:12, 136:14, 136:24, 137:3, 156:22
**plus** [1] - 159:17
**point** [35] - 7:12, 10:2, 11:15, 20:1, 20:13, 21:23, 26:3, 33:12, 70:9, 72:1, 72:20, 73:7, 74:15, 75:20, 80:10, 81:19, 82:5, 89:5, 92:17, 117:5, 119:18, 120:24, 122:20, 128:24, 134:10, 134:18, 136:10, 138:3, 140:5, 144:19, 149:9, 150:6, 161:4, 161:6, 162:14
**pointed** [3] - 67:5, 70:3, 155:13
**police** [10] - 14:1, 14:12, 64:14, 64:16, 81:17, 86:17, 99:12, 100:22, 106:1, 106:13
**policies** [1] - 94:18
**pop** [2] - 125:15, 125:19
**popped** [1] - 60:13
**pops** [1] - 135:9
**portion** [4] - 78:17, 106:24, 118:15, 144:21
**position** [5] - 6:22, 7:3, 7:13, 38:5, 150:10
**positioned** [1] - 66:3
**possession** [1] - 64:10
**possible** [9] - 37:16, 38:2, 40:17, 41:19, 62:6, 62:16, 79:8, 130:1, 148:9
**possibly** [5] - 38:25, 65:10, 129:1, 131:5, 149:4
**potential** [4] - 9:10, 65:7, 129:16, 130:10
**potentially** [2] - 9:19, 123:23
**practical** [1] - 127:7
**practice** [1] - 111:2
**precise** [1] - 18:9
**precursor** [1] - 130:10
**precursors** [3] - 75:25, 76:14, 154:16
**preliminary** [2] - 70:23, 110:21
**premised** [2] - 143:12
**preparation** [1] - 93:23
**prepare** [3] - 47:1, 93:6, 163:15
**prepared** [5] - 9:8, 19:6, 19:15, 31:22, 43:11

preparing [2] - 45:9, 64:15
**presence** [1] - 35:2
**present** [4] - 5:13, 122:11, 122:25, 141:22
**presented** [2] - 77:21, 161:2
**PRESIDING** [1] - 1:5
**pressed** [1] - 61:8
**pretrial** [1] - 161:11
**pretty** [1] - 144:9
**prevent** [1] - 157:8
**prevention** [2] - 26:1, 41:9
**previous** [4] - 32:22, 110:24, 111:15, 158:25
**previously** [4] - 10:10, 122:4, 123:17, 161:11
**primary** [1] - 68:9
**print** [2] - 57:14, 146:17
**printout** [2] - 146:16, 146:18
**printouts** [1] - 146:13
**priority** [1] - 25:14
**probable** [2] - 17:22, 63:17
**probative** [2] - 115:20, 115:21
**problem** [3] - 12:2, 17:18, 93:20
**proceed** [3] - 13:21, 106:18, 154:2
**proceeding** [1] - 164:22
**PROCEEDINGS** [2] - 1:15, 165:15
**process** [5] - 14:16, 17:14, 45:8, 64:15, 98:5
**produced** [7] - 7:10, 12:23, 12:25, 46:10, 95:1, 108:9, 147:17
**product** [2] - 11:20, 11:22
**production** [2] - 105:25, 113:24
**professional** [1] - 8:22
**promoted** [1] - 23:24
**promotion** [1] - 41:5
**properly** [1] - 127:15
**property** [46] - 54:18, 61:24, 63:25, 66:19, 66:22, 67:2, 68:8, 68:25, 69:12, 69:21, 71:23, 72:6, 72:8, 75:15, 80:12, 80:20, 84:11, 85:14, 113:22, 114:21, 117:12, 117:13, 117:20, 118:8, 119:3, 120:6, 121:4, 121:5, 122:6, 122:9,

122:12, 122:19, 122:23, 126:5, 136:11, 137:7, 137:23, 138:4, 138:6, 138:10, 141:4, 146:8, 148:15, 158:13, 158:16
**propose** [1] - 163:21
**proposed** [3] - 162:9, 162:15, 164:14
**prosecution** [1] - 17:1
**prosecutor** [14] - 19:20, 19:24, 20:1, 20:13, 21:7, 22:2, 22:8, 40:2, 46:19, 55:20, 96:9, 99:24, 133:15, 136:14
**prosecutors** [7] - 45:10, 87:13, 93:2, 94:4, 95:25, 101:11, 102:11
**protective** [30] - 12:20, 12:22, 69:6, 69:11, 71:17, 71:18, 77:6, 81:3, 85:18, 86:9, 86:15, 95:3, 118:12, 119:3, 121:23, 122:2, 127:3, 127:8, 128:8, 128:18, 129:4, 133:16, 135:6, 135:8, 139:11, 139:20, 140:6, 140:16, 142:3, 148:16
**protocol** [1] - 147:9
**prove** [3] - 9:24, 85:1, 117:5
**provide** [3] - 10:7, 22:8, 108:20
**provided** [8] - 9:18, 33:5, 33:8, 34:15, 34:16, 34:19, 35:12
**provides** [1] - 52:3
**providing** [1] - 51:21
**prowling** [1] - 154:14
**PUBLIC** [1] - 2:14
**public** [2] - 96:12, 96:17
**publish** [1] - 124:5
**pull** [3] - 57:11, 111:7, 118:18
**pulled** [3] - 48:10, 52:11, 147:7
**pulling** [2] - 50:13, 146:23
**pure** [1] - 100:12
**purely** [1] - 134:13
**purpose** [9] - 63:25, 65:4, 66:7, 66:8, 66:13, 68:10, 113:19, 114:2, 139:1
**purposes** [4] - 14:13, 17:2, 44:22, 140:11
**PURSUANT** [1] -

165:12
**put** [17] - 7:24, 8:22, 10:11, 10:17, 15:19, 16:4, 48:16, 57:15, 58:7, 67:7, 67:12, 99:1, 117:23, 151:1, 154:2, 155:9, 163:6
**puts** [2] - 123:6, 155:7
**putting** [2] - 67:14, 144:5

---

## Q

**queries** [1] - 59:21
**questioning** [4] - 77:17, 79:6, 83:6, 97:14
**questions** [16] - 8:21, 14:1, 79:23, 93:13, 101:12, 106:16, 107:22, 131:3, 140:21, 142:5, 142:8, 156:4, 156:5, 156:6, 159:5, 160:4
**quick** [2] - 131:5, 151:8
**quickly** [3] - 6:2, 82:15, 127:9
**quite** [1] - 8:9
**quote** [7] - 42:11, 78:24, 92:20, 99:24, 112:21, 118:18, 152:10
**quoting** [2] - 68:24, 85:17

---

## R

**radio** [3] - 63:5, 66:1, 137:22
**ran** [37] - 42:1, 42:7, 42:10, 43:7, 44:12, 45:23, 48:3, 49:3, 49:4, 49:19, 50:22, 51:1, 51:9, 51:20, 52:10, 53:6, 53:11, 54:12, 56:23, 57:2, 57:18, 59:20, 60:7, 96:19, 107:6, 108:1, 108:24, 109:2, 127:14, 144:18, 146:6, 146:8, 146:24, 147:4
**raps** [1] - 110:23
**RAPS** [5] - 42:13, 43:5, 44:2, 49:9
**rare** [1] - 138:23
**rather** [3] - 124:20, 127:8, 151:10
**Rattlesnakes** [1] - 155:23
**reached** [1] - 117:10
**read** [23] - 19:8, 26:22, 27:7, 34:23, 38:24, 39:3, 42:5, 43:13,

46:23, 46:24, 47:17, 47:18, 62:5, 62:24, 65:19, 91:3, 99:15, 101:18, 102:25, 107:13, 146:13

**reading** [8] - 26:21, 31:20, 39:25, 40:9, 40:21, 83:12, 84:7, 97:21

**real** [1] - 13:1

**really** [11] - 19:14, 22:21, 96:24, 104:19, 106:25, 109:5, 144:4, 154:12, 154:17, 154:19, 159:10

**reason** [20] - 6:16, 6:17, 6:18, 8:15, 14:18, 18:6, 38:15, 38:21, 103:20, 107:25, 113:1, 116:10, 127:7, 134:3, 139:10, 139:16, 157:13, 157:14, 157:23

**reasonable** [6] - 6:9, 6:21, 97:24, 100:3, 114:17, 121:19

**reasoning** [1] - 75:4

**reasons** [6] - 85:21, 100:6, 114:6, 123:16, 126:9, 135:25

**recalled** [2] - 49:23, 50:1

**receive** [1] - 97:15

**received** [11] - 14:6, 31:23, 34:25, 36:1, 38:24, 93:1, 95:25, 102:15, 104:8, 109:25, 130:9

**RECEIVED** [1] - 4:2

**receiving** [4] - 40:16, 42:6, 48:2, 50:2

**recent** [1] - 105:25

**recently** [1] - 164:2

**recess** [1] - 151:9

**recognized** [1] - 77:7

**recollect** [1] - 103:5

**recollection** [5] - 6:24, 28:17, 28:22, 29:7, 101:23

**record** [20] - 13:2, 13:19, 42:7, 42:12, 43:17, 48:3, 58:5, 107:2, 112:6, 113:9, 120:19, 122:4, 146:17, 146:19, 146:23, 150:14, 150:18, 160:20, 163:7, 164:18

**record's** [3] - 42:2, 42:10, 49:3

**recording** [2] - 54:3, 140:6

**records** [8] - 25:4,

43:18, 44:15, 48:5, 48:7, 48:10, 126:11, 147:13

**recovery** [1] - 71:12

**RECROSS** [2] - 3:4, 131:16

**redirect** [2] - 140:22, 140:24

**REDIRECT** [3] - 3:4, 106:21, 141:2

**REDUCTION** [1] - 165:19

**refer** [4] - 17:20, 28:6, 41:9, 120:20

**reference** [5] - 37:4, 37:20, 48:22, 51:5, 58:11

**referencing** [1] - 105:2

**referred** [3] - 50:13, 120:3, 125:5

**referring** [10] - 30:7, 78:2, 88:22, 102:9, 102:14, 105:8, 112:23, 120:5, 125:10, 132:15

**refers** [1] - 96:5

**reflect** [1] - 9:10

**refresh** [6] - 28:17, 28:21, 29:7, 89:13, 101:23, 105:19

**refreshed** [1] - 103:4

**regarding** [7] - 32:3, 39:20, 107:6, 110:14, 112:2, 113:24, 159:22

**regards** [4] - 8:18, 10:6, 79:8, 79:19

**REGULATIONS** [2] - 165:16, 165:20

**related** [10] - 6:5, 10:9, 27:13, 27:14, 45:22, 74:21, 83:7, 96:19, 129:21, 163:18

**relates** [1] - 9:25

**relating** [1] - 75:10

**relationship** [1] - 156:12

**relayed** [2] - 32:4, 32:18

**relaying** [1] - 49:7

**relevance** [5] - 6:24, 7:5, 9:10, 21:15, 113:12

**relevant** [12] - 6:7, 7:17, 8:4, 8:7, 8:9, 8:19, 9:12, 9:14, 9:15, 9:21, 11:23, 12:7

**rely** [2] - 9:24, 108:14

**remains** [1] - 162:22

**remember** [39] - 20:25, 21:5, 24:13, 28:16, 49:20, 60:14, 64:15, 81:24, 89:14, 96:21, 96:23, 97:12, 98:9, 98:14, 98:16,

98:22, 99:2, 99:6, 99:13, 99:21, 99:25, 100:7, 100:13, 100:19, 100:20, 101:1, 101:3, 101:16, 102:1, 102:5, 102:17, 103:2, 103:11, 104:4, 104:6, 104:19, 105:15, 106:6, 136:16

**remove** [1] - 118:11

**removed** [1] - 70:18

**rent** [1] - 115:19

**rental** [2] - 30:9, 32:10

**rented** [3] - 116:1, 152:12, 153:2

**rents** [2] - 115:18, 115:25

**repeat** [1] - 160:22

**repeatedly** [1] - 38:8

**repetitive** [1] - 160:24

**rephrase** [1] - 40:5

**reply** [2] - 160:12, 160:16

**report** [83] - 8:23, 9:8, 9:9, 9:14, 11:11, 12:25, 15:13, 15:14, 15:15, 15:19, 16:4, 17:1, 17:14, 17:15, 28:2, 30:10, 30:16, 31:3, 32:10, 33:3, 33:17, 33:20, 33:25, 35:19, 35:25, 36:10, 36:17, 37:3, 37:11, 37:17, 37:18, 37:23, 37:25, 38:3, 39:3, 39:18, 42:6, 48:2, 48:17, 51:14, 55:10, 64:14, 64:25, 71:11, 71:15, 71:16, 81:17, 82:16, 82:18, 83:12, 83:22, 84:7, 85:6, 88:1, 88:7, 89:10, 89:13, 90:2, 90:19, 102:2, 102:13, 104:3, 105:18, 105:21, 106:1, 106:2, 106:13, 107:13, 108:1, 109:25, 110:17, 111:3, 116:13, 120:22, 129:13, 129:19, 130:9, 130:21, 146:3, 157:17, 159:22, 159:25

**report-writing** [1] - 37:11, 51:14

**reported** [13] - 28:15, 29:9, 30:13, 30:25, 35:2, 35:11, 35:21, 61:17, 77:9, 97:6, 111:10, 115:16, 116:12

**REPORTED** [1] -

165:14

**REPORTER** [4] - 1:21, 151:11, 165:10, 165:23

**REPORTER'S** [1] - 1:15

**reporting** [1] - 99:16

**reports** [20] - 9:11, 14:1, 14:7, 14:10, 14:12, 14:18, 16:9, 16:18, 18:1, 37:14, 47:6, 48:22, 50:12, 52:23, 64:16, 105:18, 108:25, 109:2, 114:20

**represent** [6] - 7:8, 38:14, 59:1, 95:24, 98:12, 138:8

**reprimand** [2] - 97:3, 97:11

**request** [6] - 10:11, 121:8, 124:4, 124:20, 139:3, 156:7

**requested** [4] - 71:25, 121:9, 132:24, 148:18

**required** [1] - 130:2

**rerunning** [1] - 58:4

**researching** [1] - 55:10

**residence** [6] - 7:21, 39:1, 85:18, 91:4, 122:17, 158:19

**resident** [1] - 134:11

**respond** [2] - 71:5, 127:19

**responded** [4] - 32:3, 79:22, 106:4, 129:12

**responding** [6] - 23:13, 40:10, 47:19, 106:3, 110:13, 111:3

**response** [6] - 33:20, 36:10, 36:18, 76:15, 87:20, 121:8

**responses** [2] - 59:20, 59:22

**responsibility** [2] - 130:14, 150:16

**responsible** [1] - 163:3

**resulted** [2] - 97:10, 101:9

**retrieve** [2] - 85:14, 88:21

**return** [2] - 61:2, 157:24

**returned** [2] - 116:6, 147:8

**review** [9] - 10:20, 20:16, 20:18, 22:2, 45:18, 97:23, 98:3, 98:11, 100:2

**reviewed** [3] - 8:19, 9:8, 43:3

**rib** [1] - 111:17

**ride** [1] - 23:22

**riding** [1] - 23:10

**rights** [1] - 119:21

**Rios** [13] - 64:20, 67:4, 67:17, 73:7, 74:12, 75:11, 81:21, 109:4, 125:14, 125:18, 135:2, 140:3, 150:6

**Road** [1] - 35:3

**road** [1] - 145:9

**rob** [2] - 120:7, 153:4

**robbed** [1] - 121:5

**robbing** [1] - 153:5

**role** [1] - 24:3

**room** [10] - 92:3, 92:4, 93:15, 94:9, 101:21, 126:18, 127:24, 128:2, 128:16, 140:15

**rooms** [1] - 126:22

**routine** [1] - 25:14

**rules** [2] - 8:6, 162:19

**run** [31] - 43:21, 44:4, 44:24, 47:21, 48:8, 49:12, 50:5, 50:17, 50:20, 51:4, 51:13, 51:17, 51:19, 51:24, 53:17, 57:6, 58:4, 58:8, 109:2, 110:22, 111:2, 111:11, 112:3, 112:5, 137:8, 146:10, 147:3, 147:6, 147:13

**running** [15] - 48:5, 48:7, 48:14, 49:8, 49:9, 49:23, 52:6, 57:22, 80:11, 80:14, 112:16, 127:9, 144:17, 146:5

**runs** [5] - 49:13, 124:14, 136:16, 137:5, 144:25

**RV** [5] - 7:20, 72:18, 137:7, 158:12, 158:16

**RVs** [1] - 101:4

**S**

**safely** [2] - 63:4, 65:24

**safest** [1] - 72:4

**safety** [24] - 69:1, 69:5, 69:6, 69:10, 69:21, 70:10, 71:1, 71:14, 73:17, 75:2, 76:22, 77:4, 77:20, 78:10, 79:7, 79:13, 79:14, 79:18, 80:15, 80:20, 89:7, 138:4, 138:6, 138:10

**sanctity** [2] - 132:8, 132:14

**Santa** [4] - 27:10, 27:25, 65:22, 116:16

**saved** [1] - 121:20

**saw** [15] - 6:10, 42:22,

74:12, 77:7, 91:5, 91:24, 92:16, 96:12, 96:17, 128:16, 129:23, 154:6, 154:8, 154:9, 154:14
**scabbered** [1] - 99:18
**scared** [1] - 119:19
**scattered** [1] - 99:19
**scene** [2] - 126:6, 153:19
**schedule** [4] - 160:10, 162:2, 163:24, 164:12
**schedules** [1] - 164:13
**scheduling** [1] - 163:10
**scope** [4] - 151:16, 153:7, 158:22, 159:2
**scramble** [1] - 124:17
**Screening** [7] - 54:22, 54:23, 55:15, 56:9, 60:16, 132:3, 132:4
**search** [16] - 26:19, 26:23, 26:25, 44:4, 49:3, 87:3, 105:9, 127:17, 140:12, 140:14, 143:3, 147:22, 147:23, 148:12, 148:19, 157:11
**searched** [3] - 7:25, 99:17, 127:14
**searches** [18] - 43:8, 45:22, 48:14, 49:4, 49:19, 49:23, 50:5, 50:17, 50:20, 51:4, 53:18, 56:23, 57:2, 57:6, 57:18, 58:4, 60:8, 107:7
**searching** [3] - 154:1, 154:15
**Seargant** [1] - 73:7
**second** [23] - 29:3, 29:4, 30:19, 34:5, 35:25, 36:10, 45:21, 47:17, 58:10, 60:2, 60:4, 62:4, 64:8, 64:19, 88:16, 89:3, 91:2, 97:22, 101:18, 135:20, 147:12, 164:2, 164:3
**second-hand** [1] - 35:25
**second-most** [2] - 164:2, 164:3
**secondary** [2] - 65:4, 66:8
**secondhand** [4] - 66:18, 66:20, 68:2, 113:25
**seconds** [7] - 124:6, 124:11, 124:23, 125:1, 128:10, 156:9, 156:21
**secretaries** [1] - 50:7,

53:25, 146:9
**secretary** [28] - 44:12, 47:21, 48:8, 48:16, 48:18, 48:20, 48:23, 48:25, 49:5, 49:7, 50:13, 50:24, 51:4, 51:19, 51:21, 51:23, 52:5, 52:10, 52:15, 53:24, 54:7, 57:11, 57:12, 109:2, 110:21, 112:3, 146:6
**secretary's** [2] - 49:21, 50:6
**SECTION** [1] - 165:12
**section** [1] - 31:11
**secure** [4] - 70:20, 72:2, 117:13, 121:5
**security** [1] - 111:19
**Security** [2] - 54:20, 132:1
**see** [68] - 6:12, 7:22, 8:8, 11:13, 11:15, 11:21, 27:4, 27:6, 34:21, 39:1, 39:4, 46:21, 47:8, 48:11, 56:22, 57:19, 57:20, 58:10, 58:12, 58:14, 58:15, 59:7, 59:13, 59:19, 59:21, 59:23, 66:23, 72:17, 73:4, 74:21, 76:16, 77:22, 80:12, 82:24, 95:4, 95:13, 96:2, 97:25, 103:15, 104:11, 105:3, 105:5, 105:6, 111:8, 111:15, 111:16, 120:16, 120:18, 120:21, 124:16, 126:22, 127:1, 135:5, 136:11, 141:5, 148:5, 148:20, 154:11, 154:19, 154:20, 154:21, 154:22, 155:1, 159:10, 159:16
**seeing** [3] - 60:14, 103:5, 104:23
**seek** [1] - 92:17
**seeking** [1] - 7:11
**seem** [1] - 107:14
**sends** [1] - 20:2
**senior** [1] - 164:8
**sense** [3] - 17:17, 82:1, 115:5
**sent** [2] - 21:2, 36:14
**sentence** [5] - 32:8, 100:2, 104:8, 104:22, 104:24
**September** [1] - 23:2
**Sergeant** [9] - 64:20, 67:4, 67:17, 74:12, 75:11, 81:21, 125:14, 125:18, 135:2
**serial** [1] - 118:5

**serious** [7] - 112:18, 143:8, 143:14, 143:23, 144:10, 145:22
**serve** [3] - 12:5, 12:9, 14:12
**service** [21] - 25:19, 25:20, 31:17, 32:22, 33:22, 34:25, 35:21, 37:20, 41:3, 47:19, 50:23, 61:19, 62:4, 62:15, 65:5, 65:9, 110:14, 110:16, 113:25, 114:1, 129:18
**SESSION** [1] - 5:3
**set** [6] - 72:14, 85:21, 130:2, 160:9, 160:17, 161:10
**setting** [1] - 164:6
**seven** [11] - 24:14, 24:19, 25:7, 25:8, 26:5, 26:13, 26:15, 27:11, 124:22
**several** [2] - 28:11, 73:3
**severity** [2] - 111:18, 145:13
**shambles** [1] - 133:14
**sheet** [2] - 58:23, 111:17
**sheriff** [1] - 156:14
**Sheriff's** [2] - 47:4, 47:21
**sheriff's** [7] - 8:25, 14:3, 36:3, 48:20, 59:3, 156:12, 160:1
**sheriffs** [2] - 9:23, 156:18
**Sheriffs** [1] - 10:3
**shift** [1] - 66:2
**shoot** [1] - 121:14
**shooting** [3] - 121:16, 157:25, 158:3
**short** [3] - 23:25, 116:18, 151:19
**shortly** [1] - 67:1
**shot** [6] - 83:25, 120:6, 120:13, 120:14, 153:3, 157:21
**show** [5] - 55:3, 57:16, 101:17, 102:20, 158:5
**showed** [2] - 84:10, 98:20
**showing** [1] - 29:4
**shows** [1] - 57:15
**sic** [1] - 99:19
**sick** [1] - 163:6
**sign** [1] - 21:24
**signed** [6] - 12:10, 22:1, 34:24, 62:22, 63:13, 102:1
**significance** [4] - 39:6, 39:23, 40:7,

105:2
**significant** [2] - 18:4, 163:17
**signing** [1] - 31:22
**signs** [1] - 148:20
**similar** [4] - 87:22, 87:25, 89:4, 127:13
**simply** [2] - 66:7, 116:6
**single** [1] - 85:24
**sit** [1] - 52:19
**sitting** [1] - 115:2
**situation** [4] - 111:21, 138:1, 156:19, 157:2
**situations** [1] - 123:5
**six** [6] - 25:21, 40:23, 41:1, 41:6, 63:1, 65:22
**six-man** [4] - 25:21, 41:1, 41:6, 65:22
**six-person** [2] - 40:23, 63:1
**skip** [2] - 54:9, 59:13
**skipped** [1] - 104:24
**skips** [1] - 100:10
**skull** [1] - 94:21
**slid** [1] - 149:5
**slightly** [1] - 124:20
**slow** [1] - 122:8
**small** [2] - 126:17, 126:19
**snake** [1] - 94:21
**snyder** [1] - 163:12
**SNYDER** [83] - 2:15, 3:6, 3:8, 5:12, 5:18, 7:7, 12:14, 13:10, 13:21, 13:24, 16:2, 16:13, 17:3, 21:17, 29:2, 29:6, 30:3, 30:6, 46:9, 46:15, 52:17, 52:20, 60:1, 60:6, 62:18, 66:16, 73:24, 74:4, 74:11, 76:2, 76:8, 76:12, 78:16, 78:22, 80:4, 80:9, 81:5, 81:8, 84:23, 86:19, 86:22, 87:1, 88:8, 88:13, 95:19, 95:21, 95:23, 97:20, 99:10, 102:7, 103:22, 104:3, 104:7, 104:12, 104:21, 105:14, 106:15, 113:12, 125:21, 130:5, 131:10, 131:17, 132:16, 135:24, 139:9, 140:21, 142:7, 149:20, 150:10, 151:13, 151:21, 153:6, 153:10, 158:22, 159:2, 159:8, 160:3, 161:23, 162:1, 162:7, 163:16, 163:20, 164:15

**Snyder** [3] - 5:13, 5:17, 105:13
**so..** [2] - 131:9, 150:16
**solo** [1] - 23:22
**someone** [24] - 39:3, 39:25, 40:9, 44:24, 51:2, 53:11, 55:17, 98:21, 115:18, 115:25, 123:23, 125:20, 125:24, 126:4, 133:23, 134:7, 134:22, 135:11, 141:16, 141:18, 142:17, 147:21, 155:9, 159:24
**sometimes** [1] - 147:1
**soon** [2] - 9:3, 13:7
**sooner** [1] - 12:11
**sorry** [17] - 26:24, 30:7, 30:21, 31:11, 31:20, 37:23, 40:4, 46:1, 54:10, 84:24, 91:2, 95:10, 95:19, 106:18, 124:7, 140:23, 158:15
**sort** [3] - 106:23, 117:23, 161:8
**sound** [2] - 24:16, 24:22
**sounds** [3] - 51:14, 93:1, 105:15
**source** [1] - 142:13
**speaker** [1] - 74:13
**speaking** [1] - 100:23
**Special** [1] - 47:3
**special** [22] - 24:9, 24:19, 25:1, 25:10, 25:11, 25:17, 25:25, 26:5, 26:13, 27:10, 27:17, 34:2, 36:15, 36:17, 36:25, 40:18, 40:23, 40:25, 41:22, 63:1, 65:21, 68:24
**specific** [10] - 43:3, 49:4, 49:24, 50:2, 58:18, 106:25, 107:23, 111:10, 135:19, 160:17
**specifically** [1] - 48:14
**speculating** [1] - 78:11
**speculation** [7] - 15:25, 80:2, 97:15, 100:12, 104:15, 125:21, 137:16
**speculative** [1] - 134:13
**speculatively** [1] - 100:23
**speculatively-speaking** [1] - 100:23
**Speedy** [1] - 162:3
**spent** [3] - 23:4, 74:18, 138:5

sponsoring [2] - 101:12, 102:12
SPRING [2] - 2:6, 2:10
stamp [4] - 74:5, 124:20, 125:11, 136:19
stamped [4] - 76:5, 78:18, 86:23, 95:3
stand [3] - 6:2, 13:9, 151:2
standard [1] - 147:9
standing [1] - 126:23
start [5] - 13:25, 22:18, 23:19, 124:8, 124:17
started [7] - 5:17, 12:13, 12:16, 22:21, 23:2, 75:22, 80:11
starts [2] - 12:17, 88:17
state [5] - 6:14, 13:18, 43:24, 112:21, 152:2
State [1] - 43:19
statement [5] - 17:21, 19:1, 63:17, 93:9, 108:20
STATEMENTS [1] - 1:17
statements [9] - 47:5, 47:7, 52:22, 52:23, 53:1, 53:9, 90:3, 90:11, 90:17
States [3] - 5:5, 5:9, 43:22
states [3] - 43:21, 43:25, 113:9
STATES [11] - 1:1, 1:7, 1:22, 2:4, 2:9, 165:5, 165:11, 165:13, 165:17, 165:20
statewide [3] - 43:8, 43:9, 44:4
stating [3] - 35:1, 51:16, 65:9
station [13] - 45:3, 54:2, 54:7, 55:9, 71:10, 72:5, 82:7, 82:10, 86:17, 98:4, 103:1, 117:10, 155:22
stay [1] - 75:12
stayed [1] - 88:19
STENOGRAPHICALLY [1] - 165:14
stepped [1] - 105:6
steps [3] - 116:11, 117:13, 140:9
sticking [1] - 92:14
still [15] - 30:19, 50:10, 50:15, 72:1, 77:21, 87:7, 113:2, 118:7, 125:9, 137:14, 137:24, 137:25, 145:22, 149:1, 162:19
stolen [8] - 30:25,

63:3, 65:24, 80:12, 115:16, 116:12, 118:7, 129:13
stomped [1] - 145:15
stop [8] - 26:20, 92:16, 128:19, 153:25, 154:2, 154:4, 157:4, 157:11
story [1] - 145:19
street [4] - 96:13, 96:17, 111:7, 145:9
STREET [4] - 1:22, 2:6, 2:10, 2:16
stricken [3] - 153:11, 153:12, 153:13
strongly [1] - 150:5
structures [1] - 122:16
stuck [10] - 114:8, 114:10, 114:12, 114:15, 114:16, 115:6, 116:7, 116:9, 143:9, 144:4
stuff [19] - 11:2, 21:22, 52:2, 55:21, 57:16, 59:24, 70:18, 77:2, 85:5, 93:14, 110:25, 120:7, 126:20, 137:24, 143:19, 147:3, 147:13, 163:25, 164:6
subject [1] - 49:12
submission [1] - 161:5
submit [3] - 18:3, 162:9, 164:14
submits [1] - 109:7
submitted [6] - 18:23, 19:3, 19:6, 45:13, 149:19, 151:14
subparagraphs [1] - 89:21
subpoena [9] - 8:22, 9:20, 10:4, 10:12, 10:17, 12:5, 12:9, 12:10, 59:3
subscribed [1] - 27:1
subsequent [1] - 130:20
subsequently [1] - 148:17
substantive [1] - 106:23
suddenly [1] - 127:19
sued [3] - 106:1, 106:5, 106:11
sufficient [3] - 63:2, 65:23, 163:11
sugar [1] - 131:13
suggested [3] - 93:24, 123:11, 129:16
suggests [2] - 23:10, 25:10
SUITE [2] - 1:23, 2:6
summary [2] - 9:8, 9:11
sums [1] - 94:19

super [2] - 139:4, 139:7
supervising [1] - 24:2
supplement [2] - 108:15, 160:25
supplies [2] - 76:21, 77:18
support [4] - 22:10, 48:5, 63:5, 65:25
supporting [1] - 85:22
supports [1] - 16:10
supposed [10] - 14:18, 14:21, 14:23, 14:25, 39:21, 45:22, 76:14, 108:14, 148:19, 163:5
supposedly [3] - 35:15, 85:22
SUPPRESS [1] - 1:16
suppress [2] - 5:16, 47:2
suppression [4] - 19:12, 87:16, 90:12, 163:5
surveillance [3] - 94:8, 94:12, 121:16
suspect [10] - 64:9, 88:19, 110:5, 111:23, 116:12, 118:21, 127:14, 127:16, 138:14, 146:3
suspects [1] - 145:2
suspicions [1] - 112:16
sustained [10] - 66:15, 80:3, 80:8, 113:13, 125:22, 130:7, 139:8, 153:9, 158:23, 159:4
sweep [40] - 68:25, 69:5, 69:6, 69:9, 69:11, 69:20, 69:22, 71:14, 71:17, 71:19, 77:6, 80:19, 81:3, 85:18, 86:4, 86:9, 86:12, 86:15, 89:7, 90:8, 118:12, 119:3, 121:24, 122:2, 122:19, 127:3, 127:8, 128:9, 128:14, 128:18, 129:4, 133:16, 135:6, 135:8, 139:11, 139:20, 140:7, 140:16, 142:3, 148:16
SWORN [2] - 13:13, 152:1
sworn [3] - 17:21, 19:1, 27:1
system [5] - 42:11, 42:12, 42:13, 44:3
System [8] - 42:14, 43:5, 44:2, 44:3, 44:6, 49:10, 49:17,

57:3
systems [5] - 43:17, 44:15, 44:16, 44:18, 49:13

---

## T

Tab [1] - 95:20
tab [2] - 56:14, 95:19
Tabanez [1] - 64:21
table [8] - 5:10, 91:19, 91:23, 91:24, 127:24, 128:3, 128:16, 128:17
tabs [1] - 45:25
tacitly [1] - 154:4
tactic [1] - 145:25
tactical [1] - 41:1
tattoo [1] - 94:21
team [23] - 24:10, 24:19, 25:1, 25:11, 25:21, 26:1, 26:5, 26:13, 27:10, 27:18, 34:3, 36:15, 36:17, 36:25, 40:19, 40:23, 40:25, 41:2, 41:6, 41:22, 63:2, 65:21, 68:24
teams [1] - 23:16
telephone [1] - 121:19
ten [10] - 7:25, 75:14, 99:12, 100:21, 103:4, 126:2, 127:6, 128:10, 131:9, 164:3
terminology [1] - 52:9
terms [6] - 39:6, 39:24, 40:7, 113:4, 123:10, 146:4
Terrorist [5] - 54:22, 55:15, 56:9, 60:16, 132:3
terrorist [14] - 43:1, 47:24, 54:14, 55:11, 55:15, 55:23, 60:12, 60:19, 61:5, 112:9, 112:15, 112:25, 123:15, 131:21
Tesla [2] - 122:14, 158:21
test [1] - 28:18
testified [2] - 13:12, 142:18
testify [5] - 51:8, 52:11, 75:4
testimony [48] - 16:6, 16:14, 16:20, 16:22, 32:16, 47:1, 49:6, 49:11, 50:16, 54:7, 55:12, 57:5, 58:3, 61:23, 62:9, 62:13, 65:3, 66:11, 69:2, 71:13, 71:22, 72:4, 73:16, 73:19, 74:24, 75:6, 76:20, 77:17, 78:1, 78:8, 79:6,

79:11, 79:17, 80:14, 81:1, 93:19, 101:12, 79
102:12, 132:10, 132:12, 135:13, 135:22, 139:7, 139:14, 155:9, 156:1, 156:24, 157:13
text [5] - 21:9, 21:20, 59:20, 59:22, 62:5
texts [2] - 59:23, 94:5
THAT [2] - 165:12, 165:15
THE [207] - 2:4, 2:4, 2:9, 2:14, 2:14, 5:4, 5:11, 5:15, 5:22, 5:25, 6:3, 7:6, 9:5, 9:11, 9:22, 10:13, 10:16, 11:1, 11:8, 11:13, 13:4, 13:14, 13:16, 13:17, 13:18, 13:20, 13:22, 16:1, 16:7, 16:8, 16:23, 16:24, 21:16, 29:3, 29:14, 29:16, 29:17, 29:20, 29:22, 29:24, 29:25, 30:2, 30:4, 46:14, 51:1, 51:5, 51:7, 51:11, 51:15, 52:10, 52:13, 52:19, 60:5, 62:14, 62:15, 66:15, 74:3, 76:7, 78:20, 80:3, 80:8, 81:2, 81:3, 81:6, 81:7, 84:22, 86:21, 88:4, 88:5, 88:12, 95:17, 95:18, 95:20, 97:17, 97:18, 99:9, 102:6, 103:19, 103:20, 104:2, 104:4, 104:11, 104:16, 104:22, 105:11, 106:17, 106:20, 108:5, 108:7, 108:11, 108:22, 109:15, 109:21, 113:13, 114:22, 114:24, 114:25, 115:3, 115:4, 124:9, 125:22, 130:7, 131:1, 131:6, 131:14, 132:13, 132:14, 135:23, 139:8, 140:23, 140:25, 142:6, 142:8, 142:11, 142:12, 142:15, 142:16, 142:19, 142:20, 142:24, 142:25, 143:22, 143:24, 143:25, 144:2, 144:8, 144:9, 144:13, 144:15, 144:16, 144:24, 144:25, 145:7,

145:8, 145:18, 145:19, 145:23, 145:24, 146:4, 146:9, 146:11, 146:12, 146:16, 146:19, 146:21, 146:22, 147:15, 147:16, 147:18, 147:24, 148:20, 148:22, 148:23, 148:24, 149:6, 149:12, 149:16, 149:21, 149:25, 150:17, 151:4, 151:5, 151:6, 151:8, 151:11, 151:12, 151:18, 151:22, 152:2, 152:3, 152:5, 153:9, 153:12, 156:4, 158:23, 159:4, 159:6, 160:5, 160:7, 161:12, 161:15, 161:17, 161:25, 162:6, 162:8, 162:11, 162:13, 162:17, 162:21, 162:23, 163:1, 163:8, 163:19, 163:23, 164:17, 165:10, 165:11, 165:13, 165:14, 165:15, 165:16, 165:17, 165:19, 165:20

**themself** [1] - 123:7
**themselves** [1] - 51:9
**therefore** [1] - 66:3
**they've** [2] - 51:9, 117:6
**thinking** [2] - 51:11, 160:13
**thinks** [1] - 9:15
**third** [2] - 27:5, 64:8
**THIS** [1] - 165:18
**Thomas** [2] - 5:9, 47:3
**THOMAS** [3] - 2:10, 3:6, 3:8
**thousands** [2] - 96:22, 101:4
**Threat** [2] - 54:23, 132:4
**threaten** [1] - 155:19
**threatened** [3] - 119:19, 155:24
**three** [10] - 21:13, 24:5, 27:6, 43:3, 49:4, 49:23, 69:22, 81:23, 106:7, 124:5
**three-way** [1] - 21:13
**thrown** [2] - 106:4, 106:8
**tied** [2] - 148:5, 148:6
**timeliness** [1] - 8:10
**tip** [12] - 36:11, 37:16, 38:2, 38:6, 38:25, 39:4, 39:20, 40:6,

40:11, 41:13, 66:18, 113:24
**tipster** [1] - 68:2
**Tirado** [3] - 64:20, 91:12, 92:15
**TITLE** [1] - 165:13
**TO** [3] - 1:16, 23:17, 165:12
**today** [23] - 7:24, 9:1, 9:5, 9:6, 25:7, 52:14, 62:9, 65:3, 96:9, 101:20, 101:21, 102:10, 142:18, 143:20, 148:2, 149:15, 150:2, 150:18, 150:19, 157:13, 157:24, 160:25, 161:2
**today's** [1] - 160:18
**together** [2] - 95:21, 98:17
**tons** [3] - 120:14, 126:20
**took** [13] - 17:8, 39:8, 39:25, 40:7, 67:11, 72:7, 82:10, 86:16, 98:25, 114:19, 117:12, 144:17, 154:10
**top** [8] - 56:19, 58:22, 59:8, 62:7, 89:23, 124:21, 149:4, 163:14
**topic** [2] - 53:21, 92:25
**torture** [1] - 157:3
**tortured** [1] - 155:21
**torturing** [1] - 157:4
**totally** [2] - 11:15, 145:16
**tow** [7] - 70:18, 71:3, 71:5, 71:7, 71:22, 114:22, 115:7
**towed** [2] - 70:24, 71:15
**track** [1] - 52:14
**trailer** [5] - 6:11, 6:12, 6:13, 99:17, 100:11
**trained** [2] - 14:9, 147:11
**trainee** [7] - 8:2, 23:18, 96:12, 96:14, 96:16, 98:25, 101:25
**training** [11] - 14:6, 22:21, 22:24, 23:9, 23:17, 23:20, 23:25, 24:5, 28:1, 96:14, 142:1
**transcript** [1] - 160:21
**TRANSCRIPT** [4] - 1:15, 165:14, 165:16, 165:18
**transpired** [1] - 16:9, 118:9
**treat** [1] - 145:12
**trial** [4] - 161:7,

161:10, 162:20, 164:6
**Trial** [1] - 162:3
**trials** [2] - 163:25, 164:7
**tried** [3] - 73:3, 117:17, 148:21
**troubled** [2] - 11:17, 109:5
**truck** [25] - 28:7, 30:10, 32:4, 32:11, 33:3, 33:11, 34:12, 35:3, 36:12, 40:16, 41:12, 61:15, 62:6, 70:18, 71:3, 71:5, 71:7, 71:23, 114:23, 115:7, 118:2, 118:3, 138:12, 144:3, 152:12
**true** [6] - 16:9, 27:1, 32:14, 51:12, 84:1, 102:13
**TRUE** [1] - 165:13
**truth** [1] - 149:2
**truthful** [2] - 45:16, 51:12
**try** [2] - 114:20, 157:2
**trying** [9] - 97:11, 105:7, 115:7, 120:7, 127:9, 143:5, 153:4, 156:19, 157:2
**TUESDAY** [1] - 1:17
**turn** [17] - 9:20, 13:6, 13:7, 22:16, 26:16, 37:2, 39:10, 46:9, 52:4, 63:12, 64:13, 68:20, 82:17, 91:12, 94:24, 95:2, 148:3
**turned** [10] - 6:4, 6:16, 8:20, 9:2, 9:7, 37:7, 81:20, 82:1, 119:5, 140:2
**turning** [1] - 10:22
**turns** [1] - 123:8
**two** [23] - 7:16, 7:23, 9:15, 12:11, 20:8, 23:16, 23:23, 24:7, 27:6, 47:9, 67:18, 75:20, 83:24, 106:6, 106:7, 120:6, 121:14, 140:9, 142:10, 150:3, 158:18, 162:19, 163:9
**two-man** [2] - 23:16, 23:23
**type** [2] - 77:1, 78:12
**typically** [2] - 116:2, 121:6

---

**U**

**U-haul** [62] - 28:7, 28:14, 29:8, 30:9, 30:25, 31:7, 32:4,

32:9, 32:11, 33:2, 33:3, 33:21, 34:6, 35:1, 35:3, 35:17, 39:18, 62:1, 62:17, 64:1, 64:22, 65:11, 66:7, 67:2, 67:15, 67:21, 67:24, 68:17, 70:9, 70:12, 72:12, 83:14, 110:14, 114:8, 114:12, 114:13, 114:15, 114:17, 114:19, 114:23, 114:24, 115:6, 115:8, 115:16, 116:8, 117:7, 118:8, 118:11, 120:2, 138:12, 143:10, 143:13, 147:25, 148:8, 148:21, 148:25, 152:12, 152:18, 152:19, 153:22, 157:24
**ultimately** [2] - 6:15, 69:19
**unbiased** [1] - 14:19
**under** [11] - 19:3, 31:12, 51:2, 51:16, 62:22, 63:6, 63:13, 67:9, 80:18, 109:7, 161:5
**underlying** [2] - 12:24, 101:17
**undermined** [1] - 109:18
**undermines** [1] - 109:15
**understood** [7] - 11:7, 19:5, 40:11, 71:18, 109:13, 116:14, 151:21
**unfortunately** [1] - 60:1
**unfounded** [1] - 97:1
**unilaterally** [1] - 11:19
**unit** [4] - 23:17, 26:1, 41:1, 41:9
**UNITED** [11] - 1:1, 1:7, 1:22, 2:4, 2:9, 165:5, 165:11, 165:13, 165:17, 165:20
**United** [3] - 5:5, 5:9, 43:22
**units** [1] - 23:23
**unknown** [1] - 123:16
**unless** [4] - 132:24, 150:2, 150:3, 159:3
**unlikely** [1] - 115:22
**unlock** [1] - 134:14
**unlocked** [5] - 132:18, 134:2, 134:16, 138:21, 153:19
**unreturned** [1] - 33:15
**unsecured** [4] - 82:10, 134:1, 134:8, 134:25
**up** [50] - 7:5, 9:1, 13:5,

30:20, 31:16, 32:22, 48:10, 57:10, 57:11, 60:3, 60:13, 62:16, 66:14, 67:17, 72:14, 83:25, 84:10, 94:19, 96:23, 98:20, 104:13, 105:22, 111:6, 115:13, 120:6, 120:7, 120:24, 121:14, 122:21, 124:8, 126:4, 126:14, 132:8, 133:4, 133:8, 142:9, 148:5, 148:6, 148:15, 149:4, 149:8, 150:2, 150:7, 150:24, 153:3, 153:24, 157:21, 159:22, 161:7, 164:4
**uploaded** [1] - 121:17
**urgent** [1] - 138:25
**urn** [2] - 48:17, 50:14

---

**V**

**vacated** [1] - 161:11
**vague** [2] - 15:25, 88:3
**van** [2] - 143:10, 144:3
**vehicle** [22] - 40:10, 41:24, 61:16, 62:8, 63:3, 64:10, 65:24, 69:13, 70:16, 70:22, 70:23, 88:20, 110:1, 110:17, 113:18, 113:21, 116:1, 116:2, 116:11, 129:13, 144:23, 145:1
**vehicle's** [1] - 70:24
**Velasco** [1] - 102:2
**verify** [2] - 77:1, 148:11
**versus** [1] - 57:11
**via** [3] - 21:19, 21:21, 59:3
**victim** [1] - 85:2
**video** [24] - 73:25, 74:10, 74:12, 76:11, 78:17, 78:21, 86:25, 87:23, 88:1, 89:4, 94:20, 118:16, 120:18, 121:15, 121:21, 124:11, 124:12, 124:21, 125:2, 125:12, 133:25, 156:22, 158:2, 158:5
**videos** [3] - 70:1, 93:7, 94:12
**view** [1] - 161:1
**VIN** [7] - 80:11, 80:14, 137:8, 138:12, 147:4, 147:5, 147:6
**vinegar** [1] - 77:14
**voicemails** [1] - 33:14

**volume** [2] - 159:17, 159:18
**voluntarily** [1] - 126:5
**voluntary** [1] - 159:1
**vs** [2] - 1:10, 165:6

## W

**wait** [3] - 11:1, 151:4, 151:5
**waited** [2] - 10:13, 12:3
**waive** [1] - 162:3
**waiver** [3] - 161:8, 161:19, 161:22
**walking** [3] - 12:25, 138:11, 145:9
**wall** [2] - 120:15, 155:25
**wants** [6] - 5:21, 47:21, 57:22, 111:2, 111:11, 112:2
**Warrant** [5] - 42:14, 43:5, 44:2, 44:3, 49:17
**warrant** [61] - 6:11, 7:19, 7:20, 17:19, 17:21, 17:22, 17:25, 18:12, 19:1, 22:6, 24:15, 26:4, 26:19, 26:23, 26:25, 39:10, 39:17, 42:17, 46:2, 46:3, 47:23, 63:13, 63:21, 74:16, 74:25, 76:18, 78:5, 78:8, 78:9, 81:13, 83:10, 85:9, 87:23, 89:10, 90:20, 90:25, 92:17, 92:23, 98:21, 100:24, 110:25, 112:7, 112:8, 117:9, 122:5, 123:16, 135:3, 137:6, 142:23, 143:3, 143:4, 143:14, 143:18, 144:16, 144:17, 145:10, 147:8, 147:20, 147:23, 148:13, 148:19
**warrantless** [1] - 150:11
**warrants** [9] - 44:4, 47:22, 54:12, 57:22, 96:20, 111:3, 111:11, 112:2, 146:5
**Warrants** [1] - 49:10
**watch** [1] - 94:19
**watchlist** [13] - 43:1, 47:24, 54:14, 55:11, 55:24, 60:12, 60:20, 61:5, 112:9, 112:15, 112:25, 123:15, 131:21
**weakest** [1] - 145:14

**weapon** [5] - 116:23, 123:21, 143:5, 143:14, 143:23
**WEDNESDAY** [1] - 1:19
**week** [2] - 150:20, 162:19
**weeks** [4] - 10:20, 115:2, 150:9, 163:4
**weight** [2] - 11:14, 11:16
**Wells** [1] - 101:25
**WEST** [1] - 1:22
**WESTERN** [1] - 1:3
**whatever's** [1] - 11:3
**whatsoever** [2] - 6:24, 160:2
**when'd** [1] - 70:21
**whole** [3] - 43:22, 92:21, 138:15
**wilderness** [2] - 63:4, 65:24
**winches** [2] - 149:2, 149:3
**windows** [4] - 120:13, 120:16, 122:21, 122:22
**WITH** [2] - 165:16, 165:19
**WITNESS** [48] - 13:13, 13:17, 13:20, 16:8, 16:24, 29:16, 29:20, 29:24, 30:2, 51:5, 51:11, 51:20, 62:15, 76:7, 81:3, 81:7, 84:22, 88:5, 97:18, 103:20, 114:24, 115:3, 132:14, 142:11, 142:15, 142:19, 142:24, 143:22, 143:25, 144:8, 144:13, 144:16, 144:25, 145:8, 145:19, 145:24, 146:9, 146:12, 146:19, 146:22, 147:16, 147:24, 148:22, 148:24, 151:4, 151:6, 152:1, 152:3
**witness** [6] - 7:1, 102:4, 109:7, 150:23, 151:7, 160:8
**witness's** [1] - 16:6
**WITNESSES** [1] - 3:4
**witnesses** [3] - 150:4, 150:8, 150:13
**word** [2] - 37:21, 115:21
**words** [6] - 40:21, 105:4, 115:4, 131:18, 135:8
**work-related** [1] - 163:18
**works** [5] - 19:22, 31:24, 50:11,

163:24, 164:13
**workup** [1] - 111:8
**worried** [3] - 132:17, 134:15, 134:16
**worries** [1] - 128:23
**write** [12] - 14:7, 14:10, 15:14, 16:8, 16:9, 16:11, 16:18, 16:25, 19:16, 21:3, 145:2, 145:4
**writing** [6] - 14:1, 15:14, 15:15, 37:11, 51:14, 159:25
**written** [3] - 19:19, 21:20, 32:23
**wrote** [30] - 11:11, 20:13, 27:15, 30:8, 30:23, 31:2, 31:25, 32:2, 32:6, 32:12, 37:24, 37:25, 42:6, 42:8, 42:10, 43:17, 43:20, 48:2, 49:22, 50:1, 63:24, 64:2, 64:9, 64:11, 64:20, 65:21, 82:15, 88:6, 91:6

## Y

**yard** [2] - 72:23, 154:15
**year** [8] - 24:11, 24:13, 24:14, 25:3, 25:5, 25:6, 25:7, 26:15
**years** [10] - 6:23, 10:10, 14:4, 24:5, 24:7, 97:19, 101:7, 126:2, 127:6, 164:3
**yesterday** [6] - 7:11, 46:11, 93:1, 95:2, 95:25, 152:8
**yourself** [3] - 50:5, 50:17, 50:20
**Youtube** [1] - 121:17
**yup** [1] - 41:15